**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MATTHEW STRICKLAND, | ) |
| 11304 Lenoir Court | ) |
| Fredericksburg, VA 22407, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. _____ |
| v. | ) |
| | ) **JURY TRIAL DEMANDED** |
| TECHINT SOLUTIONS GROUP, LLC, | ) |
| 1701 Fall Hill Avenue, Unit 104 | ) |
| Fredericksburg, VA 22401, | ) |
| | ) |
| NOBLIS, INC., | ) |
| 2002 Edmund Halley Drive | ) |
| Reston, VA 20191, | ) |
| | ) |
| and | ) |
| | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff Matthew Strickland, by and through undersigned counsel, brings this action against Defendants TechINT Solutions Group, LLC ("TechINT") and Noblis, Inc. ("Noblis") for whistleblower retaliation under 41 U.S.C. § 4712 and 31 U.S.C. § 3730(h); against the United States of America for intentional infliction of emotional distress under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671– 2680; against Noblis for tortious interference with contractual and business relations under Virginia law; and against all Defendants for declaratory and injunctive relief; and alleges as follows:

1

## PRELIMINARY STATEMENT

1. This is a retaliation case. For more than a year, Matthew Strickland served as an analyst on the Department of Homeland Security's ("DHS") Countering Weapons of Mass Destruction ("CWMD") contract. He held a Top Secret/SCI clearance. He was exceptionally productive. His first-line supervisor gave him a strongly positive annual evaluation one week before he was fired. CWMD management was in the process of creating a new position to move him to the Strategy team. And yet, on the evening of May 15, 2025, he was summarily banned from DHS property and removed from the contract—because, as the DHS CWMD Assistant Secretary told him on a telephone call that same evening, "one of the four horsemen" had called to demand his firing, and temporary DHS senior advisor Corey Lewandowski was angry.

2. Mr. Strickland was fired because he had, over the course of his tenure, done exactly what federal whistleblower statutes protect. He disclosed, to officials responsible for federal contract oversight, a draft interagency intelligence product that recommended unlawful surveillance of American hurricane victims. He disclosed CWMD's neglect of credible drone-borne chemical, biological, radiological, and nuclear threat reporting. He disclosed the suppression of a unanimous interagency memorandum recommending that illicit fentanyl be designated a Weapon of Mass Destruction—a memorandum that, on information and belief, DHS political leadership blocked based on anticipated pharmaceutical-industry impacts. And, directly triggering the reprisal, he publicly supported a fellow DHS whistleblower—then-Acting FEMA Director Cameron Hamilton—who had been terminated days earlier for refusing to execute directives concerning the diversion of FEMA disaster funds and unauthorized FEMA expenditures.

3. The evidence of retaliatory motive is direct and substantial. On the evening of May 15, 2025, at approximately 7:30 p.m. ET, CWMD Assistant Secretary David Richardson telephoned Mr. Strickland and told him that "one of the four horsemen"—a nickname DHS

insiders use for four political staffers working for Secretary Kristi Noem, at least three of whom are Troup Hemenway, Joe Guy, and Josh Whitehouse—had just called to complain about a Strickland social-media post defending Hamilton. Richardson told Mr. Strickland that "the four horsemen" wanted him fired over the post, and said, verbatim, "you gave them ammo to fire you man." Within the hour, TechINT called to inform Mr. Strickland that DHS officials had banned him from DHS property, that Noblis had been so informed, and that he was no longer allowed to report to work. Mr. Strickland also possesses a contemporaneous text message from a senior DHS official who was involved in the events, in which that official expressly identifies Corey Lewandowski by name as the individual who contacted DHS leadership and demanded Mr. Strickland's termination. That text message confirms what Richardson said on the phone: the firing was ordered at the senior political level, not made independently by the contractor.

4.      Defendants TechINT (Mr. Strickland's direct employer and a DHS subcontractor) and Noblis (the prime contractor on the DHS CWMD contract) are the entities Congress made answerable for contractor whistleblower retaliation under 41 U.S.C. § 4712 and 31 U.S.C. § 3730(h). Both statutes run against the contractor, not against the federal officials who instigated the reprisal. That is a deliberate feature of the statutory scheme: Congress placed the legal burden on contractors to resist unlawful requests from federal officials. Under 41 U.S.C. § 4712(a)(3)(B), a reprisal is not shielded from liability merely because it was "undertaken at the request of an executive branch official" unless the request "takes the form of a non-discretionary directive and is within the authority of the executive branch official making the request." No such directive existed here. The request to remove Mr. Strickland came through the political channel—from a "senior advisor" with no statutory line-authority over contractor personnel, and through political

staffers acting on his behalf—not through any contracting officer invoking any contract clause or any lawful termination-for-cause process.

5. The United States is separately answerable under the Federal Tort Claims Act for the intentional infliction of emotional distress that DHS officials—acting within the scope of their federal employment—inflicted through a sustained, orchestrated campaign of harassment, professional isolation, and humiliation that culminated in Mr. Strickland's abrupt public removal. Mr. Strickland presented an administrative tort claim on Standard Form 95 to DHS on December 16, 2025, and more than six months have elapsed without final disposition. His FTCA claim is therefore ripe under 28 U.S.C. § 2675(a).

6. Mr. Strickland exhausted his administrative remedies under 41 U.S.C. § 4712 by filing a detailed whistleblower-retaliation complaint with the DHS Office of Inspector General on September 3, 2025. More than 210 days have passed without any order, and no extension has been agreed to. He is accordingly deemed to have exhausted all administrative remedies under § 4712(c)(2). He also has a timely claim under 31 U.S.C. § 3730(h), which has a three-year limitations period that runs from the date of retaliation. The two statutes are independent and cumulative: § 4712(e) expressly preserves "a right or remedy otherwise available to the employee," and Mr. Strickland invokes both. Mr. Strickland seeks full make-whole relief, including reinstatement, back pay (doubled as to the § 3730(h) count pursuant to 31 U.S.C. § 3730(h)(2)), front pay, compensatory damages for reputational harm and emotional distress, special damages, punitive damages as to the Virginia tortious-interference count, attorneys' fees and costs, declaratory and injunctive relief, and any other relief this Court deems proper.

**JURISDICTION AND VENUE**

7.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question); 41 U.S.C. § 4712(c)(2), which vests district courts with jurisdiction over de novo whistleblower-reprisal actions "without regard to the amount in controversy"; 31 U.S.C. § 3730(h), which provides for a civil action in the appropriate United States district court; and 28 U.S.C. § 1346(b)(1), which vests the district courts with exclusive jurisdiction over civil actions on claims against the United States for money damages for the negligent or wrongful acts or omissions of federal employees acting within the scope of their employment. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's Virginia common-law tortious-interference claim because that claim forms part of the same case or controversy as the federal claims. Plaintiff's claims for declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 rest on the Court's original federal-question jurisdiction over the federal statutory claims to which they relate.

8.     Venue is proper in this District. As to the claims against TechINT and Noblis, venue lies under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to those claims occurred in the District of Columbia. As to the claim against the United States under the Federal Tort Claims Act, venue lies under 28 U.S.C. § 1402(b) because the acts and omissions complained of—the harassing, isolating, and demeaning supervisory conduct of the responsible DHS officials, and the directive effecting Mr. Strickland's removal—occurred in the District of Columbia, where those officials acted and where Mr. Strickland performed his duties; and, to the extent applicable to the United States as a defendant, venue also lies under 28 U.S.C. § 1391(e)(1). Mr. Strickland performed his CWMD contract duties at the DHS CWMD offices on the St. Elizabeths Campus in Washington, D.C. The retaliatory directive originated with DHS officials in the District of Columbia and was conveyed from DHS headquarters in Washington, D.C. The four horsemen, Corey Lewandowski, Secretary Noem, and Deputy Secretary Edgar

operate out of DHS headquarters in Washington, D.C. The DHS official X-account post publicly disclaiming Mr. Strickland's federal ties was published from the District of Columbia. And Mr. Strickland's access to his worksite in the District of Columbia was revoked as part of the reprisal.

9.      This action is timely. Mr. Strickland filed his § 4712 complaint with the DHS Office of Inspector General on September 3, 2025. No order has issued, no extension was agreed to under § 4712(b)(2)(B), and more than 210 days have elapsed. Mr. Strickland is therefore deemed to have exhausted all administrative remedies under 41 U.S.C. § 4712(c)(2) and may bring this de novo action. As to 31 U.S.C. § 3730(h), the retaliation occurred on May 15, 2025, well within the three-year limitations period prescribed by § 3730(h)(3). As to the claim against the United States, Mr. Strickland presented an executed Standard Form 95 to the Department of Homeland Security on December 16, 2025, claiming a sum certain of $7,000,000; more than six months have elapsed without final disposition; and the claim is therefore deemed denied and ripe for suit under 28 U.S.C. § 2675(a). The Virginia tortious-interference claim is brought within the applicable Virginia limitations period.

**PARTIES**

10.      Plaintiff Matthew Strickland is a citizen and resident of the Commonwealth of Virginia. He resides at 11304 Lenoir Court, Fredericksburg, Virginia 22407. At all times relevant to this Complaint, Mr. Strickland was employed as an analyst on the DHS CWMD contract and held an active Top Secret/Sensitive Compartmented Information (TS/SCI) clearance. He is a "covered employee" within the meaning of 41 U.S.C. § 4712(a)(1) and an "employee, contractor, or agent" within the meaning of 31 U.S.C. § 3730(h)(1).

11.      Defendant TechINT Solutions Group, LLC is a Virginia limited liability company with its principal place of business at 1701 Fall Hill Avenue, Unit 104, Fredericksburg, Virginia

22401. TechINT was Mr. Strickland's direct employer at all relevant times. TechINT was a subcontractor to Noblis on the DHS CWMD contract. TechINT is a "contractor" or "subcontractor" within the meaning of 41 U.S.C. § 4712(a)(1) and an employer within the meaning of 31 U.S.C. § 3730(h)(1).

12.    Defendant Noblis, Inc. is a Virginia non-stock corporation with its principal place of business at 2002 Edmund Halley Drive, Reston, Virginia 20191. At all relevant times, Noblis was the prime contractor on the DHS CWMD contract under which Mr. Strickland performed his duties. Noblis is a "contractor" within the meaning of 41 U.S.C. § 4712(a)(1) and an employer within the meaning of 31 U.S.C. § 3730(h)(1). On the evening of May 15, 2025, DHS officials communicated to Noblis that Mr. Strickland was to be barred from DHS property, and Noblis in turn conveyed that communication to TechINT, which employed Mr. Strickland. On information and belief, under the structure of the prime contract and the Noblis–TechINT subcontract, Noblis possessed contractual authority over the staffing of personnel on the CWMD contract, including the authority to approve, place, retain, reassign, and remove subcontractor personnel from the engagement, such that TechINT could not retain Mr. Strickland on the contract over Noblis's direction. On information and belief, Noblis had the ability to decline to execute, or to seek a lawful basis for, the demand before it was carried out, and the ability to reassign Mr. Strickland to other Noblis or TechINT contract work not located at the DHS property from which he had been barred; Noblis did neither. Noblis did not request a written contracting-officer instruction, did not verify that the demand came from an official with authority over contractor personnel, did not inquire into the basis for the removal, and did not afford Mr. Strickland any process. Instead, with knowledge that the demand originated from DHS political personnel rather than from a contracting officer exercising lawful authority under the CWMD contract, Noblis conveyed and effected Mr.

Strickland's removal. By exercising its contractual authority over Mr. Strickland's placement to carry out the removal rather than to resist or mitigate it, Noblis took action functionally equivalent to an adverse employment action against him and participated in the reprisal, and is subject to liability under 41 U.S.C. § 4712.

13.    Defendant the United States of America is the proper defendant for the claim brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671– 2680. The tortious conduct described herein was committed by employees of the Department of Homeland Security acting within the scope of their federal employment.

## FACTUAL ALLEGATIONS

### A.    Mr. Strickland's Role on the DHS CWMD Contract

14.    In March 2024, Mr. Strickland joined the mission of the Information and Analysis Directorate ("IAD"), a directorate within the Department of Homeland Security's Countering Weapons of Mass Destruction Office ("CWMD"), as an analyst employed by TechINT as a subcontractor to Noblis. IAD is a component of CWMD; it is not the Department's separate Office of Intelligence and Analysis ("I&A"), which is a distinct office within DHS headed by an Under Secretary. Neither CWMD nor IAD is an element of the intelligence community as defined in 50 U.S.C. § 3003(4); the DHS element of the intelligence community listed in that provision is the Office of Intelligence and Analysis, not CWMD or IAD. Mr. Strickland held a TS/SCI clearance throughout his tenure, sponsored by TechINT through Noblis for the CWMD contract, and performed his duties on the St. Elizabeths Campus in Washington, D.C.

15.    Mr. Strickland's analytic portfolio included fentanyl-as-WMD policy, drone-borne CBRN threats, the origin of COVID-19, foreign genomic-weapons programs, interagency intelligence sharing, and cross-component coordination between IAD, CWMD, DHS, and other

government agencies and departments. Senior CWMD personnel credited him with greater productivity in his tenure than many employees had achieved over periods of a decade. His first-line supervisor, Desiree Dawson (GS-14), gave him a strongly positive annual evaluation within approximately one week of his firing. CWMD management—specifically Assistant Secretary (AS) David Richardson (the head of CWMD) and Mike Kangior (GS-15) had, recognizing Mr. Strickland's productivity and the hostility he was encountering in IAD from Deputy Assistant Secretary (DAS) Steve Griffin (SES and the head of IAD) and Carlos Joyner (GS-15) (Griffin's second-in-command), already created a new position on the CWMD Strategy team to move Mr. Strickland out of IAD. The CWMD Contracting Officer's Representative (COR) Kelly Muffoletto was informed and approved. Mr. Strickland was to fill that position imminently.

16.    The morning of May 15, 2025, at approximately 10:00 a.m., Mr. Strickland met with DAS Steve Griffin and informed him that he would be moving to the new CWMD Strategy team position. In that meeting, Griffin told Mr. Strickland that he hoped there was "no ill will" over the reporting requirements to which Mr. Strickland had been subjected, explaining that because he and Joyner were Mr. Strickland's supervisors, they "just wanted to know" what Assistant Secretary Richardson had Mr. Strickland working on—an acknowledgment, from Griffin himself, that the escalating reporting demands were directed at surveilling Mr. Strickland's work for Richardson. Mr. Strickland responded that the reporting requirements, and the other harassment he had endured in IAD, were egregious, and informed Griffin that Mr. Funicello had suggested he file a hostile-workplace grievance. Griffin acknowledged that filing a grievance was Mr. Strickland's right and directed him to obtain the reporting process from Mr. Funicello. The two shook hands, Griffin agreed the move was appropriate and wished Mr. Strickland well, and Mr. Strickland left his office. At no point in that meeting—or at any prior time—did Griffin or anyone

9

else suggest that any of Mr. Strickland's work was outside the scope of his contract. Approximately nine and a half hours later, that same day, Mr. Strickland was fired.

**B.     Protected Disclosure #1 — The October 2024 Intelligence & Analysis (I&A) "Hurricane Helene" Surveillance Report**

17.     In October 2024, Mr. Strickland, in his capacity as a CWMD IAD analyst, received a draft interagency product that had been produced by I&A and circulated to other offices, including CWMD IAD, for courtesy review and comment before publication. Mr. Strickland was not an employee of I&A, did not perform intelligence work for I&A, and was included on the review distribution only as a non-intelligence-community reviewer. The draft product carried an implied recommendation that DHS monitor American victims of Hurricane Helene for purported "conspiracy theories" and "misinformation" on social media. Mr. Strickland identified multiple factual inaccuracies in the underlying reporting and flagged that the recommended surveillance posture would implicate the First Amendment rights of American citizens, exceed DHS's lawful authorities, and damage public trust in the agency and in federal contractors performing work for it.

18.     Mr. Strickland raised these concerns in writing to his chain of command—federal employees responsible for contract and grant oversight at the agency—as contemplated by 41 U.S.C. § 4712(a)(2)(D). His concerns were ignored. The report proceeded uncorrected. The disclosure was protected under § 4712 because Mr. Strickland reasonably believed it evidenced gross mismanagement of a federal contract, abuse of authority relating to a federal contract, and a violation of law.

**C.     Protected Disclosure #2 — Neglect of Drone-Borne CBRN Threats**

19.     Beginning in December 2024, Mr. Strickland repeatedly alerted IAD leadership of credible news reports of thousands of unexplained drone sightings across the East Coast of the

U.S., to include Virginia and Washington D.C. Mr. Strickland reminded IAD leadership of intelligence reporting on drones that could be adapted to deliver chemical, biological, radiological, or nuclear payloads—threats squarely within CWMD's core statutory mission. He asked on multiple occasions why CWMD, in particular IAD, was not even discussing these possible drone threats. His supervisors dismissed the reporting as "not our lane," and the intelligence streams were deprioritized. The disclosure was protected under § 4712 because Mr. Strickland reasonably believed the neglect of these threat streams evidenced gross mismanagement of the CWMD contract, abuse of authority relating to that contract, and a substantial and specific danger to public health and safety.

**D.    Protected Disclosure #3 — Fentanyl as a Weapon of Mass Destruction and Suppression of the Interagency Memorandum**

20.    Throughout his tenure, Mr. Strickland participated in interagency working groups—including components of the Department of Defense—addressing the illicit-fentanyl crisis. Those working groups reached unanimous consensus that illicit fentanyl should be formally designated a Weapon of Mass Destruction. That designation would have unlocked more than 150 federal statutory authorities, including enhanced sanctions targeting foreign producers, expanded intelligence-sharing authorities, and new federal prosecutorial tools.

21.    Based on information learned through his participation in interagency working-group sessions and discussions with federal counterparts, Mr. Strickland understood that a memorandum reflecting the interagency consensus was prepared for transmission to the President, and that DHS political leadership—including, on information and belief, senior advisor Corey Lewandowski and Deputy Secretary Troy Edgar—blocked the memorandum from moving forward based on anticipated impacts to the pharmaceutical industry. The suppression of the memorandum was not undertaken to protect public health. It was undertaken notwithstanding the

11

federal contract work-product the interagency group had produced, and notwithstanding the federal contract and grant obligations owed by DHS's contractor workforce.

22.     Mr. Strickland repeatedly questioned the suppression of the memorandum in meetings and to his chain of command. The disclosure was protected under 41 U.S.C. § 4712 because Mr. Strickland reasonably believed the suppression evidenced gross mismanagement of federal contracts, abuse of authority relating to federal contracts, a substantial and specific danger to public health and safety, and a violation of law.

23.     The suppression also implicated the False Claims Act. Mr. Strickland reasonably believed that the contract deliverables produced on the fentanyl-WMD issue were being suppressed while the contracting entities—including Noblis, with which DHS had a contractual relationship, and ultimately the federal government—continued to represent, and bill for, substantive and complete work product on CBRN-threat policy. Mr. Strickland's objections were efforts to stop conduct he reasonably believed implicated false claims or false certifications to the federal government about the status of federally-funded CBRN policy work.

**E.    Protected Disclosure #4 — The Early-May 2025 Public Support for Cameron Hamilton and the Lewandowski FEMA Diversions**

24.     By early May 2025, Mr. Strickland had learned—through the interagency process, through his cross-component work at CWMD, and through conversations with federal personnel involved in FEMA operations—that Corey Lewandowski, operating as a temporary "senior advisor" to Secretary Noem, had been effectively directing DHS operations without Senate confirmation or any statutory line-authority over DHS components. Based on that information, Lewandowski had sought to route approximately $55 million in FEMA disaster-relief funds to Louisiana Governor Jeff Landry, a former Lewandowski client, under a disaster declaration premised on a single shooting incident. Acting FEMA Director Cameron Hamilton, on direction

from Lewandowski, sent that fund request to the White House for approval. The White House subsequently denied the authorization to release those funds. When Hamilton advised Lewandowski that the request was denied, Lewandowski then demanded Hamilton release the funds to Governor Landry anyway. Hamilton refused, which created an ongoing rift between Lewandowski and Hamilton. On further information and belief, Hamilton was directed by Noem's legal counsel to direct FEMA expenditures to New York City, which were then used to house illegal migrants outside of normal FEMA grant processes and without required White House approval. Hamilton executed those orders believing they were initiated by the White House since they were coming from Noem's legal counsel. Upon learning of the expenditures, President Trump and members of the White House staff were angry and disapproved. Lewandowski shifted blame for the release of those funds to Hamilton, although direction came from Noem's legal counsel, which added fuel to the rift between Hamilton and Lewandowski.

25.    Acting FEMA Director Cameron Hamilton refused to execute multiple directives given by Noem and Lewandowski he believed to be unethical. On or about May 8, 2025, Hamilton was terminated. Press reporting in the days that followed described the circumstances of Hamilton's removal, including his refusal to direct federal disaster funds to Governor Landry and his refusal to direct unauthorized FEMA expenditures.

26.    In the days immediately following Hamilton's termination, Mr. Strickland posted on X (@MattForVA) in support of Hamilton. Mr. Strickland's posts did not name Lewandowski or any other specific DHS official. He did not discuss his employment at DHS, and after examination of the post, Skip Funicello (TechINT owner) agreed that the post did not violate Mr. Strickland's contract in any way. The post described a pattern Mr. Strickland had observed: that a temporary senior advisor was effectively directing DHS without formal authority; that the Acting

FEMA Director had been fired for refusing to redirect federal disaster funds; and that DHS was prioritizing political directives over mission.

27.     Mr. Strickland's post was an effort to stop conduct he reasonably believed involved fraud on the federal government and violations of federal contract and grant law. The alleged FEMA diversions, if executed, would have constituted false certifications to the federal government that qualifying disaster conditions existed when in fact they did not, and would have resulted in federal funds being paid out on false pretenses.

**F.     The Retaliation: Warnings, Isolation, and Termination**

28.     Beginning earlier in Mr. Strickland's tenure, AS Richardson had personally selected Mr. Strickland to serve as the IAD representative at Richardson's complex-problem-solving meetings and to work with the CWMD policy, strategy, and management team on a forward strategy and action plan for the directorate. Richardson deliberately kept DAS Griffin and Carlos Joyner out of these matters because, as Richardson explained to Mr. Strickland, he did not trust them and intended that both be removed. Griffin and Joyner resented Mr. Strickland's selection. Mr. Strickland was thereby placed between competing directions from his nominal superiors in IAD and from the Assistant Secretary above them.

29.     In approximately late April and early May 2025, Joyner escalated a campaign of harassment against Mr. Strickland. What began as informal hallway demands to know what Richardson had assigned to Mr. Strickland progressed to formal demands—routed through Noblis—that Mr. Strickland report his weekly meetings and projects, then that he provide ever greater detail, and finally that he report his meetings, projects, and any conversations he had with others on a daily basis. No other person on the contract was subjected to any comparable daily-reporting requirement. The requirement served no legitimate supervisory purpose; it was imposed

to surveil, burden, and demean Mr. Strickland. Mr. Strickland complied with each demand and copied TechINT owner Skip Funicello on his submissions so that there could be no pretext for discipline; Mr. Funicello acknowledged that the submissions were sufficient. Mr. Strickland complained to Mr. Funicello that the daily-reporting demand was harassment, and Mr. Funicello agreed that it was.

30.    Also around April of 2025, Mr. Funicello called Mr. Strickland and informed him that someone in IAD leadership had called Noblis to complain about a May 2024 *New York Post* (NYP) article that Mr. Strickland was quoted in. The article was about an incident totally unrelated to DHS in which two Jordanian nationals almost breached the front gate at Quantico Marine Corps Base. The NYP reporter reached out to Mr. Strickland because he had known him for years. He knew that Mr. Strickland had extensive experience in both Iraq and Afghanistan, and wanted his opinion on what the reason for the attempted breach may have been. Mr. Strickland gave the reporter his opinion on the matter as a private citizen and did not discuss any employment at DHS. Mr. Funicello expressed to Mr. Strickland that IAD leadership wanted him fired for his contribution to this article. Mr. Funicello told Mr. Strickland that he was obviously being targeted, and that his contribution in this NYP article in no way violated his contract at DHS. He conveyed to Mr. Strickland that he was told by Noblis CWMD Project Manager Ed Nickerson that "someone in IAD leadership (Mr. Funicello wasn't given a name) has it out for you, and they told Ed that you won't have top-cover from AS Richardson forever." Mr. Funicello informed Mr. Strickland to "watch his back at work" because DAS Griffin and Carlos Joyner wanted him gone.

31.    Shortly after Mr. Strickland's early-May 2025 X post appeared, Mr. Strickland was warned by DHS officials that senior political figures, including Corey Lewandowski, were displeased with his public conduct. The pre-existing hostility from Joyner and Griffin then

15

converged with the political anger of Corey Lewandowski and the four horsemen to produce Mr. Strickland's removal.

32.    On May 15, 2025, at approximately 10:00 a.m., Mr. Strickland informed DAS Steve Griffin, the head of IAD, that he would be moving to the newly-created CWMD Strategy team position. In that same meeting, Mr. Strickland told Griffin that the reporting requirements and other harassment he had experienced in IAD were egregious and that he intended to pursue a hostile-workplace grievance, and Griffin acknowledged his right to do so. Griffin agreed the move was appropriate and wished Mr. Strickland well, and raised no concern of any kind about the propriety or scope of Mr. Strickland's work. That same day, Mr. Strickland was fired.

33.    At approximately 7:30 p.m. ET on May 15, 2025, Mr. Strickland received a telephone call from CWMD Assistant Secretary David Richardson. Richardson told Mr. Strickland that he had just received a telephone call from "one of the four horsemen"—a nickname given by DHS insiders to four political staffers, at least three of whom are Troup Hemenway, Joe Guy, and Josh Whitehouse, who worked for Secretary Noem. Richardson told Mr. Strickland that the four horsemen were angered by his X post defending Hamilton, that they wanted Mr. Strickland fired over it, and that, in Richardson's own words, "you gave them ammo to fire you man."

34.    Less than an hour after Richardson's call, Mr. Strickland received a telephone call from TechINT owner, Skip Funicello. Mr. Funicello informed Mr. Strickland that Noblis had called TechINT to convey that DHS officials had banned Mr. Strickland from DHS property, and that he was no longer allowed to report to work. Mr. Strickland's contract access was revoked that evening.

35.    Mr. Strickland also possesses a contemporaneous text-message exchange with a senior DHS official involved in these events. In those messages, the official expressly identifies

16

Corey Lewandowski by name as the individual who contacted DHS leadership and demanded that Mr. Strickland be fired. The text message is a contemporaneous business record created in the regular course of communications between Mr. Strickland and the DHS official. It independently confirms what Richardson had said on the phone: the firing was ordered at the senior political level, it was not an independent contractor decision, and it was not based on performance. The text-message exchange was preserved by Mr. Strickland in the ordinary course, remains in his possession, and will be produced in discovery.

36. On May 16, 2025 and thereafter, DHS published a statement on its official X account claiming that Mr. Strickland was not a federal employee and that "contractors alone" handled his termination. That public statement was false. DHS officials had in fact ordered Mr. Strickland's removal from the contract; Noblis and TechINT had executed that directive within the hour; and AS Richardson had said so to Mr. Strickland directly in real time. The DHS public statement inflicted additional reputational harm on Mr. Strickland and publicly advertised to prospective employers in the national-security-contracting space that Mr. Strickland had been fired under circumstances that DHS refused to claim responsibility for.

37. When the removal was first communicated, no reason was given for it at all. TechINT owner Skip Funicello telephoned Mr. Strickland within an hour of AS Richardson notifying Mr. Strickland that "one of the four horseman wanted him fired for his X post" on the evening of May 15, 2025 and told him, in substance, that Noblis had called to relay that DHS had directed that Mr. Strickland was not allowed on the property the following day. Mr. Funicello did not know whether Mr. Strickland was being fired, he simply said, "I was informed by Noblis who was informed by DHS that you're not allowed on DHS property tomorrow" and was given no reason for the property ban. Mr. Funicello, an experienced government contractor, remarked that

he had never received a communication of that kind—an employee barred from the property with no reason and no stated termination—and that it was highly unusual.

38.     Mr. Strickland contacted Skip Funicello multiple times the following day and asked if he was given a reason for the property ban, and if he was in fact removed from the contract. Mr. Funicello informed Mr. Strickland each time that he had not heard anything from Noblis nor DHS. He informed Mr. Strickland that he had called Noblis several times to get answers, but had not received an answer, nor a call back. Only approximately two days later did DHS and the contractors supply a purported justification—that Mr. Strickland "may have been working on things outside of his contract." That justification was false and pretextual. The work Mr. Strickland performed had been directed by the Assistant Secretary of CWMD himself. Mr. Strickland had never, at any time, been counseled, warned, reprimanded, or even informally told that any of his work fell outside the scope of his contract—including by DAS Griffin, with whom he had discussed his promotion to the Strategy team on the very morning of the firing. The shifting and delayed rationale—an unexplained property ban first, a manufactured "outside the contract" reason two days later—is evidence that the stated reason was a pretext for retaliation. On information and belief, Assistant Secretary Richardson, Mike Kangior, and Akram Kahn will confirm that the "outside the contract" rationale was false and that Mr. Strickland's work had been authorized and directed at the Assistant Secretary level.

## G.   Defendants TechINT and Noblis Executed the Removal Without Any Lawful Directive from an Authorized Official

39.     Neither Noblis nor TechINT received a lawful, non-discretionary directive from a federal official acting within the scope of delegated authority to terminate Mr. Strickland's contract participation. The request that moved TechINT and Noblis to remove Mr. Strickland originated with: (i) Corey Lewandowski, a temporary "senior advisor" with no Senate-confirmed role and no

statutory line-authority over contractor personnel on the DHS CWMD contract; (ii) the "four horsemen" political staffers acting at Lewandowski's behest and on behalf of Secretary Noem; and (iii) Assistant Secretary Richardson, who explicitly told Mr. Strickland that the removal demand was driven by the political complaint about his X post.

40.    No contracting officer with authority over the DHS CWMD contract issued any termination-for-cause determination. No contract clause was invoked. No performance-deficiency determination was made through any lawful administrative process. No investigation preceded the removal. Noblis and TechINT simply acted on a political demand. In fact, Lewandowski and the "four horseman" were so infuriated by Mr. Strickland's public post in support of Cameron Hamilton that they directed DHS personnel to not even allow Mr. Strickland on DHS property to turn in his DHS issued laptop and equipment. Skip Funicello relayed this message to Mr. Strickland and asked Mr. Strickland to meet him at the VA clinic parking lot in Fredericksburg, VA to obtain the DHS issued equipment. At that meeting Mr. Funicello apologized to Mr. Strickland for the unlawful termination. He said, "they really screwed you, stuff like this makes me want to sell my company and get away from government contracting."

41.    Under 41 U.S.C. § 4712(a)(3)(B), reprisal is not shielded from liability merely because it was "undertaken at the request of an executive branch official," unless the request "takes the form of a non-discretionary directive and is within the authority of the executive branch official making the request." The May 15, 2025 removal request satisfied neither requirement. It was not a non-discretionary directive—it was a political demand conveyed through informal telephone calls. And it was not within the authority of the officials making it—Lewandowski had no line-authority over contractor personnel, political staffers had still less, and Richardson's own statement to Mr. Strickland ("you gave them ammo to fire you") confirms that Richardson himself

19

understood the removal as a political response to protected speech rather than as a lawfully-compelled contract action.

42.    Noblis and TechINT had the ability, and the legal obligation under § 4712(a)(3)(B), to decline to execute the request pending a lawful contract process. They did not. They were aware of the relentless harassment endured over the previous months, and they were aware that this termination demand came from Lewandowski over a protected X post. Skip Funicello was forwarded the X post by Mr. Strickland and confirmed to Mr. Strickland that the post did not violate his contract in any way, and that it was protected speech. They are therefore not shielded by the safe-harbor provision of § 4712(a)(3)(B).

## H.   The Orchestrated Campaign of Harassment and Humiliation

43.    Independent of the removal from the contract, DHS and contractor personnel subjected Mr. Strickland to a sustained campaign of harassment, professional isolation, and humiliation over a period of months. That campaign included the deliberate professional isolation of Mr. Strickland within the workplace; the escalating demands, routed through Noblis, that he account for his meetings, projects, and even his conversations; and the imposition of a uniquely burdensome daily-reporting requirement imposed on no other person and designed to surveil, single out, and demean him for no other reason than AS Richardson taking favor in his ability to perform over IAD leadership. This conduct served no legitimate supervisory purpose, was carried out to punish and demean Mr. Strickland, was extreme and outrageous, was undertaken intentionally or with reckless disregard for the severe emotional distress it would cause, and did cause Mr. Strickland severe emotional distress.

**I.    Harm**

44.    Mr. Strickland has suffered substantial economic, professional, and emotional harm. Although his TS/SCI clearance remains active, the circumstances of his removal—coupled with DHS's false public statement disclaiming responsibility for it—have made him effectively unhireable at the level of seniority he has in the national-security contracting space in which he had built his career.

45.    He has suffered lost wages, lost benefits, and lost future earning capacity in amounts to be proven at trial. He has suffered reputational harm flowing from the public and politically-orchestrated nature of the reprisal, including DHS's publicly-issued statements about his employment status. He has suffered serious emotional distress flowing from the orchestrated, political, and public nature of the reprisal. And he has suffered the particularized harm of being singled out as a warning to other federal-contractor employees who might otherwise disclose wrongdoing.

**ADMINISTRATIVE EXHAUSTION**

46.    On September 3, 2025, Mr. Strickland, through counsel, submitted a detailed whistleblower-retaliation complaint under 41 U.S.C. § 4712 to the DHS Office of Inspector General's Whistleblower Protection Unit. That complaint identified the protected disclosures, the retaliatory acts, and the responsible DHS officials. A copy of the OIG complaint is incorporated by reference and will be produced in discovery.

47.    More than 210 days have passed since submission of the OIG complaint. The head of the executive agency has not issued an order. No extension of time was agreed to under 41 U.S.C. § 4712(b)(2)(B). There has been no showing—and there cannot be a showing—that any delay is due to bad faith on the part of the complainant. Accordingly, under 41 U.S.C. § 4712(c)(2),

Mr. Strickland is "deemed to have exhausted all administrative remedies with respect to the complaint," and he may bring this de novo action. No administrative exhaustion is required under 31 U.S.C. § 3730(h).

48. As to the claim against the United States, Mr. Strickland presented an executed Standard Form 95 to the Department of Homeland Security, Office of the General Counsel, Claims Division, on December 16, 2025, asserting a sum certain of $7,000,000. More than six months have elapsed since presentment without final disposition of the claim. Under 28 U.S.C. § 2675(a), Mr. Strickland may treat that failure as a final denial and bring suit. Mr. Strickland has therefore exhausted his administrative remedies as to his Federal Tort Claims Act claim.

## COUNT I — WHISTLEBLOWER RETALIATION UNDER 41 U.S.C. § 4712
### (Against TechINT Solutions Group, LLC and Noblis, Inc.)

49. Mr. Strickland realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

50. At all relevant times, Mr. Strickland was an employee of a subcontractor (TechINT) under a federal contract with DHS, and was therefore a "covered employee" within the meaning of 41 U.S.C. § 4712(a)(1). TechINT and Noblis are, respectively, a "subcontractor" and a "contractor" within the meaning of § 4712(a)(1). As to Noblis, the company exercised functional control over Mr. Strickland's placement on the CWMD contract and took action functionally equivalent to an adverse employment action by conveying and effecting his removal; Noblis is therefore a proper defendant under § 4712.

51. Mr. Strickland made multiple protected disclosures within the meaning of 41 U.S.C. § 4712(a)(1), to persons and bodies enumerated in § 4712(a)(2)—including federal employees responsible for contract and grant oversight or management at DHS (§ 4712(a)(2)(D));

22

the DHS Office of Inspector General (§ 4712(a)(2)(B)); and interagency working-group participants (including officials of the Department of Defense) who participated in the fentanyl-WMD policy process. He reasonably believed those disclosures constituted evidence of (a) gross mismanagement of federal contracts, (b) gross waste of federal funds, (c) abuse of authority relating to federal contracts, (d) substantial and specific danger to public health and safety, and (e) violations of law, rule, or regulation relating to federal contracts. His disclosures concerning the neglect of drone-borne CBRN threats and the suppression of the fentanyl-WMD work product bore a direct nexus to the subject matter of the DHS CWMD contract on which he worked and squarely satisfy § 4712's requirement that the disclosure relate to a Federal contract. His disclosures concerning the Hurricane Helene surveillance product and the FEMA matters constitute additional and alternative protected disclosures and, at a minimum, evidence the abuse of authority and danger to public health and safety that § 4712 protects. The intelligence-community exception in 41 U.S.C. § 4712(f) does not bar Mr. Strickland's claim. Mr. Strickland was not an employee of a contractor or subcontractor of an element of the intelligence community: his employer worked the CWMD contract, and neither CWMD nor its IAD directorate is an element of the intelligence community under 50 U.S.C. § 3003(4). His disclosures concerning the neglect of drone-borne CBRN threats, the suppression of the fentanyl-WMD work product, and the FEMA matters were CWMD matters that did not relate to any activity of an element of the intelligence community and were not discovered during services provided to any such element. In any event, each of those disclosures is independently protected, and Mr. Strickland's claim does not depend on the Hurricane Helene disclosure; even if that single disclosure were treated as relating to an activity of an intelligence-community element, the remaining disclosures independently satisfy § 4712 and are not within any exception.

52.     Defendants discharged Mr. Strickland on May 15, 2025 and removed him from the DHS CWMD contract. That discharge is a "reprisal" within the meaning of 41 U.S.C. § 4712(a)(1).

53.     Mr. Strickland's protected disclosures were a contributing factor to his discharge within the meaning of 41 U.S.C. § 4712(c)(6), which incorporates the burden-shifting framework of 5 U.S.C. § 1221(e). His disclosures concerning the neglect of drone-borne CBRN threats and the suppression of the fentanyl-WMD work product bore a direct nexus to the subject matter of the CWMD contract on which he worked, were known to the relevant decisionmakers, and are independently protected. His early-May 2025 public statement concerning the FEMA matters were likewise protected activity. The relevant decisionmakers had actual knowledge of Mr. Strickland's protected conduct—including DAS Griffin, whom Mr. Strickland informed, mere hours before his termination on May 15, 2025, that he intended to pursue a hostile-workplace grievance concerning the harassment he had experienced in IAD; the adverse action was taken within days of the triggering event; and the decisionmakers expressly stated that Mr. Strickland's disclosures and public conduct—and the DHS political staff's reaction to them—were the reason for the firing. The close temporal proximity between the protected activity and the discharge is alone sufficient to establish the contributing-factor element. The Richardson telephone call ("you gave them ammo to fire you man") and the contemporaneous text message identifying Lewandowski by name as the individual who demanded the firing together establish causation directly, well beyond the knowledge-plus-timing showing the contributing-factor standard requires.

54.     Defendants cannot carry their burden of showing, by clear and convincing evidence, that they would have taken the same action absent Mr. Strickland's protected disclosures, as required by 41 U.S.C. § 4712(c)(6) and 5 U.S.C. § 1221(e)(2). Mr. Strickland had just received a strongly positive annual evaluation, had been actively sought out by CWMD

management to fill a newly-created position, had no record of formal discipline, and had just informed DAS Griffin of his impending transfer on the very morning of the firing. No performance-based "same decision" defense is credible on these facts.

55.     The safe harbor in 41 U.S.C. § 4712(a)(3)(B) does not shield Defendants. The May 15, 2025 removal request did not take the form of a non-discretionary directive, and it did not come from an official acting within the authority of the office the official held. A "senior advisor" has no statutory line-authority over contractor personnel; political staffers have still less; and Richardson's own statement confirms that the request was a political demand, not a lawful contract directive. Defendants bear the burden of proving the safe harbor applies, and they cannot identify the authorized official, the source of authority, or the mandatory character of any instruction. Defendants' execution of the request without contractual or legal basis cannot be cured by retroactively characterizing it as a "directive."

56.     As a direct and proximate result of Defendants' conduct, Mr. Strickland has suffered and continues to suffer lost wages, lost benefits, lost future earning capacity, reputational harm, and severe emotional distress, all in amounts to be proven at trial. Under 41 U.S.C. § 4712(c)(1)(B) and (C), he is entitled to reinstatement, back pay, all employment benefits and other terms and conditions of employment that would have applied but for the reprisal, compensatory damages, and attorneys' fees and costs.

## COUNT II — FALSE CLAIMS ACT RETALIATION UNDER 31 U.S.C. § 3730(h)
### (Against TechINT Solutions Group, LLC and Noblis, Inc.)

57.     Mr. Strickland realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

58.    At all relevant times, Mr. Strickland was an "employee, contractor, or agent" within the meaning of 31 U.S.C. § 3730(h)(1).

59.    Mr. Strickland engaged in lawful acts in furtherance of "efforts to stop 1 or more violations" of the False Claims Act, within the meaning of 31 U.S.C. § 3730(h)(1). Those lawful acts included, without limitation: (a) his internal reporting and interagency advocacy concerning the suppression of the fentanyl-WMD memorandum, which Mr. Strickland reasonably believed involved false certifications to the federal government concerning the status and integrity of DHS's CWMD contract deliverables; and (b) his early-May 2025 public X post concerning the firing of Acting FEMA Administrator Cameron Hamilton which Mr. Strickland reasonably believed would result in federal funds being obtained or retained through false claims, false certifications, or fraudulent misrepresentations to the federal government. In each instance, Mr. Strickland communicated his concerns in terms of the integrity of federally-funded contract deliverables and the risk that the government was being provided or billed for work product that was incomplete, suppressed, or misrepresented, and in terms of federal funds being paid out or drawn down based on representations that were not supported by fact.

60.    Mr. Strickland acted in good faith and with a reasonable belief that the conduct at issue violated the False Claims Act. His belief was both subjectively held and objectively reasonable based on the information available to him, including direct knowledge from his interagency role of the contract deliverables at issue, the political pressure to suppress them, and the reporting on the Lewandowski FEMA diversions.

61.    Defendants knew, or were on notice, that Mr. Strickland's conduct was protected activity within the meaning of 31 U.S.C. § 3730(h). Mr. Strickland's internal objections concerning the suppression of the fentanyl-WMD memorandum were communicated to his

26

supervisors and colleagues as objections to conduct that he believed was compromising the integrity of federal contract work-product. TechINT owner Skip Funicello had himself witnessed the retaliation against Mr. Strickland and, prior to his discharge, had advised him to file a hostile-work-environment complaint—confirming that they understood his conduct as protected whistleblowing and not as ordinary workplace complaint. Most critically, the DHS reason for demanding Mr. Strickland's firing—as relayed by Richardson—was that Mr. Strickland had publicly exposed conduct the political actors wanted concealed. When Defendants received and executed the DHS removal directive, they did so with actual knowledge that the directive was a response to Mr. Strickland's protected activity, not to performance or contract compliance.

62.     Defendants terminated Mr. Strickland because of his protected activity under § 3730(h)(1). The termination occurred within days of the public post, in direct response to the political reaction to them, and under the circumstances described above.

63.     Under 31 U.S.C. § 3730(h)(2), Mr. Strickland is entitled to "all relief necessary to make [him] whole," including reinstatement with the same seniority status he would have had but for the discrimination; two times the amount of back pay; interest on the back pay; and compensation for any special damages sustained as a result of the discrimination, including emotional-distress damages, damages for reputational and career harm including the blacklisting effect of the reprisal, litigation costs, and reasonable attorneys' fees.

64.     Count II is pleaded in addition to Count I. 41 U.S.C. § 4712(e) expressly provides that "[n]othing in this section may be construed . . . to modify or derogate from a right or remedy otherwise available to the employee." The two statutes impose distinct elements, distinct burdens, and distinct remedies, and Mr. Strickland is entitled to pursue both. To the extent there is any overlap in damages, the Court may apply standard offset principles at judgment; the statutory

27

multipliers and remedies unique to § 3730(h) (including the 2x back pay multiplier and special damages) remain separately available.

## COUNT III — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER THE FEDERAL TORT CLAIMS ACT

### (Against the United States of America)

65.    Mr. Strickland realleges and incorporates by reference the allegations of Paragraphs 14 through 16 (his role on the contract), Paragraph 29 (the escalating daily-reporting harassment directed at him), and Paragraph 43 (the orchestrated campaign of harassment, isolation, and humiliation) as if fully set forth herein. This Count rests solely on the independent course of harassing, isolating, and humiliating conduct described in those paragraphs, and does not rest on, arise out of, or depend upon any allegedly false statement, any communication to third parties, the removal of Mr. Strickland from the contract, or any interference with his contractual relationships.

66.    This claim is brought against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–2680. The DHS officials whose supervisory conduct is described in this Count—including Deputy Assistant Secretary Steve Griffin and Carlos Joyner, who directed and escalated the campaign of harassment, professional isolation, and demeaning daily-reporting demands against Mr. Strickland—were federal officials and "employee[s] of the government" within the meaning of 28 U.S.C. § 2671, and not contractors. Although certain of the demeaning reporting demands were transmitted to Mr. Strickland through Noblis, they were originated, directed, and imposed by Griffin and Joyner, federal officials, and the tortious conduct is therefore that of employees of the United States and not that of any contractor. To the extent Griffin and Joyner acted within the scope of their federal employment, the United States is liable for their conduct. Under District of Columbia law, conduct may fall within the scope of employment, for purposes of respondeat superior, even where it is unauthorized, forbidden, or wrongful, so long as

28

it is incidental to the conduct the employee was employed to perform and is actuated at least in part by a purpose to serve the employer. The supervision, tasking, reporting requirements, and personnel oversight of analysts in IAD were within the ordinary duties of Griffin and Joyner, and the harassing and demeaning manner in which they exercised those supervisory functions was incidental to them. The demands at issue—for reporting of meetings, projects, and conversations—were imposed through the very channels of supervisory tasking and reporting oversight that Griffin and Joyner were employed to administer, and were thus carried out in the conduct of, and at least in part to serve the employer's interest in, the supervision of IAD personnel, however wrongful the manner in which that authority was abused. The United States is therefore liable in the same manner and to the same extent as a private employer would be under the law of the District of Columbia, where the acts occurred. Under 28 U.S.C. § 2674, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances." The relevant private analog is not the abstract supervision of a workforce, but the specific conduct challenged here: an individual who deliberately subjects another person to a sustained campaign of torment, humiliation, and degradation. A private person—including a private supervisor or a private employer acting through its supervisors—who engaged in that specific conduct would be liable for intentional infliction of emotional distress under the law of the District of Columbia. The claim therefore rests on a duty owed by private persons under District of Columbia tort law, not on any duty derived from federal statute, regulation, or the internal management prerogatives of a federal agency. This scope-of-employment allegation is pleaded in the alternative to, and without prejudice to, Plaintiff's allegations in Counts I and IV that the political demand for Mr. Strickland's removal lay outside the lawful authority of the officials who made it.

29

67.     Under District of Columbia law, a claim for intentional infliction of emotional distress requires (1) extreme and outrageous conduct that (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress. The conduct of DHS officials satisfies each element.

68.     The extreme and outrageous conduct consisted of a sustained and orchestrated campaign in which Griffin and Joyner, over a period of weeks and continuing until Mr. Strickland's removal, deliberately set out to torment, degrade, and break a subordinate, and persisted in that course knowing it was inflicting serious distress on him. This was personal mistreatment directed at Mr. Strickland in the workplace, separate and apart from any communication to third parties and separate from the act of removing him from the contract: the deliberate professional isolation of Mr. Strickland; the calculated stripping of his analytic responsibilities to render his presence meaningless; the imposition of uniquely burdensome and demeaning daily-reporting requirements—requiring him to account even for his conversations—imposed on no one else and designed to single him out before his peers and degrade him; and a campaign of escalating hostility designed to surveil, demean, and drive him out. This pattern of conduct, directed at a productive analyst who had just received a strongly positive evaluation and been selected for advancement, was undertaken intentionally to humiliate and break him, was continued after its effect on him was apparent, served no legitimate supervisory purpose, and was not an ordinary personnel action such as a reassignment, a poor evaluation, or a disciplinary investigation, but a deliberate course of torment that exceeds all bounds of decency tolerated in a civilized community.

69.     DHS officials engaged in this conduct intentionally, or with reckless disregard of the near-certainty that severe emotional distress would result. The conduct did in fact cause Mr. Strickland severe emotional distress, including sustained anxiety, sleeplessness, humiliation, and

a profound sense of professional and personal injury arising from being targeted, surveilled, and abruptly cast out of a career and a clearance-dependent profession he had spent years building, the effects of which have persisted since May 2025.

70.    This claim does not arise out of, and is not dependent upon, any libel, slander, misrepresentation, deceit, or interference with contract rights. It rests on independent outrageous conduct—the orchestrated harassment, professional isolation, and demeaning treatment of Mr. Strickland in the workplace—that is itself tortious, and actionable as intentional infliction of emotional distress, without regard to and independent of any false or defamatory statement, any misrepresentation, and any interference with a contractual relationship. Intentional infliction of emotional distress is not among the torts enumerated in 28 U.S.C. § 2680(h), and because this claim does not arise out of any enumerated tort, it is not barred by § 2680(h).

71.    The discretionary-function exception, 28 U.S.C. § 2680(a), does not bar this claim. The exception is confined to governmental decisions grounded in considerations of public policy—the kind of judgment the exception was designed to shield from second-guessing through tort. Subjecting an analyst to professional isolation, demeaning treatment, and a uniquely burdensome daily-reporting requirement imposed on no one else is not a judgment grounded in any policy consideration. It involves no permissible exercise of discretion of the sort § 2680(a) protects, and it is not susceptible to policy analysis. Harassing and demeaning a subordinate serves no governmental policy and reflects no legitimate, policy-grounded choice; conduct of that character falls outside the exception regardless of the rank of the officials who engaged in it.

72.    The scope-of-employment allegation pleaded above and the inapplicability of the discretionary-function exception are not inconsistent. Scope of employment, for purposes of respondeat superior, is a broad concept that can encompass even unauthorized, forbidden, or

wrongful acts incidental to an employee's duties; the discretionary-function exception, by contrast, is a narrow immunity confined to judgments grounded in public policy. Conduct may therefore fall within the scope of employment—so that the United States is answerable for it—while still falling outside the discretionary-function exception, because it is not the kind of policy-grounded judgment the exception shields. That is precisely the case here: Griffin's and Joyner's harassing exercise of their supervisory functions was incidental to their employment, yet it was no protected discretionary choice.

73.     As a direct and proximate result of the conduct of DHS officials, Mr. Strickland has suffered severe emotional distress and related harm. The United States is liable to Mr. Strickland for compensatory damages in an amount not to exceed the sum certain of $7,000,000 presented in his administrative claim, as required by 28 U.S.C. § 2675(b).

## COUNT IV — TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONS

### (Against Noblis, Inc.)

74.     Mr. Strickland realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

75.     At all relevant times, Mr. Strickland had a valid contractual employment relationship with TechINT and a valid business expectancy of continued employment and advancement, including the newly-created CWMD Strategy team position for which he had been selected. Noblis knew of that relationship and that expectancy.

76.     Noblis intentionally interfered with Mr. Strickland's employment relationship and business expectancy by conveying and effecting the demand that he be removed from the contract, thereby causing TechINT to terminate his employment. Noblis was a stranger to that employment relationship: Mr. Strickland's contract of employment was with TechINT alone, Noblis was not a

32

party to it, and was not the agent of TechINT or of Mr. Strickland and did not act within the scope of any agency for either of them. Noblis's separate status as the prime contractor on the Government engagement did not make it a party to, or an agent within, the distinct employment relationship between TechINT and its employee. Noblis was therefore a third party capable of tortiously interfering with that relationship.

77.    Noblis used improper methods. Noblis knew, from the circumstances under which the demand reached it on the evening of May 15, 2025, that the demand to remove Mr. Strickland was not a lawful exercise of contract authority but an unlawful retaliatory act—a politically-motivated reprisal for Mr. Strickland's protected disclosures and protected speech, originating from DHS political personnel rather than from any contracting officer. By knowingly carrying out and giving effect to that demand, Noblis itself engaged in conduct made unlawful by 41 U.S.C. § 4712 and 31 U.S.C. § 3730(h), which prohibit a contractor from effecting a reprisal against a covered employee; Noblis's own participation in procuring the discharge was therefore independently illegal, not merely ill-motivated. Carrying out a discharge that the interfering party knows to be an unlawful act of retaliation is an improper method under Virginia law, independent of motive.

78.    Independently, and whether or not Noblis's conduct is itself found to violate 41 U.S.C. § 4712 or 31 U.S.C. § 3730(h), Noblis used improper methods by departing from the established standards governing a prime contractor's handling of subcontractor personnel actions. A prime contractor in Noblis's position does not effect the abrupt discharge of a cleared analyst on the basis of an unexplained, informal evening telephone communication. The established and reasonable practice is to require or seek a lawful basis—a contracting-officer instruction, a documented for-cause determination, or some authorized contractual direction—before giving

33

effect to such an action. Noblis sought none. It did not request a written contracting-officer instruction, did not verify that the demand came from any official with authority over contractor personnel, did not inquire into the basis for the removal, and afforded Mr. Strickland no process, despite knowing the demand emanated from political personnel rather than from a contracting officer. That disregard of the standards governing its trade is an improper method under Virginia law independent of any statutory violation, and is not privileged business conduct.

79.    Noblis had no legitimate business justification for procuring Mr. Strickland's discharge. On information and belief, the purported ban of Mr. Strickland from DHS property was not a genuine, independently-grounded access determination by a security authority, but was itself an instrument of the same political reprisal, and Noblis understood it to be such; no reason was given for the ban when it was first communicated, and the "outside the contract" rationale was manufactured only two days later. Even accepting that Mr. Strickland could no longer report to the DHS property, both Noblis and TechINT held other contracts at locations other than the DHS property, and Noblis possessed the contractual ability to reassign Mr. Strickland to other work rather than to procure his discharge. Mr. Strickland was never offered any reassignment. Noblis chose to procure his discharge in order to carry out the political demand. A business justification that is itself a pretextual product of the unlawful reprisal, and that ignores an available non-retaliatory alternative, does not privilege Noblis's conduct.

80.    As a direct and proximate result of Noblis's interference, Mr. Strickland's employment was terminated, and he lost wages, benefits, future earning capacity, and professional standing, entitling him to compensatory damages. Separately, Noblis acted with actual malice and with reckless and wanton disregard of Mr. Strickland's rights: it knew the demand was an unlawful reprisal, it had a non-retaliatory alternative available—reassignment to other Noblis or TechINT

work away from the DHS property—and it chose to procure his discharge anyway. That conscious choice to carry out a known-unlawful reprisal, in disregard of an available lawful alternative, supports an award of punitive damages.

### COUNT V — DECLARATORY AND INJUNCTIVE RELIEF
### (Against TechINT Solutions Group, LLC and Noblis, Inc.)

81.    Mr. Strickland realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

82.    Pursuant to 28 U.S.C. §§ 2201 and 2202 and this Court's traditional equitable powers, Mr. Strickland seeks a declaration that his termination on May 15, 2025 violated 41 U.S.C. § 4712 and 31 U.S.C. § 3730(h), and was not excused by the safe harbor in § 4712(a)(3)(B).

83.    Mr. Strickland further seeks injunctive relief requiring Defendants to (a) expunge all adverse employment records pertaining to the May 15, 2025 removal; (b) cease and desist from any further retaliatory conduct, including interference with Mr. Strickland's pursuit of other federal-contract employment and the communication of any knowingly false or retaliatory statements about Mr. Strickland to prospective employers or contracting officers; (c) reinstate Mr. Strickland to a position comparable to the one he held on May 15, 2025, with restored contract-sponsorship, clearance-eligible duties, and status, and with the opportunity for clearance sponsorship to be re-initiated through ordinary channels, or, in the alternative if this Court finds reinstatement to be impracticable under the circumstances, award front pay as an equitable substitute for reinstatement in an amount to be determined by the Court; and (d) take such other affirmative steps as this Court deems necessary to abate the reprisal and make Mr. Strickland whole. Mr. Strickland does not seek, and this Court need not review or direct, any security-clearance adjudication.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Matthew Strickland respectfully requests that this Court enter judgment in his favor and against Defendants, jointly and severally where appropriate, and grant the following relief:

A.  A declaration that Defendants TechINT and Noblis's termination of Mr. Strickland on May 15, 2025 violated 41 U.S.C. § 4712 and 31 U.S.C. § 3730(h);

B.  An order reinstating Mr. Strickland to a position comparable to the one he held on May 15, 2025, with restored clearance-sponsorship, contract access, and all terms and conditions of employment as if the reprisal had not occurred, or, in the alternative if the Court finds reinstatement to be impracticable, an award of front pay as an equitable substitute for reinstatement in an amount sufficient to compensate Mr. Strickland for the full period during which he would have continued in his position but for the reprisal;

C.  Compensatory damages, including back pay and the value of all employment benefits Mr. Strickland would have received but for the reprisal, under 41 U.S.C. § 4712(c)(1)(B) and 31 U.S.C. § 3730(h)(2);

D.  Two times the amount of back pay, plus interest, under 31 U.S.C. § 3730(h)(2);

E.  Special damages under 31 U.S.C. § 3730(h)(2), including damages for emotional distress, reputational and career harm, and the broader harms flowing from the public and politically-orchestrated nature of the reprisal;

F.  Compensatory damages under 41 U.S.C. § 4712 for reputational harm, emotional distress, and all other non-economic harms, in an amount to be proven at trial;

G.  Compensatory damages against the United States under the Federal Tort Claims Act for the intentional infliction of emotional distress, in an amount to be proven at trial not to exceed the $7,000,000 sum certain presented administratively;

H.  Compensatory and punitive damages against Noblis on the Virginia tortious-interference claim, in amounts to be determined at trial;

**I.** Reasonable attorneys' fees, expert-witness fees, and litigation costs under 41 U.S.C. § 4712(c)(1)(C) and 31 U.S.C. § 3730(h)(2);

**J.** Affirmative equitable relief abating the reprisal, including (i) expungement of all adverse employment records stemming from the May 15, 2025 removal from Defendants' files and any records Defendants control; (ii) injunctive relief against future retaliatory conduct, interference with Mr. Strickland's prospective federal-contract employment, and the communication of knowingly false or retaliatory statements about Mr. Strickland to prospective employers or contracting officers; and (iii) such other equitable relief as the Court deems appropriate to ensure Mr. Strickland is made whole, provided that Plaintiff does not seek and the Court need not review any security-clearance adjudication;

**K.** Pre-judgment and post-judgment interest at the maximum rates allowed by law; and

**L.** Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable, pursuant to 41 U.S.C. § 4712(c)(2), 31 U.S.C. § 3730(h), and Rule 38 of the Federal Rules of Civil Procedure. Plaintiff acknowledges that Count III, brought against the United States under the Federal Tort Claims Act, is to be tried to the Court pursuant to 28 U.S.C. § 2402, and the jury demand does not extend to that count.

Dated: July 12, 2026


Respectfully submitted,


John M. Pierce
_____

**John M. Pierce**
CA Bar No. 250443
JOHN PIERCE LAW P.C.
21550 W. Oxnard Street, 3rd Floor
Woodland Hills, CA 91367
Tel: (321) 292-2366
Email: jpierce@johnpiercelaw.com

*Attorney for Plaintiff Matthew Strickland*