**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MATTHEW STRICKLAND,<br>11304 Lenoir Court<br>Fredericksburg, VA 22407,<br><br>Plaintiff,<br><br>v.<br><br>TECHINT SOLUTIONS GROUP, LLC,<br>1701 Fall Hill Avenue, Unit 104<br>Fredericksburg, VA 22401,<br><br>NOBLIS, INC.,<br>2002 Edmund Halley Drive<br>Reston, VA 20191,<br><br>and<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendants. | Civil Action No. 1:26-cv-02444-EGS<br><br>**JURY TRIAL DEMANDED** |

---

**<u>FIRST AMENDED COMPLAINT</u>**

Plaintiff Matthew Strickland, by and through undersigned counsel, files this First Amended Complaint as a matter of course under Federal Rule of Civil Procedure 15(a)(1)(B). He brings this action against Defendants TechINT Solutions Group, LLC ("TechINT") and Noblis, Inc. ("Noblis") for whistleblower reprisal under 41 U.S.C. § 4712; against the United States of America for intentional infliction of emotional distress under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680; and against Noblis for tortious interference with contractual and business relations under Virginia law. He alleges as follows:

## PRELIMINARY STATEMENT

1. This is a whistleblower-reprisal case. For more than a year, Matthew Strickland served as an analyst on the Department of Homeland Security's ("DHS") Countering Weapons of Mass Destruction ("CWMD") contract. He held a Top Secret/SCI clearance. He was exceptionally productive. His first-line supervisor gave him a strongly positive annual evaluation about one week before he was removed. CWMD management was creating a new position to move him to the Strategy team, away from the supervisors who were harassing him. And yet, on the evening of May 15, 2025, the CWMD Assistant Secretary told him that "one of the four horsemen" had called and wanted him fired, and within the hour he was told that he was not allowed on DHS property the following day. Two days later, his employer told him he was fired.

2. Over his tenure, Mr. Strickland did what 41 U.S.C. § 4712 protects. In writing, he disclosed to the federal managers who directed and oversaw contractor work on the CWMD contract a draft intelligence product, circulated by the Department's Office of Intelligence and Analysis for review, that carried an implied recommendation to monitor American victims of Hurricane Helene for "conspiracy theories" and "misinformation," and CWMD's neglect of credible drone-borne chemical, biological, radiological, and nuclear ("CBRN") threat reporting that fell squarely within CWMD's mission. In a CWMD meeting, he disclosed to one of those managers the suppression of an interagency recommendation that illicit fentanyl be designated a Weapon of Mass Destruction. He also reported to the owner of his employer, TechINT, and to the CWMD program manager of the prime contractor, Noblis, that the two DHS managers his disclosures had challenged were harassing him—conduct he reasonably believed was an abuse of their authority over work under the CWMD contract. He reported to TechINT's owner that the harassment included a surveillance-style reporting regime imposed on no one else. TechINT and Noblis knew of his reports that he was being harassed; TechINT knew that the harassment included

that reporting regime; and both knew that a new position was being created for him because of that harassment.

3. The removal came within days of Mr. Strickland's public post supporting then-Acting FEMA Director Cameron Hamilton. Political staff working for the DHS Secretary were angered by the post. According to CWMD Assistant Secretary David Richardson, the demand passed from political staffer Joe Guy to Carlos Joyner—one of the managers in CWMD's Information and Analysis Directorate ("IAD") whose conduct Mr. Strickland had challenged—and Joyner "ran with it and called the company," as Richardson later relayed what a colleague told him. Within the hour, Noblis called TechINT to relay that Mr. Strickland was not allowed on DHS property the next day. No one gave any reason. TechINT did not know whether he had been fired or merely barred for a day.

4. The demand originated with the DHS Secretary's senior advisor and political staff; the decision to act on it was the contractors'. The Assistant Secretary told Mr. Strickland in writing the next day: "It's not up to the government. It's the company." He later wrote, of the senior advisor who had called political staff, "He can't fire you. Only the company can." Only after two days without any reason did TechINT tell Mr. Strickland that he was fired because DHS was "concerned" that he "may have been working on things outside of [his] contract"—a reason that was false, and that no one had ever raised with him. TechINT identified to him no contract provision his work exceeded, and when asked for his contract, its owner said TechINT had only his offer letter.

5. Congress anticipated exactly this defense. A contractor reprisal "is prohibited even if it is undertaken at the request of an executive branch official, unless the request takes the form of a non-discretionary directive and is within the authority of the executive branch official making

the request." 41 U.S.C. § 4712(a)(3)(B). So far as was ever disclosed to Mr. Strickland, no contracting officer issued any directive and no contract clause was invoked. So far as TechINT and Noblis disclosed to him, what reached them was an informal telephone message that Mr. Strickland was not allowed on DHS property the next day, with no stated reason and no personnel directive. According to the Assistant Secretary, Corey Lewandowski, a temporary senior advisor to the DHS Secretary, called political staff; the matter then went from political staff to an IAD manager; and the IAD manager carried it to the company. On information and belief, the IAD manager carried it either directly or through the Contracting Officer's Representative ("COR") and lacked authority to direct a contractor to discharge or remove a contractor employee. The Assistant Secretary disclaimed that the government had made, or could make, the decision. TechINT and, on information and belief, Noblis chose to carry out the reprisal anyway.

6. The United States is separately answerable under the Federal Tort Claims Act for the intentional infliction of emotional distress by DHS managers who, acting within the scope of their employment, subjected Mr. Strickland to a sustained course of harassment, surveillance, and professional isolation. Mr. Strickland presented an administrative tort claim to DHS on December 16, 2025, and more than six months have passed without final disposition.

7. Mr. Strickland exhausted his administrative remedies under § 4712 by filing a whistleblower-reprisal complaint with the DHS Office of Inspector General on September 3, 2025, that identified TechINT as his employer, Noblis as the prime contractor, and the roles of TechINT and Noblis in communicating the removal to him. More than 210 days passed without an order. He seeks reinstatement, back pay, compensatory damages, punitive damages on his Virginia tort claim, declaratory and equitable relief, attorneys' fees and costs, and all other relief the Court deems proper.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331; under 41 U.S.C. § 4712(c)(2), which authorizes a de novo action in the appropriate district court "without regard to the amount in controversy"; and under 28 U.S.C. § 1346(b)(1), which vests the district courts with exclusive jurisdiction over civil actions against the United States for money damages for the wrongful acts or omissions of federal employees acting within the scope of their employment. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the Virginia tortious-interference claim because it forms part of the same case or controversy as the federal claims. The Court may grant declaratory relief under 28 U.S.C. §§ 2201–2202 in connection with the federal claims.

9. Venue is proper in this District. As to TechINT and Noblis, venue lies under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in the District of Columbia. As to the United States, venue lies under 28 U.S.C. § 1402(b) because the acts and omissions complained of occurred in the District of Columbia. Mr. Strickland performed his CWMD contract duties at the DHS CWMD offices on the St. Elizabeths Campus in Washington, D.C.; the DHS managers whose conduct is at issue worked there; the demand that led to his removal originated with DHS officials in Washington, D.C.; and DHS revoked his access to that worksite.

10. This action is timely. Mr. Strickland submitted his § 4712 complaint to the DHS Office of Inspector General on September 3, 2025. No order issued, no extension was agreed to under § 4712(b)(2)(B), and more than 210 days elapsed, so he is deemed to have exhausted his administrative remedies under § 4712(c)(2). This action was filed on July 12, 2026, within two years after the date on which his remedies were deemed exhausted. As to the United States, Mr. Strickland presented an executed Standard Form 95 to DHS on December 16, 2025, claiming a sum certain of $7,000,000; more than six months have elapsed without final disposition, so the

claim is deemed denied under 28 U.S.C. § 2675(a). The Virginia tortious-interference claim is brought within the applicable limitations period.

## PARTIES

11. Plaintiff Matthew Strickland is a citizen and resident of the Commonwealth of Virginia. He resides at 11304 Lenoir Court, Fredericksburg, Virginia 22407. At all relevant times, he was employed by TechINT as an analyst on the DHS CWMD contract and held an active Top Secret/Sensitive Compartmented Information ("TS/SCI") clearance. He was an employee of a subcontractor, TechINT, within the meaning of 41 U.S.C. § 4712(a)(1).

12. Defendant TechINT Solutions Group, LLC is a Virginia limited liability company with its principal place of business at 1701 Fall Hill Avenue, Unit 104, Fredericksburg, Virginia 22401. TechINT's owner is Skip Funicello. TechINT was Mr. Strickland's direct employer and a subcontractor to Noblis on the DHS CWMD contract. TechINT is a "subcontractor" within the meaning of 41 U.S.C. § 4712.

13. Defendant Noblis, Inc. is a Delaware nonprofit, non-stock corporation with its principal place of business at 2002 Edmund Halley Drive, Reston, Virginia 20191. Noblis was the prime contractor on the DHS CWMD contract under which Mr. Strickland performed his duties, and TechINT performed under a subcontract with Noblis. Noblis is a "contractor" within the meaning of 41 U.S.C. § 4712. Noblis's CWMD program manager was Ed Nickerson.

14. Defendant the United States of America is the proper defendant for the claim under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–2680. The tortious conduct alleged in Count II was committed by DHS employees acting within the scope of their federal employment.

## FACTUAL ALLEGATIONS

### A. Mr. Strickland's Role on the DHS CWMD Contract

15. In March 2024, Mr. Strickland began work on the DHS CWMD contract as an analyst supporting the Information and Analysis Directorate ("IAD"), a directorate within CWMD. He was employed by TechINT, a subcontractor to Noblis. He interviewed for the position with Mr. Funicello of TechINT, Mr. Nickerson of Noblis, and a representative of IAD, and each had a say in his placement on the contract. TechINT sponsored his TS/SCI clearance through Noblis for the CWMD contract. He performed his duties on the St. Elizabeths Campus in Washington, D.C.

16. IAD is a component of CWMD. It is not the Department's separate Office of Intelligence and Analysis ("I&A"), which is a distinct office within DHS. Neither CWMD nor IAD is an element of the intelligence community as defined in 50 U.S.C. § 3003(4); the only DHS elements listed in that provision are the Office of Intelligence and Analysis and the intelligence elements of the Coast Guard. The CWMD contract was a contract to support CWMD, not a contract with, or services provided to, any element of the intelligence community.

17. Under the CWMD contract, DHS managers in IAD directed and oversaw the work of contractor personnel. They assigned contractor analysts their tasks, reviewed and approved the work product the contractor workforce delivered, evaluated contractor analysts' performance, and communicated with the Contracting Officer's Representative ("COR") and with Noblis about contractor performance and staffing. The IAD managers who exercised that oversight and management over Mr. Strickland's contract work included Deputy Assistant Secretary ("DAS") Steve Griffin (SES, the head of IAD); Carlos Joyner (GS-15, Griffin's second-in-command in IAD); Branch Chief Joe Sena; Brian Crombach (a GS-14 or GS-15 supervisor); and Mr. Strickland's first-line supervisor, Desiree Dawson (GS-14). The CWMD COR was Kelly

Muffoletto. Griffin and Joyner imposed on Mr. Strickland, through Noblis, the reporting requirements alleged in Paragraph 31.

18. Mr. Strickland's analytic portfolio included fentanyl-as-WMD policy, drone-borne CBRN threats, foreign genomic-weapons programs, interagency intelligence sharing, and cross-component coordination among IAD, CWMD, DHS, and other departments and agencies. Senior CWMD personnel credited him with greater productivity in his tenure than many employees had achieved over a decade. Ms. Dawson gave him a strongly positive annual evaluation about one week before his removal.

19. CWMD Assistant Secretary David Richardson, the head of CWMD, personally selected Mr. Strickland to serve as the IAD representative at his complex-problem-solving meetings and to work with CWMD's policy, strategy, and management staff on a forward strategy and action plan for CWMD. Richardson kept Griffin and Joyner out of those matters because he did not trust them. Griffin and Joyner resented Mr. Strickland's selection and the trust the Assistant Secretary placed in his analysis.

**B. Protected Disclosure #1 — The October 2024 Hurricane Helene Product**

20. In October 2024, I&A circulated a draft product to other offices, including CWMD IAD, for courtesy review and comment before publication. Mr. Strickland reviewed it as a CWMD IAD analyst under the CWMD contract. He was not an employee of I&A, did not perform work for I&A, and did not perform services under any contract with I&A.

21. The draft carried an implied recommendation that DHS monitor American victims of Hurricane Helene for purported "conspiracy theories" and "misinformation." Mr. Strickland identified multiple factual inaccuracies in the underlying reporting and warned that the

recommended surveillance posture would infringe the First Amendment rights of American citizens, exceed DHS's lawful authorities, and damage public trust in DHS.

22. Mr. Strickland made that disclosure in writing, by email, to Branch Chief Joe Sena, Brian Crombach, Carlos Joyner, and DAS Steve Griffin—DHS managers responsible for the oversight and management of contract work in IAD, including his own. He also raised those concerns with Ms. Dawson, his first-line supervisor. His concerns were disregarded, and the draft product was finalized without any of the corrections he had identified. He reasonably believed that what he disclosed was evidence of gross mismanagement of a Federal contract, of an abuse of authority relating to a Federal contract—an arbitrary and capricious exercise of authority inconsistent with DHS's mission—and of a violation of law related to a Federal contract.

### C. Protected Disclosure #2 — Neglect of Drone-Borne CBRN Threats

23. Beginning in December 2024, Mr. Strickland repeatedly alerted IAD leadership, including in writing by email to Mr. Sena, Mr. Crombach, Joyner, and DAS Griffin, to credible reports of thousands of unexplained drone sightings across the East Coast, including in Virginia and the District of Columbia, and to intelligence reporting that drones could be adapted to deliver chemical, biological, radiological, or nuclear payloads. He also raised those concerns with Ms. Dawson. Countering those threats is the core mission of CWMD and the subject matter of the CWMD contract on which Mr. Strickland worked.

24. He asked on multiple occasions why CWMD, and IAD in particular, was not even discussing these threats. His supervisors dismissed the reporting as "not our lane," and the work was deprioritized. Mr. Strickland reasonably believed that the refusal to address those threats was evidence of gross mismanagement of the CWMD contract, an abuse of authority relating to that contract—an arbitrary and capricious exercise of authority inconsistent with CWMD's mission

and with successful performance of the contract—and a substantial and specific danger to public health or safety.

**D. Protected Disclosure #3 — Suppression of the Fentanyl-as-WMD Recommendation**

25. Throughout his tenure, Mr. Strickland participated, as part of his CWMD contract work, in interagency working groups addressing the illicit-fentanyl crisis, including with components of the Department of Defense. Those working groups reached a consensus that illicit fentanyl should be designated a Weapon of Mass Destruction, a designation that would have unlocked more than 150 federal authorities, including sanctions on foreign producers, expanded intelligence sharing, and additional prosecutorial tools.

26. Mr. Strickland learned through that work that a memorandum reflecting the interagency recommendation was prepared for transmission to the President and that, on information and belief, DHS political leadership blocked it from moving forward because of anticipated effects on the pharmaceutical industry rather than for any reason related to public health or CWMD's mission.

27. Mr. Strickland raised the suppression of that work product in a CWMD meeting where the issue was discussed, including directly with Carlos Joyner. Joyner was among those pressing CWMD not to support the designation. Mike Kangior, a CWMD GS-15, and Akram Khan witnessed Mr. Strickland raise the issue. Mr. Khan was a DHS Contracting Officer's Representative for another DHS program and a federal employee responsible for contract oversight at DHS. Mr. Strickland reasonably believed that what he disclosed was evidence of gross mismanagement of a Federal contract, an abuse of authority relating to a Federal contract, and a substantial and specific danger to public health or safety.

**E. Protected Disclosure #4 — Reports to TechINT and Noblis Management That IAD Managers Were Abusing Their Authority Over His Contract Work**

28. Beginning after Mr. Strickland's October 2024 Hurricane Helene critique, and continuing as he made the further disclosures described above and as Assistant Secretary Richardson continued to rely on him, Joyner and Griffin used their authority over contractor work to target him.

29. In or about December 2024, someone at CWMD—on information and belief, Joyner—complained about, and sought Mr. Strickland's removal over, a December 7, 2024 Washington Post article in which Mr. Strickland, as a private citizen, had offered his opinion on a May 2024 incident in which two foreign nationals drove a truck to the front gate of Marine Corps Base Quantico, an incident on which he had also commented in a May 2024 New York Post article. The complaint reached Mr. Nickerson at Noblis. Neither article concerned Mr. Strickland's work at DHS or the CWMD contract, and nothing Mr. Strickland said in either drew on or disclosed that work. Mr. Nickerson told Mr. Funicello that he had seen the Washington Post article, that nothing in it violated the contract, and that he would not remove Mr. Strickland from the contract. Mr. Funicello told Mr. Strickland of the complaint (the "press-article complaint"), told him that TechINT had likewise declined to remove him because the article had no bearing on his CWMD work and did not violate his contract, and said he was obviously being targeted. In or about March 2025, Mr. Nickerson of Noblis told Mr. Funicello that someone in IAD leadership had said, "Matt won't have top cover from the Assistant Secretary forever." Mr. Funicello told Mr. Strickland to watch his back because Griffin and Joyner wanted him gone.

30. In or about March 2025, Mr. Strickland submitted a written critique, by email to Mr. Sena, Mr. Crombach, Joyner, and DAS Griffin, of an intelligence product concerning vandalism of Tesla vehicles and dealerships, explaining that the product's characterization of the

attacks as non-political "lone wolf" incidents was contrary to the available evidence. On March 25, 2025, Mr. Funicello called Mr. Strickland and told him that Joyner had called the COR, who had called Noblis, to say that Mr. Strickland's critique was grounds to fire him because his comments were "politically motivated." Mr. Funicello relayed that Mr. Nickerson had said that they "could fire" Mr. Strickland for it but were not going to, because he otherwise appeared to be doing great and important work. That evening, Mr. Strickland asked Mr. Funicello by text to put in an email that the Noblis program manager had reached out about the Tesla product and what message he had relayed; Mr. Funicello replied, "ok will do in morning." Noblis and TechINT thus understood, by March 2025, both that Joyner was seeking a basis to have Mr. Strickland removed and that the decision whether to act on such a request was theirs.

31. Beginning after the March 25, 2025 Tesla complaint and escalating through April and May 2025, Joyner—with Griffin's support—imposed on Mr. Strickland, through Noblis, a reporting regime that culminated in a daily-reporting requirement imposed on no other analyst on the contract. What began as hallway demands to know what Assistant Secretary Richardson had assigned him became formal demands, routed through Noblis, that he report his meetings and projects weekly, then in ever greater detail, and finally that he send Joyner a daily message identifying everyone he had spoken with the day before and the subject of each conversation. On May 14, 2025, Mr. Strickland confirmed to Mr. Funicello by text that his weekly report, "including meetings attended and products working on," was in Mr. Funicello's inbox.

32. Griffin and Joyner imposed the reporting regime through the supervisory channels they were employed to administer, during working hours, and were actuated at least in part by a purpose to oversee IAD work. But applied to Mr. Strickland alone and extended to every conversation he had, the regime went far beyond any legitimate supervisory need: it surveilled his

work for the Assistant Secretary, burdened and demeaned him, and intruded on work the head of CWMD had assigned him.

33. Mr. Strickland complied with every demand and copied Mr. Funicello on his submissions so that there could be no pretext for discipline. Mr. Funicello acknowledged that the submissions were sufficient.

34. In the months before his removal, Mr. Strickland reported to Mr. Funicello, TechINT's owner, and to Mr. Nickerson, Noblis's CWMD program manager, that Joyner and Griffin were harassing him. He told Mr. Funicello that the harassment included the reporting regime alleged above. He reasonably believed that conduct was an abuse of their authority over work under the CWMD contract. Mr. Funicello agreed that the daily-reporting demand was harassment and advised Mr. Strickland to file a hostile-workplace grievance. Mr. Funicello and Mr. Nickerson each had responsibility to address misconduct affecting their companies' employees and performance on the CWMD contract. Mr. Nickerson, as Noblis's program manager, received DHS managers' complaints about subcontractor personnel; received, evaluated, and decided not to act on Joyner's March 25, 2025 claim that the Tesla critique was grounds to fire Mr. Strickland; and transmitted DHS managers' reporting demands to Mr. Strickland through TechINT.

35. Mr. Strickland reasonably believed that what he reported to Mr. Funicello and Mr. Nickerson was evidence of an abuse of authority relating to a Federal contract—an arbitrary and capricious exercise of authority by DHS managers that was inconsistent with CWMD's mission and with the successful performance of the contract—and of gross mismanagement of the contract.

36. Because of the hostility and harassment Mr. Strickland was encountering in IAD from Griffin and Joyner, including, on information and belief, the press-article complaint,

Assistant Secretary Richardson and CWMD management, including Mr. Kangior and Mr. Khan, worked to create a new position on the CWMD Strategy team to move Mr. Strickland out of IAD. In March 2025, Mr. Nickerson sent an email asking that the COR—Kelly Muffoletto—be involved in creating the position, and on March 12, 2025, Mr. Funicello asked Mr. Strickland by text about the COR referenced in Mr. Nickerson's email. Ms. Muffoletto was informed of the new position and approved it. Mr. Funicello and Mr. Nickerson both knew that the position was being created because of the harassment. Mr. Strickland was to fill it imminently.

37. On the morning of May 15, 2025, at approximately 10:00 a.m., Mr. Strickland met with DAS Griffin and told him that he would be moving to the new Strategy team position. Griffin said he hoped there was "no ill will" over the reporting requirements, explaining that because he and Joyner were Mr. Strickland's supervisors, they "just wanted to know" what the Assistant Secretary had him working on. Mr. Strickland told Griffin that the reporting requirements and the other harassment he had endured in IAD were egregious and that Mr. Funicello had suggested a hostile-workplace grievance. Griffin acknowledged that filing a grievance was Mr. Strickland's right, directed him to get the process from Mr. Funicello, agreed that the move was appropriate, and wished him well. Neither Griffin nor anyone else had ever told Mr. Strickland that any of his work was outside the scope of his contract.

**F. The Early-May 2025 Post Supporting Cameron Hamilton**

38. On or about May 8, 2025, Acting FEMA Director Cameron Hamilton was removed. Press reports in the following days described the circumstances of his removal, including his refusal to redirect federal disaster funds.

39. In the days that followed, Mr. Strickland posted on X (@MattForVA) in support of Hamilton. His posts on the subject did not name Corey Lewandowski, Secretary Kristi Noem, or

any other DHS official and did not discuss Mr. Strickland's work at DHS. They expressed Mr. Strickland's views as a private citizen: that a temporary senior advisor was effectively directing DHS without formal authority, that the Acting FEMA Director had been fired for refusing to redirect federal disaster funds, and that DHS was prioritizing political directives over its mission.

40. Shortly after those posts appeared, DHS officials warned Mr. Strickland that senior political figures at DHS, including Corey Lewandowski, then a temporary senior advisor to DHS Secretary Kristi Noem, were displeased with his public conduct.

**G. May 15–17, 2025: The Removal and the Discharge**

41. By May 15, 2025, Assistant Secretary Richardson had also been assigned to lead FEMA following Hamilton's removal, while remaining Assistant Secretary for CWMD.

42. At approximately 7:30 p.m. on May 15, 2025, Richardson telephoned Mr. Strickland and asked whether he had posted something in support of Hamilton. Mr. Strickland said he had. Richardson told him that "one of the four horsemen"—a nickname DHS insiders use for a group of political staffers working for Secretary Noem, at least three of whom are Troup Hemenway, Joe Guy, and Josh Whitehouse—had called and wanted Mr. Strickland fired because of the post. Richardson said, "you gave them ammo to fire you man."

43. About thirty minutes later, Mr. Funicello called Mr. Strickland. He said that Noblis had just called TechINT to relay that DHS had said Mr. Strickland was not allowed on DHS property the following day, Friday, May 16. Mr. Funicello said, in substance, "I was informed by Noblis who was informed by DHS that you're not allowed on DHS property tomorrow." He said that neither he nor Noblis had been given any reason, that he had never received a communication like it, that it was "weird," and that he did not know whether it meant Mr. Strickland was fired or only barred from the campus for a day. He told Mr. Strickland to take a day of leave while he tried

to find out what was going on. Mr. Strickland told Mr. Funicello that he knew why: he had just received the call from Richardson about the X post.

44. On May 16, 2025, Mr. Strickland and Mr. Funicello spoke approximately four times. Mr. Funicello reported that he had heard nothing further from Noblis or DHS, and that he had called Noblis several times without an answer. At about 2:00 p.m., Mr. Funicello asked Mr. Strickland to send him the X post. Mr. Strickland did so, and Mr. Funicello told him that it in no way violated his contract.

45. At 4:29 p.m. on May 16, 2025, Mr. Strickland texted Assistant Secretary Richardson to ask whether he was being fired, noting that he still had no formal notification. Richardson replied: "It's not up to the government. It's the company. I don't recommend posting anything." At 4:32 p.m., Mr. Strickland forwarded Richardson's response to Mr. Funicello by text. Mr. Funicello's only response was that this "doesn't explain" why Mr. Strickland's Common Access Card ("CAC") was "not working."

46. On Saturday, May 17, 2025, Mr. Funicello told Mr. Strickland that he had finally heard back and that Mr. Strickland was being fired because DHS was "concerned" that he "may have been working on things outside of [his] contract" while completing assignments given to him by the Assistant Secretary.

47. On May 19, 2025, Mr. Strickland asked Mr. Funicello for the official notice of his termination and a copy of his contract. Mr. Funicello sent him an email from Noblis and replied, "We have offer letter no contract." The Noblis email stated that DHS was not allowing Mr. Strickland on its property but gave no reason, as Mr. Strickland pointed out to Mr. Funicello the same morning. Mr. Strickland was never offered reassignment to any other work, although, on

information and belief, both Noblis and TechINT held other contracts, with open positions, at locations other than the DHS campus.

48. The "outside the contract" rationale was false and pretextual. The work DHS later questioned consisted of assignments given to him by the head of CWMD. He had never been counseled, warned, or reprimanded, orally or in writing, that any of his work fell outside his contract—including by DAS Griffin on the very morning of his removal. TechINT identified to Mr. Strickland no contract provision his work exceeded; when asked for his contract, its owner said TechINT had only an offer letter. A DHS "concern" is not a directive. TechINT adopted it as the ground for discharge. On information and belief, before TechINT discharged him and before Noblis effected his removal from the contract, neither TechINT nor Noblis asked what work was meant, consulted the Assistant Secretary who had assigned the work, or involved a contracting officer. The delayed and manufactured rationale—an unexplained property bar first, followed two days later by an "outside the contract" reason—is itself evidence of pretext. Assistant Secretary Richardson assigned and directed that work, and Mr. Kangior and Mr. Khan knew that Mr. Strickland worked within IAD parameters.

49. DHS personnel were directed not to allow Mr. Strickland on DHS property even to return his government-issued laptop and equipment. Mr. Funicello met Mr. Strickland in a parking lot in Fredericksburg, Virginia, to collect the equipment. There, Mr. Funicello apologized and said, "they really screwed you, stuff like this makes me want to sell my company and get away from government contracting."

50. On May 16, 2025, and thereafter, DHS published a statement on its official X account asserting that Mr. Strickland was not a federal employee and that the contractors alone had handled his termination.

51. In a text-message exchange on March 5 and 6, 2026, Mr. Strickland asked Assistant Secretary Richardson about Lewandowski's involvement in the effort to have him fired. Richardson responded that Lewandowski had not called him but had "called Joe Guy"; that "He can't fire you. Only the company can"; that he had told Guy "to contact the company"; that, as he understood it, the demand "[w]ent from Guy to Carlos to the company"; and, after checking with a colleague, that Joyner "ran with it and called the company." Richardson also said that Guy had told him that Mr. Strickland "posted derogatory things."

52. In two telephone calls on July 22, 2026, Mr. Strickland spoke with Mr. Funicello. When Mr. Strickland asked whether Noblis had ever sent anything official about why he was let go, Mr. Funicello responded: "I only sent it to you, and they got mad at me." He added that he would "have to dig up that email." After saying he thought fentanyl had since been designated a Weapon of Mass Destruction and that he had heard so in the news, Mr. Funicello told Mr. Strickland that "everything you're fighting about turned out to be reality in the end" and that "at least it proves that you're right." And when Mr. Strickland described Joyner's demand that he report daily on his meetings, his work for the Assistant Secretary, and every conversation he had with anyone, Mr. Funicello responded, "Yeah, I remember that."

### H. TechINT and Noblis Carried Out the Removal and Discharge Without Any Non-Discretionary Directive

53. The only communication DHS made to the contractors on May 15, 2025, so far as TechINT and Noblis disclosed to Mr. Strickland, was an informal telephone message that he was not allowed on DHS property the next day, with no stated reason, no personnel action, and no indication whether the bar extended beyond that day. It was not a directive to terminate his employment, to remove him from the contract, or to take any other personnel action. Mr. Funicello

did not know whether it meant Mr. Strickland was fired or only barred for a day, and he said Noblis had not been given a reason either.

54. So far as disclosed to Mr. Strickland, and on information and belief, no contracting officer with authority over the CWMD contract issued any directive requiring his discharge or permanent removal from the contract, no contract clause was invoked, no performance or misconduct determination was made, and no investigation preceded the removal. So far as disclosed to Mr. Strickland, and on information and belief, no DHS official issued any written direction to Noblis or TechINT requiring his discharge or permanent removal from the contract.

55. According to Assistant Secretary Richardson, Corey Lewandowski, a temporary senior advisor, called Joe Guy; the matter then "[w]ent from Guy to Carlos to the company"; and, as Richardson relayed what a colleague told him, Joyner, an IAD manager, "ran with it and called the company." On information and belief, Joyner did so either directly or through the COR. On information and belief, none of them—political staff, a senior advisor, an IAD manager, or a COR —had authority to direct a contractor to discharge or remove a contractor employee. The head of CWMD, the official responsible for the entire office, did not issue any such directive and told Mr. Strickland in writing that the decision was "not up to the government" but "the company." Richardson's statement to Guy that Guy should "contact the company" was not a directive to any contractor to take any action.

56. TechINT's decision to discharge Mr. Strickland was its own. On information and belief, Noblis made the same choice as to his removal from the contract. Two days passed before the decision to discharge him, or any reason for it, was communicated. During that time, TechINT knew from Mr. Strickland that the demand had followed the political reaction to his post and had itself concluded that the post did not violate his contract. On information and belief, Noblis

approved or directed Mr. Strickland's permanent removal from the CWMD contract, and TechINT then discharged him, rather than resisting the demand, requiring a valid contractual basis for permanent removal, insisting on a contracting-officer directive, verifying the authority of whoever had made the demand, or reassigning him to other work—none of which, on information and belief, either of them did. TechINT then communicated the pretextual "outside the contract" reason. Noblis had exercised that same discretion nearly two months earlier when it declined to act on Joyner's claim that Mr. Strickland's Tesla critique was grounds to fire him, and in or about December 2024 when it declined to remove him over the press-article complaint.

57. Noblis exercised control over Mr. Strickland's employment on the CWMD contract. It participated in selecting and placing him on the contract; it served, through Mr. Nickerson, its CWMD program manager, as the regular channel for communications between DHS managers and TechINT concerning Mr. Strickland; it transmitted DHS managers' reporting demands on him through TechINT; it received, evaluated, and decided not to act on complaints about him from DHS personnel, including the press-article complaint and the March 25, 2025 Tesla complaint; on information and belief, it had authority, under the prime contract and the Noblis–TechINT subcontract, to approve, retain, reassign, and remove subcontractor personnel; and it transmitted the written communication stating that DHS would not permit Mr. Strickland on its property. On information and belief, TechINT could not keep Mr. Strickland on the contract over Noblis's direction. On information and belief, Noblis directed or approved Mr. Strickland's permanent removal from the CWMD contract, which materially contributed to TechINT's decision to discharge him.

58. When TechINT discharged Mr. Strickland and, on information and belief, Noblis removed him from the contract, they knew of his reports to Mr. Funicello and Mr. Nickerson that

Joyner and Griffin were harassing him; knew of the press-article complaint alleged in Paragraph 29 and that Joyner had already tried to have him fired over his Tesla critique; and knew that a new position was being created to move him away from Joyner and Griffin because of that harassment. Mr. Funicello also knew that Griffin and Joyner were hostile to Mr. Strickland and wanted him gone, knew of the disclosures described in Sections B through D, and understood that those disclosures were a reason for the reporting regime. TechINT knew from Mr. Strickland himself on the evening of May 15 that the demand followed the political reaction to his post. Mr. Strickland's protected disclosures were a contributing factor in the removal and discharge: Joyner—whose conduct Mr. Strickland's disclosures had challenged, who had previously sought his discharge, and who, as Richardson later relayed, carried the demand to the company—was hostile to him.

**I. The Course of Harassment by DHS Managers**

59. Independent of his removal from the contract, DHS managers Griffin and Joyner targeted Mr. Strickland beginning in or about December 2024 and, intensively from March 2025 until his removal, subjected him to a sustained course of harassment, surveillance, and professional isolation. They professionally isolated him; stripped him of IAD responsibilities; demanded through Noblis that he account for his meetings, projects, and even his conversations, under a daily-reporting requirement imposed on no one else; and sought to surveil his work for the Assistant Secretary who had assigned it. They did so in resentment of the Assistant Secretary's reliance on him and in hostility to the disclosures described in Sections B through D—Griffin and Joyner each received the Helene and drone disclosures in writing, and Joyner was the manager to whom the fentanyl disclosure was made—and the conduct continued through his objection to DAS Griffin on the morning of May 15, 2025.

**J. Harm**

60. Mr. Strickland has suffered substantial economic, professional, and emotional harm. Although his TS/SCI clearance remains active, the circumstances of his removal, together with DHS's public statement disclaiming responsibility for it, have made him effectively unhireable at his level of seniority in the national-security contracting field in which he built his career.

61. He has suffered lost wages, lost benefits, and lost future earning capacity in amounts to be proven at trial. He has suffered reputational harm from the public and political nature of the reprisal, and serious emotional distress, including sustained anxiety, sleeplessness, and humiliation.

## ADMINISTRATIVE EXHAUSTION

62. On September 3, 2025, Mr. Strickland, through counsel, submitted a whistleblower-reprisal complaint under 41 U.S.C. § 4712 to the Whistleblower Protection Unit of the DHS Office of Inspector General. The complaint identified TechINT as his employer at the time of the reprisal and Noblis as the prime contractor on the DHS CWMD contract, both in the complaint itself and in the transmittal email. It described his disclosures concerning the Hurricane Helene product, the drone-borne CBRN threats, the fentanyl-as-WMD issue he raised in meetings, and X posts concerning the Hamilton removal; the daily-log requirements and other hostility he endured; the Richardson call on May 15, 2025; the call from TechINT, relaying a call from Noblis, that he was banned from DHS property and no longer allowed to report to work; the termination that followed (which the complaint dated May 15, 2025, the date the removal began, although TechINT communicated the discharge on May 17, 2025); and the fact that TechINT itself had advised him, before his termination, to file a hostile-work-environment complaint because of the

reprisal it had witnessed. This action does not allege that those X posts were a protected disclosure under § 4712.

63. More than 210 days have passed since the complaint was submitted. The head of DHS has not issued an order, no extension was agreed to under 41 U.S.C. § 4712(b)(2)(B), and there has been no showing that any delay is due to bad faith on Mr. Strickland's part. Under 41 U.S.C. § 4712(c)(2), Mr. Strickland is deemed to have exhausted all administrative remedies with respect to the complaint and may bring this de novo action against the contractor and subcontractor that carried out the reprisal. Section 4712(b)(1) requires only that the employee submit a complaint to the Inspector General, whose investigation is of the reprisal by the contractor or subcontractor concerned; the complaint identified the only contractor and subcontractor involved in Mr. Strickland's employment and removal. The complaint also described the daily-log requirements and other hostility, alleged that TechINT had witnessed the reprisal and advised Mr. Strickland to file a hostile-work-environment complaint, and described the removal as communicated by TechINT after a call from Noblis. It thus gave the Inspector General notice of the contractors involved, the alleged retaliatory course of conduct, and the removal and discharge for which Mr. Strickland seeks relief.

64. As to the United States, Mr. Strickland presented an executed Standard Form 95 to the DHS Office of the General Counsel on December 16, 2025, asserting a sum certain of $7,000,000. More than six months have elapsed without final disposition. Under 28 U.S.C. § 2675(a), he may treat that failure as a final denial and bring suit.

**COUNT I — WHISTLEBLOWER REPRISAL UNDER 41 U.S.C. § 4712**

**(Against TechINT Solutions Group, LLC and Noblis, Inc.)**

65. Mr. Strickland realleges and incorporates by reference each of the foregoing paragraphs.

66. At all relevant times, Mr. Strickland was an employee of TechINT, a subcontractor, working under Noblis's prime contract with DHS. TechINT is a subcontractor, and Noblis is a contractor within the meaning of 41 U.S.C. § 4712. Section 4712(c)(2) authorizes this action "against the contractor, subcontractor, grantee, subgrantee, or personal services contractor" that subjected him to a prohibited reprisal. Noblis exercised control over his placement and continued service on the contract as alleged above. Noblis's liability under § 4712 does not depend on its being Mr. Strickland's employer, because the statute reaches a contractor that itself subjects a subcontractor's employee to reprisal. In the alternative, Noblis was his joint employer because, as alleged in Paragraphs 15, 30, and 57, it participated in his selection and placement, transmitted DHS managers' reporting demands concerning him, received and acted on DHS managers' personnel complaints about him, and, on information and belief, controlled whether he could remain on the CWMD contract.

67. Mr. Strickland disclosed information he reasonably believed was evidence of one or more of the following: gross mismanagement of a Federal contract, an abuse of authority relating to a Federal contract, a substantial and specific danger to public health or safety, or a violation of law related to a Federal contract, as alleged in Paragraphs 20 through 27, Paragraphs 34 and 35, and Paragraph 37 (his statement to DAS Griffin on the morning of May 15, 2025). He made those disclosures to persons described in 41 U.S.C. § 4712(a)(2). He made the Hurricane Helene and drone-borne CBRN disclosures, in writing, to Griffin, Joyner, Sena, and Crombach, and raised them with Ms. Dawson; he made the fentanyl-as-WMD disclosure to Joyner. Griffin,

Joyner, Sena, Crombach, and Ms. Dawson were each a Federal employee responsible for contract oversight or management at DHS (§ 4712(a)(2)(D)); Mike Kangior and Akram Khan, the latter a COR for another DHS program, were present when he raised the fentanyl issue with Joyner. He made the statement alleged in Paragraph 37 to DAS Griffin (§ 4712(a)(2)(D)). He made the reports alleged in Paragraph 34 to Mr. Funicello and Mr. Nickerson, management officials of TechINT and Noblis with responsibility to investigate, discover, or address misconduct (§ 4712(a)(2)(G)).

68. Each disclosure related to the CWMD contract. The drone-CBRN and fentanyl-WMD disclosures concerned the core subject matter of the CWMD contract on which he worked. The Hurricane Helene disclosure concerned a product he reviewed under that contract. His reports to TechINT and Noblis concerned DHS managers' misuse of their authority over contract work, including his own contract work. His May 15, 2025 statement to DAS Griffin concerned the same misuse of supervisory authority over his contract work.

69. The exception in 41 U.S.C. § 4712(f) does not apply. Mr. Strickland was not an employee of a contractor or subcontractor of an element of the intelligence community: TechINT and Noblis performed the CWMD contract, and neither CWMD nor IAD is an element of the intelligence community. Because he was not an employee of a contractor or subcontractor of an element of the intelligence community, § 4712(f)(2) does not reach any of his disclosures regardless of their subject matter, and none of them was discovered during services provided to an element of the intelligence community. In any event, his claim does not depend on the Hurricane Helene disclosure; each of the other disclosures independently supports it.

70. TechINT and Noblis each took adverse action against Mr. Strickland as a reprisal for his protected disclosures: on information and belief, Noblis treated DHS's property-access

message as requiring his permanent removal from the CWMD contract, and, by May 17, 2025, effected or approved that removal; TechINT discharged him from employment on May 17, 2025.

71. Mr. Strickland's protected disclosures were a contributing factor in those actions within the meaning of 41 U.S.C. § 4712(c)(6) and 5 U.S.C. § 1221(e). Mr. Funicello, TechINT's decisionmaker, and Mr. Nickerson, Noblis's program manager, knew of the reports described in Paragraph 34, which they themselves received, and, on information and belief, Mr. Nickerson participated in the removal decision or communicated that knowledge to the Noblis officials who made it. Both knew of the Tesla critique and of Joyner's attempt to have Mr. Strickland fired for it, and knew the reasons for the planned transfer. The removal and discharge came within months of those reports, after the reporting regime had escalated through April and May 2025, and, as Assistant Secretary Richardson later relayed, the demand was carried to the company by Joyner, a manager whose conduct his disclosures had challenged and who had already tried to have him fired. In addition, on information and belief, TechINT and Noblis acted on that demand without any inquiry into its source or basis, thereby permitting Joyner—who knew of and was hostile to the disclosures made to him or in his presence—to influence and proximately cause the removal and discharge. That the political reaction to the post supplied the occasion for the demand does not displace the disclosures as a contributing factor.

72. TechINT and Noblis cannot show by clear and convincing evidence that they would have taken the same actions in the absence of the disclosures. Mr. Strickland had just received a strongly positive evaluation, was being moved to a newly created position, had no record of discipline, had never been told his work was outside his contract, and was discharged on a stated reason that was false.

73. The reprisal is not excused by 41 U.S.C. § 4712(a)(3)(B). Any request that TechINT and Noblis act against Mr. Strickland did not take the form of a non-discretionary directive: the communications disclosed to Mr. Strickland were an informal, unexplained telephone message that he was not allowed on the property the next day; two days later, a relayed "concern" that he "may have been working on things outside of [his] contract"; and a Noblis email that repeated the property bar without stating any reason. None of them identified any contract provision, invoked any contract clause, or directed any personnel action, and DHS's Assistant Secretary told Mr. Strickland that the decision belonged to the company. Nor, on information and belief, was any such request within the authority of the officials who made it: neither political staff, nor a temporary senior advisor, nor an IAD manager, nor the COR had authority to direct a contractor to discharge or remove a contractor employee, and, on information and belief, no contracting officer issued any directive requiring his discharge or permanent removal from the contract. To the extent any request was prompted by the posts alleged in Paragraph 39, which were Mr. Strickland's speech as a private citizen on a matter of public concern, did not discuss his work at DHS, and, as TechINT itself concluded, did not violate his contract, no executive branch official had authority, consistent with the First Amendment, to direct a contractor to discharge or remove him as punishment for that speech. On information and belief, Noblis made its own decision to remove him from the contract, and TechINT made its own decision to discharge him.

74. As a direct and proximate result, Mr. Strickland has suffered and continues to suffer lost wages, lost benefits, lost future earning capacity, reputational harm, and emotional distress, in amounts to be proven at trial. Under 41 U.S.C. § 4712(c), he is entitled to reinstatement, compensatory damages including back pay, all employment benefits and other terms and

conditions of employment that would have applied but for the reprisal, affirmative relief to abate the reprisal, and attorneys' fees, expert-witness fees, and costs.

## COUNT II — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER THE FEDERAL TORT CLAIMS ACT

### (Against the United States of America)

75. Mr. Strickland realleges and incorporates by reference the allegations of Paragraphs 8 through 14 (jurisdiction, venue, and parties), Paragraphs 15 through 19 (his role on the contract), Paragraph 31 (the reporting regime), Paragraph 32 (its purpose), Paragraph 33 (his compliance), Paragraph 37 (the May 15, 2025 meeting with DAS Griffin), Paragraph 59 (the course of harassment), and Paragraph 64 (administrative presentment). This Count rests solely on the course of harassing, surveilling, and isolating conduct described in those paragraphs. It does not rest on, arise out of, or depend on any allegedly false statement, on Mr. Strickland's removal from the contract or discharge, or on any interference with his contractual relationships. That Griffin and Joyner transmitted demands through Noblis is alleged only as the means of imposing the regime, not as a communication tort.

76. The DHS managers whose conduct is described in this Count—DAS Steve Griffin and Carlos Joyner, who directed and escalated the harassment, surveillance, and isolation of Mr. Strickland—were employees of the government within the meaning of 28 U.S.C. § 2671. Although some of their demands were transmitted through Noblis, Griffin and Joyner originated, directed, and imposed them.

77. Griffin and Joyner acted within the scope of their federal employment. Under District of Columbia law, conduct may fall within the scope of employment even where it is unauthorized, forbidden, or wrongful, so long as it is of the kind the employee is employed to perform, occurs within the time and space limits of the employment, and is actuated at least in part

by a purpose to serve the employer. The tasking, reporting requirements, and oversight of contractor analysts in IAD were within Griffin's and Joyner's ordinary duties; they imposed the demands at issue through the channels of supervisory tasking and reporting they were employed to administer, during working hours at the DHS workplace, and actuated at least in part by a purpose to serve DHS's interest in supervising IAD contract work, however wrongful the manner in which they abused that authority.

78. Under 28 U.S.C. § 2674, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances." A private entity whose managers exercised day-to-day supervisory authority over contractor personnel and deliberately subjected one of them to a sustained campaign of surveillance, humiliation, and degradation would be liable for intentional infliction of emotional distress under District of Columbia law, where the acts occurred. The claim rests on that duty, not on any duty created by federal statute or regulation.

79. Under District of Columbia law, intentional infliction of emotional distress requires extreme and outrageous conduct that intentionally or recklessly causes severe emotional distress. Griffin and Joyner engaged in a deliberate course of conduct, over a period of months and continuing through May 15, 2025, that degraded and isolated a productive analyst whom the head of CWMD trusted more than he trusted them: professionally isolating him, stripping him of IAD responsibilities, forcing him to account each day for every conversation he had, and seeking to surveil his work for the Assistant Secretary who had assigned it, singling him out alone among the analysts on the contract. Even though carried out through supervisory channels and actuated in part by a purpose to oversee IAD work, that conduct went beyond any legitimate supervisory need, was not an ordinary personnel action, and exceeded all bounds of decency tolerated in a civilized community.

80. Griffin and Joyner acted intentionally, or with reckless disregard of the near-certainty that severe emotional distress would result. Their conduct caused Mr. Strickland severe emotional distress, including sustained anxiety, sleeplessness, humiliation, and a profound sense of professional and personal injury. That distress was caused by the course of harassment alleged in this Count, independent of his later removal and discharge.

81. This claim does not arise out of any libel, slander, misrepresentation, deceit, or interference with contract rights. Intentional infliction of emotional distress is not among the torts listed in 28 U.S.C. § 2680(h), and this claim rests on independent conduct that is tortious without regard to any statement or any contractual relationship.

82. The discretionary-function exception, 28 U.S.C. § 2680(a), does not bar this claim. Count II does not challenge a policy judgment about what work contractor analysts should perform or what generally applicable reporting procedures IAD should use. It challenges the individualized manner in which Griffin and Joyner singled out Mr. Strickland for surveillance, humiliation, and professional isolation through requirements imposed on no other analyst and extending to every workplace conversation. That targeted harassment is not a judgment grounded in considerations of public policy and is not susceptible to policy analysis merely because Griffin and Joyner used supervisory channels to carry it out.

83. The scope-of-employment allegations in Paragraph 77 are consistent with the inapplicability of the discretionary-function exception. Scope of employment is a broad concept that can include wrongful acts incidental to an employee's duties; the discretionary-function exception is confined to policy-grounded judgments. Those allegations concern the supervisory conduct underlying this Count and do not allege that Griffin, Joyner, or any other official had authority to direct the removal or discharge at issue in Counts I and III.

84. As a direct and proximate result, Mr. Strickland has suffered severe emotional distress and related harm. The United States is liable to him for compensatory damages in an amount to be determined at trial, subject to 28 U.S.C. § 2675(b).

## COUNT III — TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONS

**(Against Noblis, Inc.)**

85. Mr. Strickland realleges and incorporates by reference Paragraphs 1 through 64.

86. At all relevant times, Mr. Strickland had a valid contractual employment relationship with TechINT and a valid business expectancy of continued employment with TechINT. The new Strategy-team position being created for him was evidence that his continued employment was reasonably probable. Noblis knew of that relationship and that expectancy.

87. On information and belief, Noblis intentionally interfered with that relationship and expectancy by treating DHS's unexplained property-access message as requiring Mr. Strickland's permanent removal from the CWMD contract, effecting that removal, and thereby procuring or materially contributing to TechINT's termination of his employment. In the alternative to the allegations in Paragraphs 57 and 66 that Noblis controlled Mr. Strickland's employment and was his joint employer, and as Rule 8(d) permits, Noblis was not a party to the employment relationship between TechINT and Mr. Strickland and was not the agent of either of them.

88. Noblis used improper methods. First, on information and belief, Noblis knew from the circumstances—including Mr. Strickland's reports of harassment, Joyner's earlier attempt to have him fired over the Tesla critique, the absence of any reason or contracting-officer direction, and the timing—that the demand was a reprisal, and by effecting his permanent removal and thereby procuring or materially contributing to his discharge, Noblis itself violated 41 U.S.C. § 4712. Procuring a discharge through conduct that federal law prohibits is an improper method.

89. Second, the circumstances confirm that Noblis was carrying out the reprisal rather than exercising a contractual right in good faith; a contractual power to remove subcontractor personnel is not a right to remove them for a reason federal law prohibits. Even if Noblis held contractual discretion over subcontractor personnel, it did not exercise that discretion in response to any contractual request: the communications disclosed to Mr. Strickland were an unexplained message that he was not to come onto the property the next day and a Noblis email repeating the bar without any reason, not a request or directive under the prime contract or the subcontract, and, on information and belief, no contracting officer invoked any contract provision. On information and belief, Noblis went beyond relaying that message: it effected Mr. Strickland's permanent removal from the contract, thereby procuring or materially contributing to his discharge. The only reason TechINT later gave was pretextual. On information and belief, Noblis effected that removal without requesting a contracting-officer instruction, verifying that the demand came from an official with authority, or inquiring into its basis.

90. Noblis had no legitimate business justification for participating in a reprisal prohibited by federal law. The unexplained property bar did not on its face require Mr. Strickland's permanent removal or discharge, and no performance deficiency or contract violation had been identified to him. On information and belief, Noblis acted not to protect a legitimate contractual interest but to carry out the retaliatory demand alleged above.

91. As a direct and proximate result, Mr. Strickland's employment was terminated, and he lost wages, benefits, future earning capacity, and professional standing. Noblis acted with actual malice and with willful and wanton disregard of Mr. Strickland's rights: on information and belief, it knew the demand was a reprisal, knew of Mr. Strickland's harassment reports and Joyner's earlier attempt to have him fired, and chose to effect his permanent removal from the CWMD

contract anyway, thereby materially contributing to TechINT's discharge decision, rather than pursue any lawful alternative. Mr. Strickland is entitled to compensatory damages and to punitive damages as permitted by Virginia law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Matthew Strickland respectfully requests that the Court enter judgment in his favor and against Defendants, jointly and severally as to TechINT and Noblis where appropriate, and severally as to the United States, and grant the following relief:

**A.** A declaration under 28 U.S.C. §§ 2201–2202 that TechINT and Noblis subjected Mr. Strickland to a reprisal prohibited by 41 U.S.C. § 4712 and that the reprisal was not excused by § 4712(a)(3)(B);

**B.** An order requiring TechINT and Noblis, as applicable, to reinstate Mr. Strickland to a position comparable to the one he held on May 15, 2025, with all terms and conditions of employment that would have applied but for the reprisal, or, if the Court finds reinstatement impracticable, front pay in lieu of reinstatement;

**C.** Compensatory damages under 41 U.S.C. § 4712, including back pay and the value of all employment benefits Mr. Strickland would have received but for the reprisal, and damages for reputational harm, emotional distress, and other non-economic harm, in an amount to be proven at trial;

**D.** Compensatory damages against the United States under the Federal Tort Claims Act in an amount to be proven at trial, subject to 28 U.S.C. § 2675(b);

**E.** Compensatory and punitive damages against Noblis on the Virginia tortious-interference claim, in amounts to be determined at trial;

**F.** Affirmative relief to abate the reprisal, including expungement, from the records TechINT and Noblis control, of all adverse employment records arising from the May 2025 removal and discharge; provided that Mr. Strickland does not seek an order directing DHS

to make any security-clearance, suitability, facility-access, or system-access determination, and does not seek review of any security-clearance adjudication;

**G.** Reasonable attorneys' fees, expert-witness fees, and costs under 41 U.S.C. § 4712(c);

**H.** Pre-judgment and post-judgment interest against TechINT and Noblis at the maximum rates allowed by law, and post-judgment interest against the United States to the extent allowed by law; and

**I.** Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable, under 41 U.S.C. § 4712(c)(2) and Rule 38 of the Federal Rules of Civil Procedure. Count II, against the United States under the Federal Tort Claims Act, is to be tried to the Court under 28 U.S.C. § 2402, and this demand does not extend to that Count.

Dated: October 26, 2026
Respectfully submitted,



**John M. Pierce**
CA Bar No. 250443
JOHN PIERCE LAW P.C.
21550 W. Oxnard Street, 3rd Floor
Woodland Hills, CA 91367
Tel: (321) 292-2366
Email: jpierce@johnpiercelaw.com
*Counsel for Plaintiff Matthew Strickland*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 26, 2026, I electronically filed the foregoing First Amended Complaint, together with the redline comparison required by Paragraph 6 of the Court's Standing Order (ECF No. 8), with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

John M. Pierce

**John M. Pierce**
CA Bar No. 250443
JOHN PIERCE LAW P.C.
21550 W. Oxnard Street, 3rd Floor
Woodland Hills, CA 91367
Tel: (321) 292-2366
Email: jpierce@johnpiercelaw.com
*Counsel for Plaintiff Matthew Strickland*