**REDLINE COMPARISON — ORIGINAL COMPLAINT (ECF No. 1) AND FIRST AMENDED COMPLAINT**

*Strickland v. TechINT Solutions Group, LLC, et al., No. 1:26-cv-02444-EGS (D.D.C.)*

Legend: ~~deleted text~~; inserted text. Caption, signature block, and certificate of service omitted. Paragraph numbers are shown as they appear in each pleading.

FIRST AMENDED COMPLAINT

Plaintiff Matthew Strickland, by and through undersigned counsel, files this First Amended Complaint as a matter of course under Federal Rule of Civil Procedure 15(a)(1)(B). He brings this action against Defendants TechINT Solutions Group, LLC ("TechINT") and Noblis, Inc. ("Noblis") for whistleblower ~~retaliation~~ reprisal under 41 U.S.C. § ~~4712 and 31 U.S.C. § 3730(h);~~ 4712; against the United States of America for intentional infliction of emotional distress under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), ~~2671 – 2680;~~ 2671–2680; and against Noblis for tortious interference with contractual and business relations under Virginia ~~law; and against all Defendants for declaratory and injunctive relief; and~~ law. He alleges as follows:

PRELIMINARY STATEMENT

1. This is a ~~retaliation~~ whistleblower-reprisal case. For more than a year, Matthew Strickland served as an analyst on the Department of Homeland Security's ("DHS") Countering Weapons of Mass Destruction ("CWMD") contract. He held a Top Secret/SCI clearance. He was exceptionally productive. His first-line supervisor gave him a strongly positive annual evaluation about one week before he was ~~fired.~~ removed. CWMD management was ~~in the process of~~ creating a new position to move him to the Strategy ~~team.~~ team, away from the supervisors who were harassing him. And yet, on the evening of May 15, 2025, ~~he was summarily banned from DHS property and removed from~~ the ~~contract — because, as the DHS~~ CWMD Assistant Secretary told him ~~on a telephone call~~ that ~~same evening,~~ "one of the four horsemen" had called ~~to demand~~ and wanted him fired, and within the hour he was told that he was not allowed on DHS property the following day. Two days later, his ~~firing, and temporary DHS senior advisor Corey Lewandowski~~ employer told him he was ~~angry.~~ fired.

2. Over his tenure, Mr. Strickland ~~was fired because~~ did what 41 U.S.C. § 4712 protects. In writing, he ~~had, over~~ disclosed to the ~~course of his tenure, done exactly what~~ federal ~~whistleblower statutes protect. He disclosed, to officials responsible for federal~~ managers who directed and oversaw contractor work on the CWMD contract ~~oversight,~~ a draft ~~interagency~~ intelligence ~~product~~ product, circulated by the Department's Office of Intelligence and Analysis for review, that ~~recommended unlawful surveillance~~ carried an implied recommendation to monitor American victims of ~~American hurricane victims. He disclosed~~ Hurricane Helene for "conspiracy theories" and "misinformation," and CWMD's neglect of credible drone-borne chemical, biological, radiological, and nuclear ("CBRN") threat ~~reporting. He~~ reporting that fell squarely within CWMD's mission. In a CWMD meeting, he disclosed to one of those managers the suppression of ~~a unanimous~~ an interagency ~~memorandum recommending~~ recommendation that illicit fentanyl be designated a Weapon of Mass ~~Destruction—a memorandum that,~~ Destruction. He also reported to the owner of his employer, TechINT, and to the CWMD program manager of the prime contractor, Noblis, that the two DHS managers his disclosures had challenged were harassing him—conduct he reasonably believed was an abuse of their authority over work under the CWMD contract. He reported to TechINT's owner that the harassment included a surveillance-style reporting regime imposed on ~~information~~ no one else. TechINT and ~~belief, DHS political leadership blocked based on anticipated pharmaceutical industry impacts. And, directly triggering~~ Noblis knew of his reports that he was being harassed; TechINT knew that the ~~reprisal, he publicly supported~~ harassment included that reporting regime; and both knew that a ~~fellow DHS whistleblower—then-Acting~~ new position was being created for him because of that harassment.

¶3. The removal came within days of Mr. Strickland's public post supporting then-Acting FEMA Director Cameron ~~Hamilton—who had been terminated days earlier~~ Hamilton. Political staff working for ~~refusing~~ the DHS Secretary were angered by the post. According to ~~execute directives concerning the diversion of FEMA disaster funds and unauthorized FEMA expenditures.~~

~~¶3. The evidence of retaliatory motive is direct and substantial. On the evening of May 15, 2025, at approximately 7:30 p.m. ET,~~ CWMD Assistant Secretary David ~~Richardson telephoned~~ Richardson, the demand passed from political staffer Joe Guy to Carlos Joyner—one of the

managers in CWMD's Information and Analysis Directorate ("IAD") whose conduct Mr. Strickland had challenged—and Joyner "ran with it and called the company," as Richardson later relayed what a colleague told ~~him~~ him. Within the hour, Noblis called TechINT to relay that ~~"one of~~ Mr. Strickland was not allowed on DHS property the ~~four horsemen" — a nickname~~ next day. No one gave any reason. TechINT did not know whether he had been fired or merely barred for a day.

¶4. The demand originated with the DHS ~~insiders use for four~~ Secretary's senior advisor and political ~~staffers working for~~ staff; the decision to act on it was the contractors'. The Assistant Secretary ~~Kristi Noem, at least three of whom are Troup Hemenway, Joe Guy, and Josh Whitehouse — had just called to complain about a Strickland social-media post defending Hamilton. Richardson~~ told Mr. Strickland ~~that "the four horsemen" wanted him fired over~~ in writing the ~~post, and said, verbatim, "you gave them ammo~~ next day: "It's not up to the government. It's the company." He later wrote, of the senior advisor who had called political staff, "He can't fire ~~you man." Within~~ you. Only the ~~hour,~~ company can." Only after two days without any reason did TechINT ~~called to inform~~ tell Mr. Strickland that he was fired because DHS ~~officials had banned him from DHS property,~~ was "concerned" that ~~Noblis had~~ he "may have been ~~so informed,~~ working on things outside of [his] contract"—a reason that was false, and that ~~he was~~ no ~~longer allowed~~ one had ever raised with him. TechINT identified to ~~report to work. Mr. Strickland also possesses a contemporaneous text message from a senior DHS official who was involved in the events, in which that official expressly identifies Corey Lewandowski by name as the individual who contacted DHS leadership~~ him no contract provision his work exceeded, and ~~demanded Mr. Strickland's termination. That text message confirms what Richardson~~ when asked for his contract, its owner said ~~on the phone: the firing was ordered at the senior political level, not made independently by the contractor.~~ TechINT had only his offer letter.

~~4. Defendants TechINT (Mr. Strickland's direct employer and a DHS subcontractor) and Noblis (the prime~~ 5. Congress anticipated exactly this defense. A contractor ~~on the DHS CWMD contract) are the entities Congress made answerable for contractor whistleblower retaliation under 41 U.S.C. § 4712 and 31 U.S.C. § 3730(h). Both statutes run against the contractor, not against the federal officials who instigated the reprisal. That~~ reprisal "is prohibited even if it is ~~a~~

~~deliberate feature of the statutory scheme: Congress placed the legal burden on contractors to resist unlawful requests from federal officials. Under 41 U.S.C. § 4712(a)(3)(B), a reprisal is not shielded from liability merely because it was “undertaken~~ undertaken at the request of an executive branch ~~official”~~ official, unless the request ~~“takes~~ takes the form of a non-discretionary directive and is within the authority of the executive branch official making the request.” ~~No such~~ 41 U.S.C. § 4712(a)(3)(B). So far as was ever disclosed to Mr. Strickland, no contracting officer issued any directive ~~existed here. The request~~ and no contract clause was invoked. So far as TechINT and Noblis disclosed to ~~remove~~ him, what reached them was an informal telephone message that Mr. Strickland ~~came~~ was not allowed on DHS property the next day, with no stated reason and no personnel directive. According to the Assistant Secretary, Corey Lewandowski, a temporary senior advisor to the DHS Secretary, called political staff; the matter then went from political staff to an IAD manager; and the IAD manager carried it to the company. On information and belief, the IAD manager carried it either directly or through the ~~political channel — from~~ Contracting Officer’s Representative (“COR”) and lacked authority to direct a ~~“senior advisor” with no statutory line-authority over~~ contractor ~~personnel,~~ to discharge or remove a contractor employee. The Assistant Secretary disclaimed that the government had made, or could make, the decision. TechINT and, on information and ~~through political staffers acting on his behalf — not through any contracting officer invoking any contract clause or any lawful termination-for-cause process.~~ belief, Noblis chose to carry out the reprisal anyway.

~~5.~~ 6. The United States is separately answerable under the Federal Tort Claims Act for the intentional infliction of emotional distress ~~that~~ by DHS ~~officials — acting~~ managers who, acting within the scope of their ~~federal employment — inflicted through~~ employment, subjected Mr. Strickland to a ~~sustained, orchestrated campaign~~ sustained course of harassment, surveillance, and professional ~~isolation, and humiliation that culminated in Mr. Strickland’s abrupt public removal.~~ isolation. Mr. Strickland presented an administrative tort claim ~~on Standard Form 95~~ to DHS on December 16, 2025, and more than six months have ~~elapsed~~ passed without final ~~disposition. His FTCA claim is therefore ripe under 28 U.S.C. § 2675(a).~~ disposition.

~~6.~~ 7. Mr. Strickland exhausted his administrative remedies under ~~41 U.S.C.~~ § 4712 by filing a ~~detailed whistleblower-retaliation~~ whistleblower-reprisal complaint with the DHS Office of Inspector General on September 3, ~~2025.~~ 2025, that identified TechINT as his employer, Noblis

as the prime contractor, and the roles of TechINT and Noblis in communicating the removal to him. More than 210 days ~~have~~ passed without ~~any order, and no extension has been agreed to.~~ an order. He ~~is accordingly deemed to have exhausted all administrative remedies under § 4712(c)(2). He also has a timely claim under 31 U.S.C. § 3730(h), which has a three-year limitations period that runs from the date of retaliation. The two statutes are independent and cumulative: § 4712(e) expressly preserves "a right or remedy otherwise available to the employee," and Mr. Strickland invokes both. Mr. Strickland~~ seeks ~~full make-whole relief, including~~ reinstatement, back ~~pay (doubled as to the § 3730(h) count pursuant to 31 U.S.C. § 3730(h)(2)), front~~ pay, compensatory ~~damages for reputational harm and emotional distress, special~~ damages, punitive damages ~~as to the~~ on his Virginia ~~tortious-interference count,~~ tort claim, declaratory and equitable relief, attorneys' fees and costs, ~~declaratory~~ and ~~injunctive relief, and any~~ all other relief ~~this~~ the Court deems proper.

JURISDICTION AND VENUE

~~7.~~ 8. This Court has subject-matter jurisdiction under 28 U.S.C. § ~~1331 (federal question);~~ 1331; under 41 U.S.C. § 4712(c)(2), which ~~vests district courts with jurisdiction over~~ authorizes a de novo ~~whistleblower-reprisal actions~~ action in the appropriate district court "without regard to the amount in controversy"; ~~31 U.S.C. § 3730(h), which provides for a civil action in the appropriate United States district court;~~ and under 28 U.S.C. § 1346(b)(1), which vests the district courts with exclusive jurisdiction over civil actions ~~on claims~~ against the United States for money damages for the ~~negligent or~~ wrongful acts or omissions of federal employees acting within the scope of their employment. ~~This~~ The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over ~~Plaintiff's~~ the Virginia ~~common-law~~ tortious-interference claim because ~~that claim~~ it forms part of the same case or controversy as the federal claims. ~~Plaintiff's claims for~~ The Court may grant declaratory ~~and injunctive~~ relief under 28 U.S.C. §§ 2201–2202 ~~rest on the Court's original federal-question jurisdiction over~~ in connection with the federal ~~statutory claims to which they relate.~~ claims.

~~8.~~ 9. Venue is proper in this District. As to ~~the claims against~~ TechINT and Noblis, venue lies under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to ~~those~~ the claims occurred in the District of Columbia. As to the ~~claim against the~~ United ~~States under the Federal Tort Claims Act,~~ States, venue lies under 28 U.S.C. § 1402(b) because the acts

and omissions complained ~~of — the harassing, isolating, and demeaning supervisory conduct~~ of ~~the responsible DHS officials, and the directive effecting Mr. Strickland's removal — occurred~~ occurred in the District of ~~Columbia, where those officials acted and where Mr. Strickland performed his duties; and, to the extent applicable to the United States as a defendant, venue also lies under 28 U.S.C. § 1391(e)(1).~~ Columbia. Mr. Strickland performed his CWMD contract duties at the DHS CWMD offices on the St. Elizabeths Campus in Washington, ~~D.C. The retaliatory directive~~ D.C.; the DHS managers whose conduct is at issue worked there; the demand that led to his removal originated with DHS officials in ~~the District of Columbia~~ Washington, D.C.; and ~~was conveyed from~~ DHS ~~headquarters in Washington, D.C. The four horsemen, Corey Lewandowski, Secretary Noem, and Deputy Secretary Edgar operate out of DHS headquarters in Washington, D.C. The DHS official X-account post publicly disclaiming Mr. Strickland's federal ties was published from the District of Columbia. And Mr. Strickland's~~ revoked his access to ~~his worksite in the District of Columbia was revoked as part of the reprisal.~~ that worksite.

~~9.~~ 10. This action is timely. Mr. Strickland ~~filed~~ submitted his § 4712 complaint ~~with~~ to the DHS Office of Inspector General on September 3, 2025. No order ~~has~~ issued, no extension was agreed to under § 4712(b)(2)(B), and more than 210 days ~~have elapsed. Mr. Strickland~~ elapsed, so he is ~~therefore~~ deemed to have exhausted ~~all~~ his administrative remedies under ~~41 U.S.C.~~ § ~~4712(c)(2) and may bring this de novo action.~~ 4712(c)(2). This action was filed on July 12, 2026, within two years after the date on which his remedies were deemed exhausted. As to ~~31 U.S.C. § 3730(h), the retaliation occurred on May 15, 2025, well within the three-year limitations period prescribed by § 3730(h)(3). As to the claim against~~ the United States, Mr. Strickland presented an executed Standard Form 95 to ~~the Department of Homeland Security~~ DHS on December 16, 2025, claiming a sum certain of $7,000,000; more than six months have elapsed without final ~~disposition; and~~ disposition, so the claim is ~~therefore~~ deemed denied ~~and ripe for suit~~ under 28 U.S.C. § 2675(a). The Virginia tortious-interference claim is brought within the applicable ~~Virginia~~ limitations period.

PARTIES

~~10.~~ 11. Plaintiff Matthew Strickland is a citizen and resident of the Commonwealth of Virginia. He resides at 11304 Lenoir Court, Fredericksburg, Virginia 22407. At all relevant times, ~~times~~

relevant to this Complaint, Mr. Strickland he was employed by TechINT as an analyst on the DHS CWMD contract and held an active Top Secret/Sensitive Compartmented Information (TS/SCI) ("TS/SCI") clearance. He is was an employee of a "covered employee" subcontractor, TechINT, within the meaning of 41 U.S.C. § 4712(a)(1) and an "employee, contractor, or agent" within the meaning of 31 U.S.C. § 3730(h)(1).4712(a)(1).

11. 12. Defendant TechINT Solutions Group, LLC is a Virginia limited liability company with its principal place of business at 1701 Fall Hill Avenue, Unit 104, Fredericksburg, Virginia 22401. TechINT's owner is Skip Funicello. TechINT was Mr. Strickland's direct employer at all relevant times. TechINT was and a subcontractor to Noblis on the DHS CWMD contract. TechINT is a "contractor" or "subcontractor" within the meaning of 41 U.S.C. § 4712(a)(1) and an employer within the meaning of 31 U.S.C. § 3730(h)(1).4712.

12. 13. Defendant Noblis, Inc. is a Virginia Delaware nonprofit, non-stock corporation with its principal place of business at 2002 Edmund Halley Drive, Reston, Virginia 20191. At all relevant times, Noblis was the prime contractor on the DHS CWMD contract under which Mr. Strickland performed his duties. duties, and TechINT performed under a subcontract with Noblis. Noblis is a "contractor" within the meaning of 41 U.S.C. § 4712(a)(1) and an employer within the meaning of 31 U.S.C. § 3730(h)(1). On the evening of May 15, 2025, DHS officials communicated to Noblis that Mr. Strickland 4712. Noblis's CWMD program manager was to be barred from DHS property, and Noblis in turn conveyed that communication to TechINT, which employed Mr. Strickland. On information and belief, under the structure of the prime contract and the Noblis–TechINT subcontract, Noblis possessed contractual authority over the staffing of personnel on the CWMD contract, including the authority to approve, place, retain, reassign, and remove subcontractor personnel from the engagement, such that TechINT could not retain Mr. Strickland on the contract over Noblis's direction. On information and belief, Noblis had the ability to decline to execute, or to seek a lawful basis for, the demand before it was carried out, and the ability to reassign Mr. Strickland to other Noblis or TechINT contract work not located at the DHS property from which he had been barred; Noblis did neither. Noblis did not request a written contracting-officer instruction, did not verify that the demand came from an official with authority over contractor personnel, did not inquire into the basis for the removal, and did not afford Mr. Strickland any process. Instead, with knowledge that the demand originated from

~~DHS political personnel rather than from a contracting officer exercising lawful authority under the CWMD contract, Noblis conveyed and effected Mr. Strickland's removal. By exercising its contractual authority over Mr. Strickland's placement to carry out the removal rather than to resist or mitigate it, Noblis took action functionally equivalent to an adverse employment action against him and participated in the reprisal, and is subject to liability under 41 U.S.C. § 4712.~~Ed Nickerson.

~~13.~~ 14. Defendant the United States of America is the proper defendant for the claim ~~brought~~ under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and ~~2671 – 2680.~~ 2671–2680. The tortious conduct ~~described herein~~ alleged in Count II was committed by DHS employees ~~of the Department of Homeland Security~~ acting within the scope of their federal employment.

FACTUAL ALLEGATIONS

A. Mr. Strickland's Role on the DHS CWMD Contract

~~14.~~ 15. In March 2024, Mr. Strickland ~~joined~~ began work on the ~~mission of~~ DHS CWMD contract as an analyst supporting the Information and Analysis Directorate ("IAD"), a directorate within ~~the Department of Homeland Security's Countering Weapons of Mass Destruction Office ("CWMD"), as an analyst~~ CWMD. He was employed by ~~TechINT as~~ TechINT, a subcontractor to Noblis. He interviewed for the position with Mr. Funicello of TechINT, Mr. Nickerson of Noblis, and a representative of IAD, and each had a say in his placement on the contract. TechINT sponsored his TS/SCI clearance through Noblis for the CWMD contract. He performed his duties on the St. Elizabeths Campus in Washington, D.C.

¶16. IAD is a component of ~~CWMD; it~~ CWMD. It is not the Department's separate Office of Intelligence and Analysis ("I&A"), which is a distinct office within ~~DHS headed by an Under Secretary.~~ DHS. Neither CWMD nor IAD is an element of the intelligence community as defined in 50 U.S.C. § 3003(4); the only DHS ~~element of the intelligence community~~ elements listed in that provision ~~is~~ are the Office of Intelligence and ~~Analysis,~~ Analysis and the intelligence elements of the Coast Guard. The CWMD contract was a contract to support CWMD, not ~~CWMD~~ a contract with, or ~~IAD. Mr. Strickland held a TS/SCI clearance throughout his tenure, sponsored by TechINT through Noblis for~~ services provided to, any element of the intelligence community.

¶17. Under the CWMD contract, DHS managers in IAD directed and ~~performed his duties~~ oversaw the work of contractor personnel. They assigned contractor analysts their tasks, reviewed and approved the work product the contractor workforce delivered, evaluated contractor analysts' performance, and communicated with the Contracting Officer's Representative ("COR") and with Noblis about contractor performance and staffing. The IAD managers who exercised that oversight and management over Mr. Strickland's contract work included Deputy Assistant Secretary ("DAS") Steve Griffin (SES, the head of IAD); Carlos Joyner (GS-15, Griffin's second-in-command in IAD); Branch Chief Joe Sena; Brian Crombach (a GS-14 or GS-15 supervisor); and Mr. Strickland's first-line supervisor, Desiree Dawson (GS-14). The CWMD COR was Kelly Muffoletto. Griffin and Joyner imposed on Mr. Strickland, through Noblis, the ~~St. Elizabeths Campus~~ reporting requirements alleged in ~~Washington, D.C.~~Paragraph 31.

~~15.~~ 18. Mr. Strickland's analytic portfolio included fentanyl-as-WMD policy, drone-borne CBRN threats, ~~the origin of COVID-19,~~ foreign genomic-weapons programs, interagency intelligence sharing, and cross-component coordination ~~between~~ among IAD, CWMD, DHS, and other ~~government agencies~~ departments and ~~departments.~~ agencies. Senior CWMD personnel credited him with greater productivity in his tenure than many employees had achieved over ~~periods of~~ a decade. ~~His first-line supervisor, Desiree~~ Ms. Dawson ~~(GS-14),~~ gave him a strongly positive annual evaluation ~~within approximately~~ about one week ~~of~~ before his ~~firing.~~ removal.

¶19. CWMD ~~management—specifically~~ Assistant Secretary ~~(AS)~~ David ~~Richardson (the head of CWMD) and Mike Kangior (GS-15) had, recognizing Mr. Strickland's productivity and the hostility he was encountering in IAD from Deputy Assistant Secretary (DAS) Steve Griffin (SES and~~ Richardson, the head of ~~IAD) and Carlos Joyner (GS-15) (Griffin's second-in-command), already created a new position on the CWMD Strategy team to move~~ CWMD, personally selected Mr. Strickland to serve as the IAD representative at his complex-problem-solving meetings and to work with CWMD's policy, strategy, and management staff on a forward strategy and action plan for CWMD. Richardson kept Griffin and Joyner out of ~~IAD. The CWMD Contracting Officer's Representative (COR) Kelly Muffoletto was informed and approved. Mr. Strickland was to fill that position imminently.~~

¶16. The morning of May 15, 2025, at approximately 10:00 a.m., Mr. Strickland met with DAS Steve those matters because he did not trust them. Griffin and informed him that he would be moving to the new CWMD Strategy team position. In that meeting, Griffin told Mr. Strickland that he hoped there was "no ill will" over the reporting requirements to which Mr. Strickland had been subjected, explaining that because he and Joyner were resented Mr. Strickland's supervisors, they "just wanted to know" what selection and the trust the Assistant Secretary Richardson had Mr. Strickland working on — an acknowledgment, from Griffin himself, that the escalating reporting demands were directed at surveilling Mr. Strickland's work for Richardson. Mr. Strickland responded that the reporting requirements, and the other harassment he had endured placed in IAD, were egregious, and informed Griffin that Mr. Funicello had suggested he file a hostile-workplace grievance. Griffin acknowledged that filing a grievance was Mr. Strickland's right and directed him to obtain the reporting process from Mr. Funicello. The two shook hands, Griffin agreed the move was appropriate and wished Mr. Strickland well, and Mr. Strickland left his office. At no point in that meeting — or at any prior time — did Griffin or anyone else suggest that any of Mr. Strickland's work was outside the scope of his contract. Approximately nine and a half hours later, that same day, Mr. Strickland was fired.analysis.

B. Protected Disclosure #1 — The October 2024 Intelligence & Analysis (I&A) "Hurricane Helene" Surveillance ReportHurricane Helene Product

17. 20. In October 2024, Mr. Strickland, in his capacity as a CWMD IAD analyst, received I&A circulated a draft interagency product that had been produced by I&A and circulated to other offices, including CWMD IAD, for courtesy review and comment before publication. Mr. Strickland reviewed it as a CWMD IAD analyst under the CWMD contract. He was not an employee of I&A, did not perform intelligence work for I&A, and was included on the review distribution only as a non-intelligence-community reviewer. did not perform services under any contract with I&A.

¶21. The draft product carried an implied recommendation that DHS monitor American victims of Hurricane Helene for purported "conspiracy theories" and "misinformation" on social media. "misinformation." Mr. Strickland identified multiple factual inaccuracies in the underlying reporting and flagged warned that the recommended surveillance posture would implicate

infringe the First Amendment rights of American citizens, exceed DHS's lawful authorities, and damage public trust in ~~the agency and in federal contractors performing work for it.~~DHS.

~~18.~~ 22. Mr. Strickland ~~raised these concerns~~ made that disclosure in ~~writing~~ writing, by email, to ~~his chain of command—federal employees~~ Branch Chief Joe Sena, Brian Crombach, Carlos Joyner, and DAS Steve Griffin—DHS managers responsible for the oversight and management of contract ~~and grant oversight at the agency—as contemplated by 41 U.S.C. § 4712(a)(2)(D).~~ work in IAD, including his own. He also raised those concerns with Ms. Dawson, his first-line supervisor. His concerns were ~~ignored. The report proceeded~~ disregarded, and the draft product was finalized ~~uncorrected.~~ without any of the corrections he had identified. ~~The disclosure was protected under § 4712 because Mr. Strickland~~ He reasonably believed ~~it evidenced~~ that what he disclosed was evidence of gross mismanagement of a ~~federal~~ Federal contract, of an abuse of authority relating to a ~~federal contract,~~ Federal contract—an arbitrary and capricious exercise of authority inconsistent with DHS's mission—and of a violation of ~~law.~~law related to a Federal contract.

C. Protected Disclosure #2 — Neglect of Drone-Borne CBRN Threats

~~19.~~ 23. Beginning in December 2024, Mr. Strickland repeatedly alerted IAD ~~leadership of~~ leadership, including in writing by email to Mr. Sena, Mr. Crombach, Joyner, and DAS Griffin, to credible ~~news~~ reports of thousands of unexplained drone sightings across the East ~~Coast of the U.S., to include~~ Coast, including in Virginia and ~~Washington D.C. Mr. Strickland reminded IAD leadership~~ the District of Columbia, and to intelligence reporting ~~on~~ that drones ~~that~~ could be adapted to deliver chemical, biological, radiological, or nuclear ~~payloads—threats squarely within CWMD's~~ payloads. He also raised those concerns with Ms. Dawson. Countering those threats is the core ~~statutory mission.~~ mission of CWMD and the subject matter of the CWMD contract on which Mr. Strickland worked.

¶24. He asked on multiple occasions why CWMD, and IAD in ~~particular IAD,~~ particular, was not even discussing these ~~possible drone~~ threats. His supervisors dismissed the reporting as "not our lane," and the ~~intelligence streams were~~ work was deprioritized. ~~The disclosure was protected under § 4712 because~~ Mr. Strickland reasonably believed that the ~~neglect~~ refusal to address those threats was evidence of ~~these threat streams evidenced~~ gross mismanagement of the CWMD

contract, an abuse of authority relating to that contract—an arbitrary and capricious exercise of authority inconsistent with CWMD's mission and with successful performance of the contract—and a substantial and specific danger to public health or safety.

¶D. Protected Disclosure #3 — Suppression of the Fentanyl-as-WMD Recommendation

¶25. Throughout his tenure, Mr. Strickland participated, as part of his CWMD contract work, in interagency working groups addressing the illicit-fentanyl crisis, including with components of the Department of Defense. Those working groups reached a consensus that illicit fentanyl should be designated a Weapon of Mass Destruction, a designation that would have unlocked more than 150 federal authorities, including sanctions on foreign producers, expanded intelligence sharing, and additional prosecutorial tools.

¶26. Mr. Strickland learned through that work that a memorandum reflecting the interagency recommendation was prepared for transmission to the President and that, on information and belief, DHS political leadership blocked it from moving forward because of anticipated effects on the pharmaceutical industry rather than for any reason related to public health or CWMD's mission.

¶27. Mr. Strickland raised the suppression of that work product in a CWMD meeting where the issue was discussed, including directly with Carlos Joyner. Joyner was among those pressing CWMD not to support the designation. Mike Kangior, a CWMD GS-15, and Akram Khan witnessed Mr. Strickland raise the issue. Mr. Khan was a DHS Contracting Officer's Representative for another DHS program and a federal employee responsible for contract oversight at DHS. Mr. Strickland reasonably believed that what he disclosed was evidence of gross mismanagement of a Federal contract, an abuse of authority relating to a Federal contract, and a substantial and specific danger to public health ~~and~~ or safety.

~~¶D. Protected Disclosure #3 — Fentanyl as a Weapon of Mass Destruction and Suppression of the Interagency Memorandum~~

~~¶20. Throughout his tenure, Mr. Strickland participated in interagency working groups — including components of the Department of Defense — addressing the illicit-fentanyl crisis. Those working groups reached unanimous consensus that illicit fentanyl should be formally~~

~~designated a Weapon of Mass Destruction. That designation would have unlocked more than 150 federal statutory authorities, including enhanced sanctions targeting foreign producers, expanded intelligence-sharing authorities, and new federal prosecutorial tools.~~

~~¶21. Based on information learned through his participation in interagency working-group sessions and discussions with federal counterparts, Mr. Strickland understood that a memorandum reflecting the interagency consensus was prepared for transmission to the President, and that DHS political leadership—including, on information and belief, senior advisor Corey Lewandowski and Deputy Secretary Troy Edgar—blocked the memorandum from moving forward based on anticipated impacts to the pharmaceutical industry. The suppression of the memorandum was not undertaken to protect public health. It was undertaken notwithstanding the federal contract work-product the interagency group had produced, and notwithstanding the federal contract and grant obligations owed by DHS's contractor workforce.~~

~~¶22. Mr. Strickland repeatedly questioned the suppression of the memorandum in meetings and to his chain of command. The disclosure was protected under 41 U.S.C. § 4712 because Mr. Strickland reasonably believed the suppression evidenced gross mismanagement of federal contracts, abuse of authority relating to federal contracts, a substantial and specific danger to public health and safety, and a violation of law.~~

~~¶23. The suppression also implicated the False Claims Act. Mr. Strickland reasonably believed that the contract deliverables produced on the fentanyl-WMD issue were being suppressed while the contracting entities—including Noblis, with which DHS had a contractual relationship, and ultimately the federal government—continued to represent, and bill for, substantive and complete work product on CBRN-threat policy. Mr. Strickland's objections were efforts to stop conduct he reasonably believed implicated false claims or false certifications to the federal government about the status of federally-funded CBRN policy work.~~

E. Protected Disclosure #4 — <u>Reports to TechINT and Noblis Management That IAD Managers Were Abusing Their Authority Over His Contract Work</u>

<u>¶28. Beginning after Mr. Strickland's October 2024 Hurricane Helene critique, and continuing as he made the further disclosures described above and as Assistant Secretary Richardson continued to rely on him, Joyner and Griffin used their authority over contractor work to target him.</u>

¶29. In or about December 2024, someone at CWMD—on information and belief, Joyner—complained about, and sought Mr. Strickland's removal over, a December 7, 2024 Washington Post article in which Mr. Strickland, as a private citizen, had offered his opinion on a May 2024 incident in which two foreign nationals drove a truck to the front gate of Marine Corps Base Quantico, an incident on which he had also commented in a May 2024 New York Post article. The complaint reached Mr. Nickerson at Noblis. Neither article concerned Mr. Strickland's work at DHS or the CWMD contract, and nothing Mr. Strickland said in either drew on or disclosed that work. Mr. Nickerson told Mr. Funicello that he had seen the Washington Post article, that nothing in it violated the contract, and that he would not remove Mr. Strickland from the contract. Mr. Funicello told Mr. Strickland of the complaint (the "press-article complaint"), told him that TechINT had likewise declined to remove him because the article had no bearing on his CWMD work and did not violate his contract, and said he was obviously being targeted. In or about March 2025, Mr. Nickerson of Noblis told Mr. Funicello that someone in IAD leadership had said, "Matt won't have top cover from the Assistant Secretary forever." Mr. Funicello told Mr. Strickland to watch his back because Griffin and Joyner wanted him gone.

¶30. In or about March 2025, Mr. Strickland submitted a written critique, by email to Mr. Sena, Mr. Crombach, Joyner, and DAS Griffin, of an intelligence product concerning vandalism of Tesla vehicles and dealerships, explaining that the product's characterization of the attacks as non-political "lone wolf" incidents was contrary to the available evidence. On March 25, 2025, Mr. Funicello called Mr. Strickland and told him that Joyner had called the COR, who had called Noblis, to say that Mr. Strickland's critique was grounds to fire him because his comments were "politically motivated." Mr. Funicello relayed that Mr. Nickerson had said that they "could fire" Mr. Strickland for it but were not going to, because he otherwise appeared to be doing great and important work. That evening, Mr. Strickland asked Mr. Funicello by text to put in an email that the Noblis program manager had reached out about the Tesla product and what message he had relayed; Mr. Funicello replied, "ok will do in morning." Noblis and TechINT thus understood, by March 2025, both that Joyner was seeking a basis to have Mr. Strickland removed and that the decision whether to act on such a request was theirs.

¶31. Beginning after the March 25, 2025 Tesla complaint and escalating through April and May 2025, Joyner—with Griffin's support—imposed on Mr. Strickland, through Noblis, a reporting

regime that culminated in a daily-reporting requirement imposed on no other analyst on the contract. What began as hallway demands to know what Assistant Secretary Richardson had assigned him became formal demands, routed through Noblis, that he report his meetings and projects weekly, then in ever greater detail, and finally that he send Joyner a daily message identifying everyone he had spoken with the day before and the subject of each conversation. On May 14, 2025, Mr. Strickland confirmed to Mr. Funicello by text that his weekly report, "including meetings attended and products working on," was in Mr. Funicello's inbox.

¶32. Griffin and Joyner imposed the reporting regime through the supervisory channels they were employed to administer, during working hours, and were actuated at least in part by a purpose to oversee IAD work. But applied to Mr. Strickland alone and extended to every conversation he had, the regime went far beyond any legitimate supervisory need: it surveilled his work for the Assistant Secretary, burdened and demeaned him, and intruded on work the head of CWMD had assigned him.

¶33. Mr. Strickland complied with every demand and copied Mr. Funicello on his submissions so that there could be no pretext for discipline. Mr. Funicello acknowledged that the submissions were sufficient.

¶34. In the months before his removal, Mr. Strickland reported to Mr. Funicello, TechINT's owner, and to Mr. Nickerson, Noblis's CWMD program manager, that Joyner and Griffin were harassing him. He told Mr. Funicello that the harassment included the reporting regime alleged above. He reasonably believed that conduct was an abuse of their authority over work under the CWMD contract. Mr. Funicello agreed that the daily-reporting demand was harassment and advised Mr. Strickland to file a hostile-workplace grievance. Mr. Funicello and Mr. Nickerson each had responsibility to address misconduct affecting their companies' employees and performance on the CWMD contract. Mr. Nickerson, as Noblis's program manager, received DHS managers' complaints about subcontractor personnel; received, evaluated, and decided not to act on Joyner's March 25, 2025 claim that the Tesla critique was grounds to fire Mr. Strickland; and transmitted DHS managers' reporting demands to Mr. Strickland through TechINT.

¶35. Mr. Strickland reasonably believed that what he reported to Mr. Funicello and Mr. Nickerson was evidence of an abuse of authority relating to a Federal contract—an arbitrary and capricious exercise of authority by DHS managers that was inconsistent with CWMD's mission and with the successful performance of the contract—and of gross mismanagement of the contract.

¶36. Because of the hostility and harassment Mr. Strickland was encountering in IAD from Griffin and Joyner, including, on information and belief, the press-article complaint, Assistant Secretary Richardson and CWMD management, including Mr. Kangior and Mr. Khan, worked to create a new position on the CWMD Strategy team to move Mr. Strickland out of IAD. In March 2025, Mr. Nickerson sent an email asking that the COR—Kelly Muffoletto—be involved in creating the position, and on March 12, 2025, Mr. Funicello asked Mr. Strickland by text about the COR referenced in Mr. Nickerson's email. Ms. Muffoletto was informed of the new position and approved it. Mr. Funicello and Mr. Nickerson both knew that the position was being created because of the harassment. Mr. Strickland was to fill it imminently.

¶37. On the morning of May 15, 2025, at approximately 10:00 a.m., Mr. Strickland met with DAS Griffin and told him that he would be moving to the new Strategy team position. Griffin said he hoped there was "no ill will" over the reporting requirements, explaining that because he and Joyner were Mr. Strickland's supervisors, they "just wanted to know" what the Assistant Secretary had him working on. Mr. Strickland told Griffin that the reporting requirements and the other harassment he had endured in IAD were egregious and that Mr. Funicello had suggested a hostile-workplace grievance. Griffin acknowledged that filing a grievance was Mr. Strickland's right, directed him to get the process from Mr. Funicello, agreed that the move was appropriate, and wished him well. Neither Griffin nor anyone else had ever told Mr. Strickland that any of his work was outside the scope of his contract.

¶F. The Early-May 2025 ~~Public Support for~~ Post Supporting Cameron ~~Hamilton and the Lewandowski FEMA Diversions~~Hamilton

~~24. By early May 2025, Mr. Strickland had learned—through the interagency process, through his cross-component work at CWMD, and through conversations with federal personnel involved in FEMA operations—that Corey Lewandowski, operating as a temporary "senior advisor" to~~

Secretary Noem, had been effectively directing DHS operations without Senate confirmation or any statutory line-authority over DHS components. Based on that information, Lewandowski had sought to route approximately $55 million in FEMA disaster-relief funds to Louisiana Governor Jeff Landry, a former Lewandowski client, under a disaster declaration premised on a single shooting incident. Acting FEMA Director Cameron Hamilton, on direction from Lewandowski, sent that fund request to the White House for approval. The White House subsequently denied the authorization to release those funds. When Hamilton advised Lewandowski that the request was denied, Lewandowski then demanded Hamilton release the funds to Governor Landry anyway. Hamilton refused, which created an ongoing rift between Lewandowski and Hamilton. On further information and belief, Hamilton was directed by Noem's legal counsel to direct FEMA expenditures to New York City, which were then used to house illegal migrants outside of normal FEMA grant processes and without required White House approval. Hamilton executed those orders believing they were initiated by the White House since they were coming from Noem's legal counsel. Upon learning of the expenditures, President Trump and members of the White House staff were angry and disapproved. Lewandowski shifted blame for the release of those funds to Hamilton, although direction came from Noem's legal counsel, which added fuel to the rift between Hamilton and Lewandowski.

¶25. Acting FEMA Director Cameron Hamilton refused to execute multiple directives given by Noem and Lewandowski he believed to be unethical. 38. On or about May 8, 2025, Acting FEMA Director Cameron Hamilton was terminated. removed. Press reporting reports in the following days that followed described the circumstances of Hamilton's his removal, including his refusal to direct redirect federal disaster funds to Governor Landry and his refusal to direct unauthorized FEMA expenditures.funds.

26. 39. In the days immediately following Hamilton's termination, that followed, Mr. Strickland posted on X (@MattForVA) in support of Hamilton. Mr. Strickland's His posts on the subject did not name Lewandowski Corey Lewandowski, Secretary Kristi Noem, or any other specific DHS official. He official and did not discuss his employment at DHS, and after examination of the post, Skip Funicello (TechINT owner) agreed that the post did not violate Mr. Strickland's contract in any way. The post described work at DHS. They expressed Mr. Strickland's views as a pattern Mr. Strickland had observed: private citizen: that a temporary senior advisor was

effectively directing DHS without formal ~~authority;~~ authority, that the Acting FEMA Director had been fired for refusing to redirect federal disaster ~~funds;~~ funds, and that DHS was prioritizing political directives over its mission.

~~27. Mr. Strickland's post was an effort to stop conduct he reasonably believed involved fraud on the federal government and violations of federal contract and grant law. The alleged FEMA diversions, if executed, would have constituted false certifications to the federal government that qualifying disaster conditions existed when in fact they did not, and would have resulted in federal funds being paid out on false pretenses.~~

~~¶F. The Retaliation: Warnings, Isolation, and Termination~~

~~¶28. Beginning earlier in Mr. Strickland's tenure, AS Richardson had personally selected Mr. Strickland to serve as the IAD representative at Richardson's complex-problem-solving meetings and to work with the CWMD policy, strategy, and management team on a forward strategy and action plan for the directorate. Richardson deliberately kept DAS Griffin and Carlos Joyner out of these matters because, as Richardson explained to Mr. Strickland, he did not trust them and intended that both be removed. Griffin and Joyner resented Mr. Strickland's selection. Mr. Strickland was thereby placed between competing directions from his nominal superiors in IAD and from the Assistant Secretary above them.~~

~~¶29. In approximately late April and early May 2025, Joyner escalated a campaign of harassment against Mr. Strickland. What began as informal hallway demands to know what Richardson had assigned to Mr. Strickland progressed to formal demands — routed through Noblis — that Mr. Strickland report his weekly meetings and projects, then that he provide ever greater detail, and finally that he report his meetings, projects, and any conversations he had with others on a daily basis. No other person on the contract was subjected to any comparable daily-reporting requirement. The requirement served no legitimate supervisory purpose; it was imposed to surveil, burden, and demean Mr. Strickland. Mr. Strickland complied with each demand and copied TechINT owner Skip Funicello on his submissions so that there could be no pretext for discipline; Mr. Funicello acknowledged that the submissions were sufficient. Mr. Strickland complained to Mr. Funicello that the daily-reporting demand was harassment, and Mr. Funicello agreed that it was.~~

~~¶30. Also around April of 2025, Mr. Funicello called Mr. Strickland and informed him that someone in IAD leadership had called Noblis to complain about a May 2024 New York Post (NYP) article that Mr. Strickland was quoted in. The article was about an incident totally unrelated to~~ 40. Shortly after those posts appeared, DHS ~~in which two Jordanian nationals almost breached the front gate at Quantico Marine Corps Base. The NYP reporter reached out to Mr. Strickland because he had known him for years. He knew that Mr. Strickland had extensive experience in both Iraq and Afghanistan, and wanted his opinion on what the reason for the attempted breach may have been. Mr. Strickland gave the reporter his opinion on the matter as a private citizen and did not discuss any employment at DHS. Mr. Funicello expressed to~~ officials warned Mr. Strickland that ~~IAD leadership wanted him fired for his contribution to this article. Mr. Funicello told Mr. Strickland that he was obviously being targeted, and that his contribution in this NYP article in no way violated his contract at DHS. He conveyed to Mr. Strickland that he was told by Noblis CWMD Project Manager Ed Nickerson that "someone in IAD leadership (Mr. Funicello wasn't given a name) has it out for you, and they told Ed that you won't have top-cover from AS Richardson forever." Mr. Funicello informed Mr. Strickland to "watch his back at work" because DAS Griffin and Carlos Joyner wanted him gone.~~

~~¶31. Shortly after Mr. Strickland's early-May 2025 X post appeared, Mr. Strickland was warned by DHS officials that~~ senior political ~~figures,~~ figures at DHS, including Corey Lewandowski, then a temporary senior advisor to DHS Secretary Kristi Noem, were displeased with his public ~~conduct.~~ conduct.

¶G. May 15–17, 2025: The ~~pre-existing hostility from Joyner and Griffin then converged with the political anger of Corey Lewandowski~~ Removal and the ~~four horsemen to produce Mr. Strickland's removal.~~Discharge

~~32. On~~ 41. By May 15, 2025, ~~at approximately 10:00 a.m., Mr. Strickland informed DAS Steve Griffin, the head of IAD, that he would be moving~~ Assistant Secretary Richardson had also been assigned to ~~the newly-created CWMD Strategy team position. In that same meeting, Mr. Strickland told Griffin that the reporting requirements and other harassment he had experienced in IAD were egregious and that he intended to pursue a hostile-workplace grievance, and Griffin acknowledged his right to do so. Griffin agreed the move was appropriate and wished Mr. Strickland well, and raised no concern of any kind about the propriety or scope of Mr.~~

~~Strickland's work. That same day, Mr. Strickland was fired.~~lead FEMA following Hamilton's removal, while remaining Assistant Secretary for CWMD.

~~33.~~ 42. At approximately 7:30 p.m. ~~ET~~ on May 15, 2025, Richardson telephoned Mr. Strickland ~~received a telephone call from CWMD Assistant Secretary David Richardson.~~ and asked whether he had posted something in support of Hamilton. Mr. Strickland said he had. Richardson told ~~Mr. Strickland~~ him that ~~he had just received a telephone call from~~ "one of the four horsemen"—a nickname ~~given by~~ DHS insiders ~~to four~~ use for a group of political ~~staffers,~~ staffers working for Secretary Noem, at least three of whom are Troup Hemenway, Joe Guy, and Josh ~~Whitehouse, who worked for Secretary Noem. Richardson told Mr. Strickland that the four horsemen were angered by his X post defending Hamilton, that they~~ Whitehouse—had called and wanted Mr. Strickland fired ~~over it, and that, in Richardson's own words,~~ because of the post. Richardson said, "you gave them ammo to fire you man."

~~34. Less than an hour after Richardson's call, Mr. Strickland received a telephone call from TechINT owner, Skip Funicello.~~ 43. About thirty minutes later, Mr. Funicello ~~informed~~ called Mr. ~~Strickland~~ Strickland. He said that Noblis had just called TechINT ~~to convey that DHS officials had banned Mr. Strickland from DHS property, and that he was no longer allowed to report to work. Mr. Strickland's contract access was revoked that evening.~~

~~¶35. Mr. Strickland also possesses a contemporaneous text-message exchange with a senior DHS official involved in these events. In those messages, the official expressly identifies Corey Lewandowski by name as the individual who contacted DHS leadership and demanded that Mr. Strickland be fired. The text message is a contemporaneous business record created in the regular course of communications between Mr. Strickland and the DHS official. It independently confirms what Richardson had said on the phone: the firing was ordered at the senior political level, it was not an independent contractor decision, and it was not based on performance. The text-message exchange was preserved by Mr. Strickland in the ordinary course, remains in his possession, and will be produced in discovery.~~

~~¶36. On May 16, 2025 and thereafter, DHS published a statement on its official X account claiming that Mr. Strickland was not a federal employee and that "contractors alone" handled his termination. That public statement was false. DHS officials had in fact ordered Mr. Strickland's~~

~~removal from the contract; Noblis and TechINT had executed that directive within the hour; and AS Richardson had said so to Mr. Strickland directly in real time. The DHS public statement inflicted additional reputational harm on Mr. Strickland and publicly advertised to prospective employers in the national-security-contracting space that Mr. Strickland had been fired under circumstances that DHS refused to claim responsibility for.~~

~~¶37. When the removal was first communicated, no reason was given for it at all. TechINT owner Skip Funicello telephoned Mr. Strickland within an hour of AS Richardson notifying Mr. Strickland that "one of the four horseman wanted him fired for his X post" on the evening of May 15, 2025 and told him, in substance, that Noblis had called~~ to relay that DHS had ~~directed that~~ said Mr. Strickland was not allowed on ~~the~~ DHS property the following ~~day.~~ day, Friday, May 16. Mr. Funicello ~~did not know whether Mr. Strickland was being fired, he simply~~ said, in substance, "I was informed by Noblis who was informed by DHS that you're not allowed on DHS property ~~tomorrow" and was~~ tomorrow." He said that neither he nor Noblis had been given ~~no reason for the property ban. Mr. Funicello, an experienced government contractor, remarked~~ any reason, that he had never received a communication ~~of~~ like it, that ~~kind — an employee~~ it was "weird," and that he did not know whether it meant Mr. Strickland was fired or only barred from the ~~property with no reason and no stated termination — and that it was highly unusual.~~

~~¶38.~~ campus for a day. He told Mr. Strickland ~~contacted Skip Funicello multiple times the following~~ to take a day ~~and asked if~~ of leave while he tried to find out what was ~~given a reason for the property ban, and if he was in fact removed from the contract.~~ going on. Mr. Strickland told Mr. Funicello ~~informed~~ that he knew why: he had just received the call from Richardson about the X post.

¶44. On May 16, 2025, Mr. Strickland ~~each time~~ and Mr. Funicello spoke approximately four times. Mr. Funicello reported that he had ~~not~~ heard ~~anything~~ nothing further from Noblis ~~nor DHS. He informed Mr. Strickland~~ or DHS, and that he had called Noblis several times ~~to get answers, but had not received~~ without an ~~answer, nor a call back. Only approximately two days later did DHS and the contractors supply a purported justification — that~~ answer. At about 2:00 p.m., Mr. Funicello asked Mr. Strickland to send him the X post. Mr. Strickland did so, and Mr. Funicello told him that it in no way violated his contract.

¶45. At 4:29 p.m. on May 16, 2025, Mr. Strickland texted Assistant Secretary Richardson to ask whether he was being fired, noting that he still had no formal notification. Richardson replied: "It's not up to the government. It's the company. I don't recommend posting anything." At 4:32 p.m., Mr. Strickland forwarded Richardson's response to Mr. Funicello by text. Mr. Funicello's only response was that this "doesn't explain" why Mr. Strickland's Common Access Card ("CAC") was "not working."

¶46. On Saturday, May 17, 2025, Mr. Funicello told Mr. Strickland that he had finally heard back and that Mr. Strickland was being fired because DHS was "concerned" that he "may have been working on things outside of [his] contract" while completing assignments given to him by the Assistant Secretary.

¶47. On May 19, 2025, Mr. Strickland asked Mr. Funicello for the official notice of his termination and a copy of his contract. Mr. Funicello sent him an email from Noblis and replied, "We have offer letter no contract." ~~That justification~~ The Noblis email stated that DHS was not allowing Mr. Strickland on its property but gave no reason, as Mr. Strickland pointed out to Mr. Funicello the same morning. Mr. Strickland was never offered reassignment to any other work, although, on information and belief, both Noblis and TechINT held other contracts, with open positions, at locations other than the DHS campus.

¶48. The "outside the contract" rationale was false and pretextual. The work ~~Mr. Strickland performed had been directed~~ DHS later questioned consisted of assignments given to him by the ~~Assistant Secretary~~ head of ~~CWMD himself. Mr. Strickland~~ CWMD. He had ~~never, at any time,~~ never been counseled, warned, or reprimanded, orally or ~~even informally told~~ in writing, that any of his work fell outside ~~the scope of~~ his contract—including by DAS ~~Griffin, with whom he had discussed his promotion to the Strategy team~~ Griffin on the very morning of his removal. TechINT identified to Mr. Strickland no contract provision his work exceeded; when asked for his contract, its owner said TechINT had only an offer letter. A DHS "concern" is not a directive. TechINT adopted it as the ~~firing. The shifting and delayed rationale—an unexplained property ban first, a manufactured "outside the contract" reason two days later—is evidence that the stated reason was a pretext~~ ground for ~~retaliation.~~ discharge. On information and belief, before TechINT discharged him and before Noblis effected his removal from the contract, neither TechINT nor Noblis asked what work was meant, consulted the Assistant Secretary ~~Richardson,~~

~~Mike Kangior,~~ who had assigned the work, or involved a contracting officer. The delayed and ~~Akram Kahn will confirm that the~~ manufactured rationale—an unexplained property bar first, followed two days later by an "outside the contract" ~~rationale was false~~ reason—is itself evidence of pretext. Assistant Secretary Richardson assigned and directed that work, and Mr. Kangior and Mr. Khan knew that Mr. ~~Strickland's work had been authorized and directed at the Assistant Secretary level.~~ Strickland worked within IAD parameters.

~~G. Defendants TechINT and Noblis Executed the Removal Without Any Lawful Directive from an Authorized Official~~

~~¶39. Neither Noblis nor TechINT received a lawful, non-discretionary directive from a federal official acting within the scope of delegated authority to terminate Mr. Strickland's contract participation. The request that moved TechINT and Noblis to remove Mr. Strickland originated with: (i) Corey Lewandowski, a temporary "senior advisor" with no Senate-confirmed role and no statutory line-authority over contractor personnel on the DHS CWMD contract; (ii) the "four horsemen" political staffers acting at Lewandowski's behest and on behalf of Secretary Noem; and (iii) Assistant Secretary Richardson, who explicitly told Mr. Strickland that the removal demand was driven by the political complaint about his X post.~~

~~¶40. No contracting officer with authority over the DHS CWMD contract issued any termination-for-cause determination. No contract clause was invoked. No performance-deficiency determination was made through any lawful administrative process. No investigation preceded the removal. Noblis and TechINT simply acted on a political demand. In fact, Lewandowski and the "four horseman" were so infuriated by Mr. Strickland's public post in support of Cameron Hamilton that they directed~~ 49. DHS personnel were directed not to ~~not even~~ allow Mr. Strickland on DHS property even to ~~turn in~~ return his ~~DHS issued~~ government-issued laptop and equipment. ~~Skip~~ Mr. Funicello ~~relayed this message to~~ met Mr. Strickland ~~and asked Mr. Strickland to meet him at the VA clinic~~ in a parking lot in Fredericksburg, ~~VA~~ Virginia, to ~~obtain~~ collect the ~~DHS issued~~ equipment. ~~At that meeting~~ There, Mr. Funicello apologized ~~to Mr. Strickland for the unlawful termination. He~~ and said, "they really screwed you, stuff like this makes me want to sell my company and get away from government contracting."

41. Under 41 U.S.C. § 4712(a)(3)(B), reprisal is 50. On May 16, 2025, and thereafter, DHS published a statement on its official X account asserting that Mr. Strickland was not shielded a federal employee and that the contractors alone had handled his termination.

¶51. In a text-message exchange on March 5 and 6, 2026, Mr. Strickland asked Assistant Secretary Richardson about Lewandowski's involvement in the effort to have him fired. Richardson responded that Lewandowski had not called him but had "called Joe Guy"; that "He can't fire you. Only the company can"; that he had told Guy "to contact the company"; that, as he understood it, the demand "[w]ent from liability merely because Guy to Carlos to the company"; and, after checking with a colleague, that Joyner "ran with it and called the company." Richardson also said that Guy had told him that Mr. Strickland "posted derogatory things."

¶52. In two telephone calls on July 22, 2026, Mr. Strickland spoke with Mr. Funicello. When Mr. Strickland asked whether Noblis had ever sent anything official about why he was "undertaken let go, Mr. Funicello responded: "I only sent it to you, and they got mad at me." He added that he would "have to dig up that email." After saying he thought fentanyl had since been designated a Weapon of Mass Destruction and that he had heard so in the request of an executive branch official," unless news, Mr. Funicello told Mr. Strickland that "everything you're fighting about turned out to be reality in the request "takes end" and that "at least it proves that you're right." And when Mr. Strickland described Joyner's demand that he report daily on his meetings, his work for the form of a non-discretionary directive Assistant Secretary, and is within every conversation he had with anyone, Mr. Funicello responded, "Yeah, I remember that."

¶H. TechINT and Noblis Carried Out the authority of Removal and Discharge Without Any Non-Discretionary Directive

¶53. The only communication DHS made to the executive branch official making the request." The contractors on May 15, 2025 removal request satisfied neither requirement. 2025, so far as TechINT and Noblis disclosed to Mr. Strickland, was an informal telephone message that he was not allowed on DHS property the next day, with no stated reason, no personnel action, and no indication whether the bar extended beyond that day. It was not a non-discretionary directive—it directive to terminate his employment, to remove him from the contract, or to take any other

personnel action. Mr. Funicello did not know whether it meant Mr. Strickland was fired or only barred for a political demand conveyed day, and he said Noblis had not been given a reason either.

¶54. So far as disclosed to Mr. Strickland, and on information and belief, no contracting officer with authority over the CWMD contract issued any directive requiring his discharge or permanent removal from the contract, no contract clause was invoked, no performance or misconduct determination was made, and no investigation preceded the removal. So far as disclosed to Mr. Strickland, and on information and belief, no DHS official issued any written direction to Noblis or TechINT requiring his discharge or permanent removal from the contract.

¶55. According to Assistant Secretary Richardson, Corey Lewandowski, a temporary senior advisor, called Joe Guy; the matter then "[w]ent from Guy to Carlos to the company"; and, as Richardson relayed what a colleague told him, Joyner, an IAD manager, "ran with it and called the company." On information and belief, Joyner did so either directly or through informal telephone calls. And it the COR. On information and belief, none of them—political staff, a senior advisor, an IAD manager, or a COR—had authority to direct a contractor to discharge or remove a contractor employee. The head of CWMD, the official responsible for the entire office, did not issue any such directive and told Mr. Strickland in writing that the decision was "not up to the government" but "the company." Richardson's statement to Guy that Guy should "contact the company" was not within the authority of the officials making it—Lewandowski had no line-authority over a directive to any contractor personnel, political staffers had still less, and Richardson's own statement to take any action.

¶56. TechINT's decision to discharge Mr. Strickland ("you gave them ammo was its own. On information and belief, Noblis made the same choice as to fire you") confirms his removal from the contract. Two days passed before the decision to discharge him, or any reason for it, was communicated. During that Richardson himself understood the removal as a political response to protected speech rather than as a lawfully-compelled contract action.

¶42. Noblis and time, TechINT had the ability, and the legal obligation under § 4712(a)(3)(B), to decline to execute the request pending a lawful contract process. They did not. They were aware of the relentless harassment endured over the previous months, and they were aware that this

termination demand came knew from Lewandowski over a protected X post. Skip Funicello was forwarded the X post by Mr. Strickland that the demand had followed the political reaction to his post and confirmed to Mr. Strickland had itself concluded that the post did not violate his contract. On information and belief, Noblis approved or directed Mr. Strickland's permanent removal from the CWMD contract, and TechINT then discharged him, rather than resisting the demand, requiring a valid contractual basis for permanent removal, insisting on a contracting-officer directive, verifying the authority of whoever had made the demand, or reassigning him to other work—none of which, on information and belief, either of them did. TechINT then communicated the pretextual "outside the contract" reason. Noblis had exercised that same discretion nearly two months earlier when it declined to act on Joyner's claim that Mr. Strickland's Tesla critique was grounds to fire him, and in or about December 2024 when it declined to remove him over the press-article complaint.

¶57. Noblis exercised control over Mr. Strickland's employment on the CWMD contract. It participated in selecting and placing him on the contract; it served, through Mr. Nickerson, its CWMD program manager, as the regular channel for communications between DHS managers and TechINT concerning Mr. Strickland; it transmitted DHS managers' reporting demands on him through TechINT; it received, evaluated, and decided not to act on complaints about him from DHS personnel, including the press-article complaint and the March 25, 2025 Tesla complaint; on information and belief, it had authority, under the prime contract and the Noblis–TechINT subcontract, to approve, retain, reassign, and remove subcontractor personnel; and it transmitted the written communication stating that DHS would not permit Mr. Strickland on its property. On information and belief, TechINT could not keep Mr. Strickland on the contract over Noblis's direction. On information and belief, Noblis directed or approved Mr. Strickland's permanent removal from the CWMD contract, which materially contributed to TechINT's decision to discharge him.

¶58. When TechINT discharged Mr. Strickland and, on information and belief, Noblis removed him from the contract, they knew of his reports to Mr. Funicello and Mr. Nickerson that Joyner and Griffin were harassing him; knew of the press-article complaint alleged in Paragraph 29 and that Joyner had already tried to have him fired over his Tesla critique; and knew that a new position was being created to move him away from Joyner and Griffin because of that

harassment. Mr. Funicello also knew that Griffin and Joyner were hostile to Mr. Strickland and wanted him gone, knew of the disclosures described in Sections B through D, and understood that those disclosures were a reason for the reporting regime. TechINT knew from Mr. Strickland himself on the evening of May 15 that the demand followed the political reaction to his post. Mr. Strickland's protected disclosures were a contributing factor in ~~any way,~~ the removal and ~~that it was protected speech. They are therefore not shielded by~~ discharge: Joyner—whose conduct Mr. Strickland's disclosures had challenged, who had previously sought his discharge, and who, as Richardson later relayed, carried the ~~safe-harbor provision of § 4712(a)(3)(B).~~demand to the company—was hostile to him.

~~H.~~ I. The ~~Orchestrated Campaign~~ Course of Harassment ~~and Humiliation~~by DHS Managers

~~43.~~ 59. Independent of ~~the~~ his removal from the contract, DHS managers Griffin and ~~contractor personnel subjected~~ Joyner targeted Mr. Strickland beginning in or about December 2024 and, intensively from March 2025 until his removal, subjected him to a sustained ~~campaign~~ course of harassment, surveillance, and professional ~~isolation, and humiliation over a period~~ isolation. They professionally isolated him; stripped him of ~~months. That campaign included the deliberate professional isolation of Mr. Strickland within the workplace; the escalating demands, routed~~ IAD responsibilities; demanded through ~~Noblis,~~ Noblis that he account for his meetings, projects, and even his ~~conversations; and the imposition of~~ conversations, under a ~~uniquely burdensome~~ daily-reporting requirement imposed on no ~~other person~~ one else; and ~~designed~~ sought to ~~surveil, single out, and demean him for no other reason than AS Richardson taking favor in~~ surveil his ~~ability to perform over IAD leadership. This conduct served no legitimate supervisory purpose, was carried out to punish and demean Mr. Strickland, was extreme and outrageous, was undertaken intentionally or with reckless disregard~~ work for the ~~severe emotional distress it would cause,~~ Assistant Secretary who had assigned it. They did so in resentment of the Assistant Secretary's reliance on him and ~~did cause Mr. Strickland severe emotional distress.~~in hostility to the disclosures described in Sections B through D—Griffin and Joyner each received the Helene and drone disclosures in writing, and Joyner was the manager to whom the fentanyl disclosure was made—and the conduct continued through his objection to DAS Griffin on the morning of May 15, 2025.

~~I.~~ J. Harm

~~44.~~ 60. Mr. Strickland has suffered substantial economic, professional, and emotional harm. Although his TS/SCI clearance remains active, the circumstances of his ~~removal—coupled~~ removal, together with DHS's ~~false~~ public statement disclaiming responsibility for ~~it—have~~ it, have made him effectively unhireable at ~~the~~ his level of seniority ~~he has~~ in the national-security contracting ~~space~~ field in which he ~~had~~ built his career.

~~45.~~ 61. He has suffered lost wages, lost benefits, and lost future earning capacity in amounts to be proven at trial. He has suffered reputational harm ~~flowing~~ from the public and ~~politically-orchestrated~~ political nature of the reprisal, ~~including DHS's publicly-issued statements about his employment status. He has suffered~~ and serious emotional ~~distress flowing from the orchestrated, political,~~ distress, including sustained anxiety, sleeplessness, and ~~public nature of the reprisal. And he has suffered the particularized harm of being singled out as a warning to other federal-contractor employees who might otherwise disclose wrongdoing.~~ humiliation.

ADMINISTRATIVE EXHAUSTION

~~46.~~ 62. On September 3, 2025, Mr. Strickland, through counsel, submitted a ~~detailed whistleblower-retaliation~~ whistleblower-reprisal complaint under 41 U.S.C. § 4712 to the Whistleblower Protection Unit of the DHS Office of Inspector ~~General's Whistleblower Protection Unit. That~~ General. The complaint identified TechINT as his employer at the ~~protected disclosures,~~ time of the ~~retaliatory acts,~~ reprisal and Noblis as the prime contractor on the DHS CWMD contract, both in the complaint itself and in the transmittal email. It described his disclosures concerning the Hurricane Helene product, the drone-borne CBRN threats, the fentanyl-as-WMD issue he raised in meetings, and X posts concerning the Hamilton removal; the daily-log requirements and other hostility he endured; the Richardson call on May 15, 2025; the call from TechINT, relaying a call from Noblis, that he was banned from DHS property and no longer allowed to report to work; the termination that followed (which the complaint dated May 15, 2025, the date the removal began, although TechINT communicated the discharge on May 17, 2025); and the ~~responsible DHS officials. A copy~~ fact that TechINT itself had advised him, before his termination, to file a hostile-work-environment complaint because of the ~~OIG complaint is incorporated by reference and will be produced in discovery.~~ reprisal it had witnessed. This action does not allege that those X posts were a protected disclosure under § 4712.

~~47.~~ 63. More than 210 days have passed since ~~submission of~~ the ~~OIG complaint.~~ complaint was submitted. The head of ~~the executive agency~~ DHS has not issued an ~~order. No~~ order, no extension ~~of time~~ was agreed to under 41 U.S.C. § ~~4712(b)(2)(B). There~~ 4712(b)(2)(B), and there has been no ~~showing—and there cannot be a showing—that~~ showing that any delay is due to bad faith on ~~the part of the complainant. Accordingly, under~~ Mr. Strickland's part. Under 41 U.S.C. § 4712(c)(2), Mr. Strickland is ~~"deemed~~ deemed to have exhausted all administrative remedies with respect to the ~~complaint,"~~ complaint and ~~he~~ may bring this de novo ~~action. No administrative exhaustion~~ action against the contractor and subcontractor that carried out the reprisal. Section 4712(b)(1) requires only that the employee submit a complaint to the Inspector General, whose investigation is ~~required under 31 U.S.C. § 3730(h).~~ of the reprisal by the contractor or subcontractor concerned; the complaint identified the only contractor and subcontractor involved in Mr. Strickland's employment and removal. The complaint also described the daily-log requirements and other hostility, alleged that TechINT had witnessed the reprisal and advised Mr. Strickland to file a hostile-work-environment complaint, and described the removal as communicated by TechINT after a call from Noblis. It thus gave the Inspector General notice of the contractors involved, the alleged retaliatory course of conduct, and the removal and discharge for which Mr. Strickland seeks relief.

~~48.~~ 64. As to ~~the claim against~~ the United States, Mr. Strickland presented an executed Standard Form 95 to the ~~Department of Homeland Security,~~ DHS Office of the General ~~Counsel, Claims Division,~~ Counsel on December 16, 2025, asserting a sum certain of $7,000,000. More than six months have elapsed ~~since presentment~~ without final ~~disposition of the claim.~~ disposition. Under 28 U.S.C. § 2675(a), ~~Mr. Strickland~~ he may treat that failure as a final denial and bring ~~suit. Mr. Strickland has therefore exhausted his administrative remedies as to his Federal Tort Claims Act claim.~~ suit.

COUNT I — WHISTLEBLOWER ~~RETALIATION~~ REPRISAL UNDER 41 U.S.C. § 4712

(Against TechINT Solutions Group, LLC and Noblis, Inc.)

~~49.~~ 65. Mr. Strickland realleges and incorporates by reference each of the foregoing ~~paragraphs as if fully set forth herein.~~ paragraphs.

~~50.~~ 66. At all relevant times, Mr. Strickland was an employee of TechINT, a subcontractor, working under Noblis's prime contract with DHS. TechINT is a subcontractor, ~~subcontractor (TechINT) under~~ and Noblis is a ~~federal contract with DHS, and was therefore a "covered employee"~~ contractor within the meaning of 41 U.S.C. § ~~4712(a)(1). TechINT and~~ 4712. Section 4712(c)(2) authorizes this action "against the contractor, subcontractor, grantee, subgrantee, or personal services contractor" that subjected him to a prohibited reprisal. Noblis ~~are, respectively, a "subcontractor" and a "contractor" within the meaning of § 4712(a)(1). As to Noblis, the company~~ exercised ~~functional~~ control over his placement and continued service on the contract as alleged above. Noblis's liability under § 4712 does not depend on its being Mr. Strickland's ~~placement~~ employer, because the statute reaches a contractor that itself subjects a subcontractor's employee to reprisal. In the alternative, Noblis was his joint employer because, as alleged in Paragraphs 15, 30, and 57, it participated in his selection and placement, transmitted DHS managers' reporting demands concerning him, received and acted on DHS managers' personnel complaints about him, and, on information and belief, controlled whether he could remain on the CWMD ~~contract and took action functionally equivalent to an adverse employment action by conveying and effecting his removal; Noblis is therefore a proper defendant under § 4712.~~contract.

~~51.~~ 67. Mr. Strickland disclosed information he reasonably believed was evidence of one or more of the following: gross mismanagement of a Federal contract, an abuse of authority relating to a Federal contract, a substantial and specific danger to public health or safety, or a violation of law related to a Federal contract, as alleged in Paragraphs 20 through 27, Paragraphs 34 and 35, and Paragraph 37 (his statement to DAS Griffin on the morning of May 15, 2025). He made ~~multiple protected~~ those disclosures ~~within the meaning of~~ to persons described in 41 U.S.C. § ~~4712(a)(1),~~ 4712(a)(2). He made the Hurricane Helene and drone-borne CBRN disclosures, in writing, to ~~persons~~ Griffin, Joyner, Sena, and ~~bodies enumerated in § 4712(a)(2) — including federal employees~~ Crombach, and raised them with Ms. Dawson; he made the fentanyl-as-WMD disclosure to Joyner. Griffin, Joyner, Sena, Crombach, and Ms. Dawson were each a Federal employee responsible for contract ~~and grant~~ oversight or management at DHS (§ 4712(a)(2)(D)); Mike Kangior and Akram Khan, the latter a COR for another DHS ~~Office of Inspector General~~ program, were present when he raised the fentanyl issue with Joyner. He made the statement alleged in Paragraph 37 to DAS Griffin (§ ~~4712(a)(2)(B));~~ 4712(a)(2)(D)). He made the reports

alleged in Paragraph 34 to Mr. Funicello and ~~interagency working-group participants (including~~ Mr. Nickerson, management officials of ~~the Department of Defense) who participated in the fentanyl-WMD policy process. He reasonably believed those disclosures constituted evidence of (a) gross mismanagement of federal contracts, (b) gross waste of federal funds, (c) abuse of authority relating~~ TechINT and Noblis with responsibility to ~~federal contracts, (d) substantial and specific danger to public health and safety, and (e) violations of law, rule,~~ investigate, discover, or ~~regulation relating to federal contracts. His disclosures concerning the neglect of drone-borne CBRN threats and the suppression of the fentanyl-WMD work product bore a direct nexus~~ address misconduct (§ 4712(a)(2)(G)).

¶68. Each disclosure related to the CWMD contract. The drone-CBRN and fentanyl-WMD disclosures concerned the core subject matter of the ~~DHS~~ CWMD contract on which he ~~worked and squarely satisfy § 4712's requirement~~ worked. The Hurricane Helene disclosure concerned a product he reviewed under that ~~the disclosure relate to a Federal~~ contract. His ~~disclosures concerning~~ reports to TechINT and Noblis concerned DHS managers' misuse of their authority over contract work, including his own contract work. His May 15, 2025 statement to DAS Griffin concerned the ~~Hurricane Helene surveillance product and the FEMA matters constitute additional and alternative protected disclosures and, at a minimum, evidence the abuse~~ same misuse of supervisory authority ~~and danger to public health and safety that § 4712 protects.~~ over his contract work.

¶69. The ~~intelligence-community~~ exception in 41 U.S.C. § 4712(f) does not ~~bar Mr. Strickland's claim.~~ apply. Mr. Strickland was not an employee of a contractor or subcontractor of an element of the intelligence community: ~~his employer worked~~ TechINT and Noblis performed the CWMD contract, and neither CWMD nor ~~its~~ IAD ~~directorate~~ is an element of the intelligence ~~community under 50 U.S.C. § 3003(4). His disclosures concerning the neglect~~ community. Because he was not an employee of ~~drone-borne CBRN threats, the suppression of the fentanyl-WMD work product, and the FEMA matters were CWMD matters that did not relate to any activity~~ a contractor or subcontractor of an element of the intelligence ~~community~~ community, § 4712(f)(2) does not reach any of his disclosures regardless of their subject matter, and ~~were not~~ none of them was discovered during services provided to ~~any such element.~~ an element of the intelligence community. In any event, ~~each of those disclosures is independently protected, and~~

Mr. Strickland's his claim does not depend on the Hurricane Helene disclosure; even if that single disclosure were treated as relating to an activity each of an intelligence community element, the remaining other disclosures independently satisfy § 4712 supports it.

¶70. TechINT and are not within any exception.

¶52. Defendants discharged Noblis each took adverse action against Mr. Strickland as a reprisal for his protected disclosures: on information and belief, Noblis treated DHS's property-access message as requiring his permanent removal from the CWMD contract, and, by May 17, 2025, effected or approved that removal; TechINT discharged him from employment on May 15, 2025 and removed him from the DHS CWMD contract. That discharge is a "reprisal" within the meaning of 41 U.S.C. § 4712(a)(1).17, 2025.

53. 71. Mr. Strickland's protected disclosures were a contributing factor to his discharge in those actions within the meaning of 41 U.S.C. § 4712(c)(6), which incorporates the burden-shifting framework of 5 U.S.C. § 1221(e). His disclosures concerning the neglect of drone-borne CBRN threats and the suppression of the fentanyl-WMD work product bore a direct nexus to the subject matter of the CWMD contract on which he worked, were known to the relevant decisionmakers, and are independently protected. His early-May 2025 public statement concerning the FEMA matters were likewise protected activity. The relevant decisionmakers had actual knowledge of Mr. Strickland's protected conduct—including DAS Griffin, whom Mr. Strickland informed, mere hours before his termination on May 15, 2025, that he intended to pursue a hostile-workplace grievance concerning the harassment he had experienced in IAD; the adverse action was taken within days of the triggering event; and the decisionmakers expressly stated that Mr. Strickland's disclosures and public conduct—and the DHS political staff's reaction to them—were the reason for the firing. The close temporal proximity between the protected activity and the discharge is alone sufficient to establish the contributing-factor element. The Richardson telephone call ("you gave them ammo to fire you man") and the contemporaneous text message identifying Lewandowski by name as the individual who demanded the firing together establish causation directly, well beyond the knowledge-plus-timing showing the contributing-factor standard requires.

¶54. Defendants cannot carry their burden of showing, by clear and convincing evidence, that they would have taken the same action absent Mr. Strickland's protected disclosures, as required by 41 U.S.C. § 4712(c)(6) and 5 U.S.C. § 1221(e)(2). 1221(e). Mr. Funicello, TechINT's decisionmaker, and Mr. Nickerson, Noblis's program manager, knew of the reports described in Paragraph 34, which they themselves received, and, on information and belief, Mr. Nickerson participated in the removal decision or communicated that knowledge to the Noblis officials who made it. Both knew of the Tesla critique and of Joyner's attempt to have Mr. Strickland fired for it, and knew the reasons for the planned transfer. The removal and discharge came within months of those reports, after the reporting regime had escalated through April and May 2025, and, as Assistant Secretary Richardson later relayed, the demand was carried to the company by Joyner, a manager whose conduct his disclosures had challenged and who had already tried to have him fired. In addition, on information and belief, TechINT and Noblis acted on that demand without any inquiry into its source or basis, thereby permitting Joyner—who knew of and was hostile to the disclosures made to him or in his presence—to influence and proximately cause the removal and discharge. That the political reaction to the post supplied the occasion for the demand does not displace the disclosures as a contributing factor.

¶72. TechINT and Noblis cannot show by clear and convincing evidence that they would have taken the same actions in the absence of the disclosures. Mr. Strickland had just received a strongly positive annual evaluation, had been actively sought out by CWMD management was being moved to fill a newly-created newly created position, had no record of formal discipline, had never been told his work was outside his contract, and had just informed DAS Griffin of his impending transfer was discharged on the very morning of the firing. No performance-based "same decision" defense a stated reason that was false.

¶73. The reprisal is credible on these facts.

¶55. The safe harbor in not excused by 41 U.S.C. § 4712(a)(3)(B) does not shield Defendants. The May 15, 2025 removal 4712(a)(3)(B). Any request that TechINT and Noblis act against Mr. Strickland did not take the form of a non-discretionary directive, directive: the communications disclosed to Mr. Strickland were an informal, unexplained telephone message that he was not allowed on the property the next day; two days later, a relayed "concern" that he "may have been working on things outside of [his] contract"; and it did not come from an official acting a Noblis

email that repeated the property bar without stating any reason. None of them identified any contract provision, invoked any contract clause, or directed any personnel action, and DHS's Assistant Secretary told Mr. Strickland that the decision belonged to the company. Nor, on information and belief, was any such request within the authority of the ~~office~~ officials who made it: neither political staff, nor a temporary senior advisor, nor an IAD manager, nor the ~~official held. A "senior advisor" has~~ COR had authority to direct a contractor to discharge or remove a contractor employee, and, on information and belief, no ~~statutory line-authority over contractor personnel; political staffers have still less;~~ contracting officer issued any directive requiring his discharge or permanent removal from the contract. To the extent any request was prompted by the posts alleged in Paragraph 39, which were Mr. Strickland's speech as a private citizen on a matter of public concern, did not discuss his work at DHS, and, as TechINT itself concluded, did not violate his contract, no executive branch official had authority, consistent with the First Amendment, to direct a contractor to discharge or remove him as punishment for that speech. On information and ~~Richardson's~~ belief, Noblis made its own ~~statement confirms that~~ decision to remove him from the ~~request was a political demand, not a lawful contract directive. Defendants bear the burden of proving the safe harbor applies,~~ contract, and ~~they cannot identify the authorized official, the source of authority, or the mandatory character of any instruction. Defendants' execution of the request without contractual or legal basis cannot be cured by retroactively characterizing it as a "directive."~~ TechINT made its own decision to discharge him.

~~56.~~ 74. As a direct and proximate ~~result of Defendants' conduct,~~ result, Mr. Strickland has suffered and continues to suffer lost wages, lost benefits, lost future earning capacity, reputational harm, and ~~severe~~ emotional distress, ~~all~~ in amounts to be proven at trial. Under 41 U.S.C. § ~~4712(c)(1)(B) and (C),~~ 4712(c), he is entitled to reinstatement, compensatory damages including back pay, all employment benefits and other terms and conditions of employment that would have applied but for the reprisal, ~~compensatory damages,~~ affirmative relief to abate the reprisal, and attorneys' ~~fees~~ fees, expert-witness fees, and costs.

COUNT II ~~— FALSE CLAIMS ACT RETALIATION UNDER 31 U.S.C. § 3730(h)~~

~~¶(Against TechINT Solutions Group, LLC and Noblis, Inc.)~~

¶57. Mr. Strickland realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

¶58. At all relevant times, Mr. Strickland was an "employee, contractor, or agent" within the meaning of 31 U.S.C. § 3730(h)(1).

¶59. Mr. Strickland engaged in lawful acts in furtherance of "efforts to stop 1 or more violations" of the False Claims Act, within the meaning of 31 U.S.C. § 3730(h)(1). Those lawful acts included, without limitation: (a) his internal reporting and interagency advocacy concerning the suppression of the fentanyl-WMD memorandum, which Mr. Strickland reasonably believed involved false certifications to the federal government concerning the status and integrity of DHS's CWMD contract deliverables; and (b) his early-May 2025 public X post concerning the firing of Acting FEMA Administrator Cameron Hamilton which Mr. Strickland reasonably believed would result in federal funds being obtained or retained through false claims, false certifications, or fraudulent misrepresentations to the federal government. In each instance, Mr. Strickland communicated his concerns in terms of the integrity of federally-funded contract deliverables and the risk that the government was being provided or billed for work product that was incomplete, suppressed, or misrepresented, and in terms of federal funds being paid out or drawn down based on representations that were not supported by fact.

¶60. Mr. Strickland acted in good faith and with a reasonable belief that the conduct at issue violated the False Claims Act. His belief was both subjectively held and objectively reasonable based on the information available to him, including direct knowledge from his interagency role of the contract deliverables at issue, the political pressure to suppress them, and the reporting on the Lewandowski FEMA diversions.

¶61. Defendants knew, or were on notice, that Mr. Strickland's conduct was protected activity within the meaning of 31 U.S.C. § 3730(h). Mr. Strickland's internal objections concerning the suppression of the fentanyl-WMD memorandum were communicated to his supervisors and colleagues as objections to conduct that he believed was compromising the integrity of federal contract work-product. TechINT owner Skip Funicello had himself witnessed the retaliation against Mr. Strickland and, prior to his discharge, had advised him to file a hostile-work-environment complaint—confirming that they understood his conduct as protected

~~whistleblowing and not as ordinary workplace complaint. Most critically, the DHS reason for demanding Mr. Strickland's firing—as relayed by Richardson—was that Mr. Strickland had publicly exposed conduct the political actors wanted concealed. When Defendants received and executed the DHS removal directive, they did so with actual knowledge that the directive was a response to Mr. Strickland's protected activity, not to performance or contract compliance.~~

~~¶62. Defendants terminated Mr. Strickland because of his protected activity under § 3730(h)(1). The termination occurred within days of the public post, in direct response to the political reaction to them, and under the circumstances described above.~~

~~¶63. Under 31 U.S.C. § 3730(h)(2), Mr. Strickland is entitled to "all relief necessary to make [him] whole," including reinstatement with the same seniority status he would have had but for the discrimination; two times the amount of back pay; interest on the back pay; and compensation for any special damages sustained as a result of the discrimination, including emotional-distress damages, damages for reputational and career harm including the blacklisting effect of the reprisal, litigation costs, and reasonable attorneys' fees.~~

~~¶64. Count II is pleaded in addition to Count I. 41 U.S.C. § 4712(e) expressly provides that "[n]othing in this section may be construed . . . to modify or derogate from a right or remedy otherwise available to the employee." The two statutes impose distinct elements, distinct burdens, and distinct remedies, and Mr. Strickland is entitled to pursue both. To the extent there is any overlap in damages, the Court may apply standard offset principles at judgment; the statutory multipliers and remedies unique to § 3730(h) (including the 2x back pay multiplier and special damages) remain separately available.~~

~~¶COUNT III~~— INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER THE FEDERAL TORT CLAIMS ACT

(Against the United States of America)

~~65.~~ 75. Mr. Strickland realleges and incorporates by reference the allegations of Paragraphs 8 through 14 (jurisdiction, venue, and parties), Paragraphs 15 through ~~16~~ 19 (his role on the contract), Paragraph ~~29~~ 31 (the ~~escalating daily-reporting harassment directed at him),~~ reporting regime), Paragraph 32 (its purpose), Paragraph 33 (his compliance), Paragraph 37 (the May 15,

2025 meeting with DAS Griffin), Paragraph 59 (the course of harassment), and Paragraph ~~43 (the orchestrated campaign of harassment, isolation, and humiliation) as if fully set forth herein.~~ 64 (administrative presentment). This Count rests solely on the ~~independent~~ course of harassing, ~~isolating,~~ surveilling, and ~~humiliating~~ isolating conduct described in those ~~paragraphs, and~~ paragraphs. It does not rest on, arise out of, or depend ~~upon~~ on any allegedly false statement, ~~any communication to third parties, the~~ on Mr. Strickland's removal ~~of Mr. Strickland~~ from the ~~contract,~~ contract or discharge, or on any interference with his contractual ~~relationships.~~relationships. That Griffin and Joyner transmitted demands through Noblis is alleged only as the means of imposing the regime, not as a communication tort.

~~66. This claim is brought against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–2680.~~ 76. The DHS ~~officials~~ managers whose ~~supervisory~~ conduct is described in this ~~Count—including Deputy Assistant Secretary~~ Count—DAS Steve Griffin and Carlos Joyner, who directed and escalated the ~~campaign~~ harassment, surveillance, and isolation of ~~harassment, professional isolation, and demeaning daily-reporting demands against~~ Mr. Strickland—were ~~federal officials and "employee[s]~~ employees of the ~~government"~~ government within the meaning of 28 U.S.C. § ~~2671, and not contractors.~~ 2671. Although ~~certain~~ some of ~~the demeaning reporting~~ their demands were transmitted ~~to Mr. Strickland~~ through Noblis, ~~they were~~ Griffin and Joyner originated, directed, and imposed ~~by Griffin and Joyner, federal officials, and the tortious conduct is therefore that of employees of the United States and not that of any contractor. To the extent~~ them.

~~¶~~77. Griffin and Joyner acted within the scope of their federal ~~employment, the United States is liable for their conduct.~~ employment. Under District of Columbia law, conduct may fall within the scope of ~~employment, for purposes of respondeat superior,~~ employment even where it is unauthorized, forbidden, or wrongful, so long as it is ~~incidental to~~ of the ~~conduct~~ kind the employee ~~was~~ is employed to ~~perform~~ perform, occurs within the time and space limits of the employment, and is actuated at least in part by a purpose to serve the employer. The ~~supervision,~~ tasking, reporting requirements, and ~~personnel~~ oversight of contractor analysts in IAD were within Griffin's and Joyner's ordinary duties; they imposed the ~~ordinary duties of Griffin and Joyner, and the harassing and demeaning manner in which they exercised those supervisory functions was incidental to them. The~~ demands at ~~issue—for reporting of meetings, projects, and~~

~~conversations—were imposed~~ issue through the ~~very~~ channels of supervisory tasking and reporting ~~oversight that Griffin and Joyner~~ they were employed to administer, during working hours at the DHS workplace, and ~~were thus carried out in the conduct of, and~~ actuated at least in part by a purpose to serve ~~the employer's~~ DHS's interest ~~in, the supervision of~~ in supervising IAD ~~personnel,~~ contract work, however wrongful the manner in which they abused that ~~authority was abused. The United States is therefore liable in the same manner and to the same extent as a private employer would be under the law of the District of Columbia, where the acts occurred.~~ authority.

¶78. Under 28 U.S.C. § 2674, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances." ~~The relevant~~ A private ~~analog is not the abstract supervision~~ entity whose managers exercised day-to-day supervisory authority over contractor personnel and deliberately subjected one of ~~a workforce, but the specific conduct challenged here: an individual who deliberately subjects another person~~ them to a sustained campaign of ~~torment,~~ surveillance, humiliation, and ~~degradation. A private person—including a private supervisor or a private employer acting through its supervisors—who engaged in that specific conduct~~ degradation would be liable for intentional infliction of emotional distress under ~~the law of the District of Columbia. The claim therefore rests on a duty owed by private persons under~~ District of Columbia ~~tort~~ law, where the acts occurred. The claim rests on that duty, not on any duty ~~derived from~~ created by federal ~~statute, regulation,~~ statute or ~~the internal management prerogatives of a federal agency. This scope-of-employment allegation is pleaded in the alternative to, and without prejudice to, Plaintiff's allegations in Counts I and IV that the political demand for Mr. Strickland's removal lay outside the lawful authority of the officials who made it.~~regulation.

~~67.~~ 79. Under District of Columbia law, ~~a claim for~~ intentional infliction of emotional distress requires ~~(1)~~ extreme and outrageous conduct that ~~(2)~~ intentionally or recklessly ~~(3)~~ causes ~~the plaintiff~~ severe emotional distress. ~~The conduct of DHS officials satisfies each element.~~

~~¶68. The extreme and outrageous conduct consisted of a sustained and orchestrated campaign in which~~ Griffin and ~~Joyner,~~ Joyner engaged in a deliberate course of conduct, over a period of ~~weeks~~ months and continuing ~~until Mr. Strickland's removal, deliberately set out to torment, degrade,~~ through May 15, 2025, that degraded and ~~break~~ isolated a ~~subordinate, and persisted in~~

~~that course knowing it was inflicting serious distress on him. This was personal mistreatment directed at Mr. Strickland in~~ productive analyst whom the ~~workplace, separate and apart from any communication to third parties and separate from the act~~ head of ~~removing~~ CWMD trusted more than he trusted them: professionally isolating him, stripping him ~~from the contract: the deliberate professional isolation~~ of ~~Mr. Strickland; the calculated stripping of his analytic responsibilities to render his presence meaningless; the imposition of uniquely burdensome and demeaning daily-reporting requirements—requiring~~ IAD responsibilities, forcing him to account ~~even~~ each day for every conversation he had, and seeking to surveil his ~~conversations—imposed on no one else and designed to single~~ work for the Assistant Secretary who had assigned it, singling him out ~~before his peers~~ alone among the analysts on the contract. Even though carried out through supervisory channels and ~~degrade him; and~~ actuated in part by a ~~campaign of escalating hostility designed~~ purpose to ~~surveil, demean, and drive him out. This pattern of conduct, directed at a productive analyst who had just received a strongly positive evaluation and been selected for advancement, was undertaken intentionally to humiliate and break him, was continued after its effect on him was apparent, served no~~ oversee IAD work, that conduct went beyond any legitimate supervisory ~~purpose, and~~ need, was not an ordinary personnel ~~action such as a reassignment, a poor evaluation, or a disciplinary investigation, but a deliberate course of torment that exceeds~~ action, and exceeded all bounds of decency tolerated in a civilized community.

~~69. DHS officials engaged in this conduct~~ 80. Griffin and Joyner acted intentionally, or with reckless disregard of the near-certainty that severe emotional distress would result. ~~The~~ Their conduct ~~did in fact cause~~ caused Mr. Strickland severe emotional distress, including sustained anxiety, sleeplessness, humiliation, and a profound sense of professional and personal ~~injury arising from being targeted, surveilled,~~ injury. That distress was caused by the course of harassment alleged in this Count, independent of his later removal and ~~abruptly cast out of a career and a clearance-dependent profession he had spent years building, the effects of which have persisted since May 2025.~~discharge.

~~70.~~ 81. This claim does not arise out ~~of, and is not dependent upon,~~ of any libel, slander, misrepresentation, deceit, or interference with contract rights. ~~It rests on independent outrageous conduct—the orchestrated harassment, professional isolation, and demeaning treatment of Mr.~~

~~Strickland in the workplace — that is itself tortious, and actionable as intentional infliction of emotional distress, without regard to and independent of any false or defamatory statement, any misrepresentation, and any interference with a contractual relationship.~~ Intentional infliction of emotional distress is not among the torts ~~enumerated~~ listed in 28 U.S.C. § 2680(h), and ~~because~~ this claim ~~does not arise out of~~ rests on independent conduct that is tortious without regard to any ~~enumerated tort, it is not barred by § 2680(h).~~ statement or any contractual relationship.

~~71.~~ 82. The discretionary-function exception, 28 U.S.C. § 2680(a), does not bar this claim. ~~The exception is confined to governmental decisions grounded~~ Count II does not challenge a policy judgment about what work contractor analysts should perform or what generally applicable reporting procedures IAD should use. It challenges the individualized manner in ~~considerations of public policy — the kind of judgment the exception was designed to shield from second-guessing~~ which Griffin and Joyner singled out Mr. Strickland for surveillance, humiliation, and professional isolation through ~~tort. Subjecting an analyst to professional isolation, demeaning treatment, and a uniquely burdensome daily-reporting requirement~~ requirements imposed on no ~~one else~~ other analyst and extending to every workplace conversation. That targeted harassment is not a judgment grounded in ~~any~~ considerations of public policy ~~consideration. It involves no permissible exercise of discretion of the sort § 2680(a) protects,~~ and ~~it~~ is not susceptible to policy ~~analysis. Harassing~~ analysis merely because Griffin and ~~demeaning a subordinate serves no governmental policy and reflects no legitimate, policy-grounded choice; conduct of that character falls outside the exception regardless of the rank of the officials who engaged in it.~~ Joyner used supervisory channels to carry it out.

~~72.~~ 83. The scope-of-employment ~~allegation pleaded above and~~ allegations in Paragraph 77 are consistent with the inapplicability of the discretionary-function ~~exception are not inconsistent.~~ exception. Scope of ~~employment, for purposes of respondeat superior,~~ employment is a broad concept that can ~~encompass even unauthorized, forbidden, or~~ include wrongful acts incidental to an employee's duties; the discretionary-function ~~exception, by contrast,~~ exception is ~~a narrow immunity~~ confined to ~~judgments grounded~~ policy-grounded judgments. Those allegations concern the supervisory conduct underlying this Count and do not allege that Griffin, Joyner, or any other official had authority to direct the removal or discharge at issue in ~~public policy. Conduct may therefore fall within the scope of employment — so that the United States is~~

~~answerable for it—while still falling outside the discretionary-function exception, because it is not the kind of policy-grounded judgment the exception shields. That is precisely the case here: Griffin's~~ Counts I and ~~Joyner's harassing exercise of their supervisory functions was incidental to their employment, yet it was no protected discretionary choice.~~III.

~~73.~~ 84. As a direct and proximate ~~result of the conduct of DHS officials,~~ result, Mr. Strickland has suffered severe emotional distress and related harm. The United States is liable to ~~Mr. Strickland~~ him for compensatory damages in an amount ~~not~~ to ~~exceed the sum certain of $7,000,000 presented in his administrative claim, as required by~~ be determined at trial, subject to 28 U.S.C. § 2675(b).

COUNT ~~IV~~ III — TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONS

(Against Noblis, Inc.)

~~74.~~ 85. Mr. Strickland realleges and incorporates by reference ~~each of the foregoing paragraphs as if fully set forth herein.~~Paragraphs 1 through 64.

~~75.~~ 86. At all relevant times, Mr. Strickland had a valid contractual employment relationship with TechINT and a valid business expectancy of continued employment ~~and advancement, including the newly-created CWMD Strategy team~~ with TechINT. The new Strategy-team position being created for ~~which he had been selected.~~ him was evidence that his continued employment was reasonably probable. Noblis knew of that relationship and that expectancy.

~~76.~~ 87. On information and belief, Noblis intentionally interfered with that relationship and expectancy by treating DHS's unexplained property-access message as requiring Mr. Strickland's permanent removal from the CWMD contract, effecting that removal, and thereby procuring or materially contributing to TechINT's termination of his employment. In the alternative to the allegations in Paragraphs 57 and 66 that Noblis controlled Mr. Strickland's employment ~~relationship~~ and ~~business expectancy by conveying~~ was his joint employer, and ~~effecting the demand that he be removed from the contract, thereby causing TechINT to terminate his employment. Noblis was a stranger to that employment relationship: Mr. Strickland's contract of employment was with TechINT alone,~~ as Rule 8(d) permits, Noblis was

not a party to ~~it,~~ the employment relationship between TechINT and Mr. Strickland and was not the agent of ~~TechINT or of Mr. Strickland and did not act within the scope of any agency for~~ either of ~~them. Noblis's separate status as the prime contractor on the Government engagement did not make it a party to, or an agent within, the distinct employment relationship between TechINT and its employee. Noblis was therefore a third party capable of tortiously interfering with that relationship.~~them.

~~77.~~ 88. Noblis used improper methods. First, on information and belief, Noblis ~~knew,~~ knew from the ~~circumstances under which~~ circumstances—including Mr. Strickland's reports of harassment, Joyner's earlier attempt to have him fired over the Tesla critique, the absence of any reason or contracting-officer direction, and the timing—that the demand ~~reached it on the evening of May 15, 2025, that the demand~~ was a reprisal, and by effecting his permanent removal and thereby procuring or materially contributing to ~~remove Mr. Strickland was not a lawful exercise of contract authority but an unlawful retaliatory act—a politically-motivated reprisal for Mr. Strickland's protected disclosures and protected speech, originating from DHS political personnel rather than from any contracting officer. By knowingly carrying out and giving effect to that demand,~~ his discharge, Noblis itself ~~engaged in conduct made unlawful by~~ violated 41 U.S.C. § ~~4712 and 31 U.S.C. § 3730(h), which prohibit a contractor from effecting a reprisal against a covered employee; Noblis's own participation in procuring the discharge was therefore independently illegal, not merely ill-motivated. Carrying out~~ 4712. Procuring a discharge through conduct that ~~the interfering party knows to be an unlawful act of retaliation~~ federal law prohibits is an improper ~~method~~ method.

¶89. Second, the circumstances confirm that Noblis was carrying out the reprisal rather than exercising a contractual right in good faith; a contractual power to remove subcontractor personnel is not a right to remove them for a reason federal law prohibits. Even if Noblis held contractual discretion over subcontractor personnel, it did not exercise that discretion in response to any contractual request: the communications disclosed to Mr. Strickland were an unexplained message that he was not to come onto the property the next day and a Noblis email repeating the bar without any reason, not a request or directive under ~~Virginia law, independent of motive.~~

~~¶78. Independently,~~ the prime contract or the subcontract, and, on information and ~~whether or not Noblis's conduct is itself found to violate 41 U.S.C. § 4712 or 31 U.S.C. § 3730(h),~~ belief, no

contracting officer invoked any contract provision. On information and belief, Noblis ~~used improper methods by departing~~ went beyond relaying that message: it effected Mr. Strickland's permanent removal from the ~~established standards governing~~ contract, thereby procuring or materially contributing to his discharge. The only reason TechINT later gave was pretextual. On information and belief, Noblis effected that removal without requesting a ~~prime contractor's handling of subcontractor personnel actions. A prime contractor in Noblis's position does not effect the abrupt discharge of a cleared analyst on the basis of an unexplained, informal evening telephone communication. The established and reasonable practice is to require or seek a lawful basis — a~~ contracting-officer instruction, ~~a documented for-cause determination, or some authorized contractual direction — before giving effect to such an action. Noblis sought none. It did not request a written contracting-officer instruction, did not verify~~ verifying that the demand came from ~~any~~ an official with ~~authority over contractor personnel, did not inquire~~ authority, or inquiring into ~~the basis for the removal, and afforded Mr. Strickland no process, despite knowing the demand emanated from political personnel rather than from a contracting officer. That disregard of the standards governing~~ its ~~trade is an improper method under Virginia law independent of any statutory violation, and is not privileged business conduct.~~basis.

~~79.~~ 90. Noblis had no legitimate business justification for ~~procuring~~ participating in a reprisal prohibited by federal law. The unexplained property bar did not on its face require Mr. Strickland's ~~discharge.~~ permanent removal or discharge, and no performance deficiency or contract violation had been identified to him. On information and belief, ~~the purported ban of Mr. Strickland from DHS property was~~ Noblis acted not to protect a ~~genuine, independently-grounded access determination by a security authority,~~ legitimate contractual interest but ~~was itself an instrument of the same political reprisal, and Noblis understood it to be such; no reason was given for the ban when it was first communicated, and the "outside the contract" rationale was manufactured only two days later. Even accepting that Mr. Strickland could no longer report to the DHS property, both Noblis and TechINT held other contracts at locations other than the DHS property, and Noblis possessed the contractual ability to reassign Mr. Strickland to other work rather than to procure his discharge. Mr. Strickland was never offered any reassignment. Noblis chose to procure his discharge in order~~ to carry out the ~~political demand. A business justification that is itself a pretextual product of the unlawful reprisal, and that ignores an~~

available non-retaliatory alternative, does not privilege Noblis's conduct.retaliatory demand alleged above.

80. 91. As a direct and proximate result of Noblis's interference, result, Mr. Strickland's employment was terminated, terminated, and he lost wages, benefits, future earning capacity, and professional standing, entitling him to compensatory damages. Separately, standing. Noblis acted with actual malice and with reckless willful and wanton disregard of Mr. Strickland's rights: on information and belief, it knew the demand was an unlawful a reprisal, it had a non-retaliatory alternative available—reassignment knew of Mr. Strickland's harassment reports and Joyner's earlier attempt to other Noblis or TechINT work away have him fired, and chose to effect his permanent removal from the DHS property—and it chose CWMD contract anyway, thereby materially contributing to procure his TechINT's discharge anyway. That conscious choice decision, rather than pursue any lawful alternative. Mr. Strickland is entitled to carry out a known-unlawful reprisal, in disregard of an available lawful alternative, supports an award of compensatory damages and to punitive damages.damages as permitted by Virginia law.

COUNT V—DECLARATORY AND INJUNCTIVE PRAYER FOR RELIEF

(Against WHEREFORE, Plaintiff Matthew Strickland respectfully requests that the Court enter judgment in his favor and against Defendants, jointly and severally as to TechINT Solutions Group, LLC and Noblis, Inc.)Noblis where appropriate, and severally as to the United States, and grant the following relief:

81. Mr. Strickland realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

¶82. Pursuant to A. A declaration under 28 U.S.C. §§ 2201 2201–2202 that TechINT and 2202 and this Court's traditional equitable powers, Noblis subjected Mr. Strickland seeks to a declaration that his termination on May 15, 2025 violated reprisal prohibited by 41 U.S.C. § 4712 and 31 U.S.C. § 3730(h), and that the reprisal was not excused by the safe harbor in § 4712(a)(3)(B).4712(a)(3)(B);

83. Mr. Strickland further seeks injunctive relief B. An order requiring Defendants TechINT and Noblis, as applicable, to (a) expunge all adverse employment records pertaining to the May 15,

~~2025 removal; (b) cease and desist from any further retaliatory conduct, including interference with Mr. Strickland's pursuit of other federal-contract employment and the communication of any knowingly false or retaliatory statements about Mr. Strickland to prospective employers or contracting officers; (c)~~ reinstate Mr. Strickland to a position comparable to the one he held on May 15, 2025, with ~~restored contract-sponsorship, clearance-eligible duties, and status, and with the opportunity for clearance sponsorship to be re-initiated through ordinary channels, or, in the alternative if this Court finds reinstatement to be impracticable under the circumstances, award front pay as an equitable substitute for reinstatement in an amount to be determined by the Court; and (d) take such other affirmative steps as this Court deems necessary to abate the reprisal and make Mr. Strickland whole. Mr. Strickland does not seek, and this Court need not review or direct, any security-clearance adjudication.~~

~~¶PRAYER FOR RELIEF~~

~~¶WHEREFORE, Plaintiff Matthew Strickland respectfully requests that this Court enter judgment in his favor and against Defendants, jointly and severally where appropriate, and grant the following relief:~~

~~¶A. A declaration that Defendants TechINT and Noblis's termination of Mr. Strickland on May 15, 2025 violated 41 U.S.C. § 4712 and 31 U.S.C. § 3730(h);~~

~~¶B. An order reinstating Mr. Strickland to a position comparable to the one he held on May 15, 2025, with restored clearance-sponsorship, contract access, and~~ all terms and conditions of employment ~~as if~~ that would have applied but for the ~~reprisal had not occurred,~~ reprisal, or, ~~in the alternative~~ if the Court finds reinstatement ~~to be~~ impracticable, ~~an award of~~ front pay ~~as an equitable substitute for reinstatement~~ in ~~an amount sufficient to compensate Mr. Strickland for the full period during which he would have continued in his position but for the reprisal;~~ lieu of reinstatement;

C. Compensatory ~~damages,~~ damages under 41 U.S.C. § 4712, including back pay and the value of all employment benefits Mr. Strickland would have received but for the reprisal, ~~under 41 U.S.C. § 4712(c)(1)(B)~~ and ~~31 U.S.C. § 3730(h)(2);~~

~~¶D. Two times the amount of back pay, plus interest, under 31 U.S.C. § 3730(h)(2);~~

¶~~E. Special~~ damages ~~under 31 U.S.C. § 3730(h)(2), including damages for emotional distress, reputational and career harm, and the broader harms flowing from the public and politically-orchestrated nature of the reprisal;~~

¶~~F. Compensatory damages under 41 U.S.C. § 4712~~ for reputational harm, emotional distress, and ~~all~~ other non-economic ~~harms,~~ harm, in an amount to be proven at trial;

~~G.~~ D. Compensatory damages against the United States under the Federal Tort Claims Act ~~for the intentional infliction of emotional distress,~~ in an amount to be proven at ~~trial not~~ trial, subject to ~~exceed the $7,000,000 sum certain presented administratively;~~ 28 U.S.C. § 2675(b);

~~H.~~ E. Compensatory and punitive damages against Noblis on the Virginia tortious-interference claim, in amounts to be determined at trial;

~~I.~~ F. Affirmative relief to abate the reprisal, including expungement, from the records TechINT and Noblis control, of all adverse employment records arising from the May 2025 removal and discharge; provided that Mr. Strickland does not seek an order directing DHS to make any security-clearance, suitability, facility-access, or system-access determination, and does not seek review of any security-clearance adjudication;

¶G. Reasonable attorneys' fees, expert-witness fees, and ~~litigation~~ costs under 41 U.S.C. § ~~4712(c)(1)(C) and 31 U.S.C. § 3730(h)(2);~~ 4712(c);

~~J. Affirmative equitable relief abating the reprisal, including (i) expungement of all adverse employment records stemming from the May 15, 2025 removal from Defendants' files and any records Defendants control; (ii) injunctive relief against future retaliatory conduct, interference with Mr. Strickland's prospective federal-contract employment, and the communication of knowingly false or retaliatory statements about Mr. Strickland to prospective employers or contracting officers; and (iii) such other equitable relief as the Court deems appropriate to ensure Mr. Strickland is made whole, provided that Plaintiff does not seek and the Court need not review any security-clearance adjudication;~~

¶~~K.~~ H. Pre-judgment and post-judgment interest against TechINT and Noblis at the maximum rates allowed by law, and post-judgment interest against the United States to the extent allowed by law; and

L. I. Such other and further relief as the Court deems just and proper.

JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable, pursuant to under 41 U.S.C. § 4712(c)(2), 31 U.S.C. § 3730(h), 4712(c)(2) and Rule 38 of the Federal Rules of Civil Procedure. Plaintiff acknowledges that Count III, brought II, against the United States under the Federal Tort Claims Act, is to be tried to the Court pursuant to under 28 U.S.C. § 2402, and the jury this demand does not extend to that count.Count.